# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| APPLE INC.        ) | |
|          Movant,      ) | |
|             ) | |
|     v.        ) | Misc. Case No. |
|        ) | _____ |
| OMNI BRIDGEWAY (USA) LLC     ) | |
|        ) | |
|        Respondent.    ) | (*MPH v. Apple Inc.*, Case No. 3:18- |
|        ) | cv-05935-TLT; pending in U.S.D.C. |
|        ) | N.D. Cal.) |

## DECLARATION OF BRIAN A. BIGGS IN SUPPORT OF APPLE INC.'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA TO OMNI BRIDGEWAY LLC

I, Brian A. Biggs, declare as follows:

1.      I am over 18 years of age and competent to make this declaration. I submit this declaration in connection with Apple Inc.'s ("Apple") Motion to Compel Compliance with Subpoena to Omni Bridgeway (USA) LLC ("Omni"). I provide the statements in this declaration upon my personal knowledge. If called to testify as a witness in this matter, I could and would testify competently and truthfully to each of the statements in this declaration under oath.

2.      I am an attorney and partner at DLA Piper LLP (US) located in Wilmington, Delaware, where I have been employed since 2012. I represent the Movant, Apple Inc., which is a named defendant in the underlying litigation, *MPH Techs. Oy v. Apple Inc.*, Case No. 3:18-cv-05935-TLT, currently pending in the United States District Court for the District of Northern California (the "N.D. Cal. Litigation"). I am familiar with the underlying litigation.

3.      Attached hereto as Exhibit A is a true and correct copy of the Amended Subpoena to Omni, a Delaware limited liability company, served by Apple on Omni's registered agent for service of process in Delaware on December 4, 2023.

1

4.     Attached hereto as Exhibit B is a true and correct copy of Omni's objections to Apple's Amended Subpoena, dated January 18, 2024.

5.     Attached hereto as Exhibit C is a true and correct copy of Omni's Annual Report 2023, retrieved from https://omnibridgeway.com/InvestorPresentations/omni-bridgeway-annual-report-2023/16/.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 3, 2024, in Wilmington, Delaware.

Brian A. Biggs (DE Bar No. 5591)

# EXHIBIT A
# [FILED UNDER SEAL]

# EXHIBIT B

January 18, 2024

**By First Class Mail and Electronic Mail**

Hannah Cannon
WSC LLP
500 Molino Street, 118
Los Angeles, CA, 90013
hcannom@wscllp.com

Re:     Subpoena Regarding MPH Technologies Oy v. Apple, Inc., Case No. 18-05935 (N.D. Cal.)

Counsel:

I write regarding the subpoena for deposition testimony and documents served on Omni Bridgeway (USA) LLC ("Omni") by Defendant Apple, Inc. ("Apple") on December 4, 2023 (the "subpoena") in the above-referenced matter.

Omni is not a party to the above-referenced matter, and as set forth in Omni's objections and responses below, the subpoena does not coherently state what information it seeks; why the information sought by the subpoena is discoverable in the underlying litigation; and why information requested by the subpoena cannot be obtained directly from a party to the underlying action.  Omni is willing to meet and confer to discuss the scope of the subpoena; however, Omni is currently unable to respond to the subpoena as it is unable to discern the scope of the subpoena.

Further, as set forth in the following objections and responses to the subpoena, as the deposition request is unduly burdensome and unnecessary, Omni is not willing to provide a witness to testify or appear for the scheduled deposition.  It is improper to require a third party such as Omni to produce a witness to provide deposition testimony on subject matters and information that could be obtained from another source, such as documents and other non-testimonial sources of information.

Accordingly, I invite you to contact me at jen@warrenkashwarren.com to discuss the subpoena further.  In the meantime, Omni makes the following objections and responses to the subpoena and its enumerated requests.

**Objections to Subpoena**

In addition to Omni's specific responses and objections to the deposition subpoena and document requests stated below, Omni makes the following general objections to the subpoena.  The below objections are also incorporated in the responses and objections to the enumerated requests and topics stated below.

1.      Omni objects to the subpoena on the grounds that it imposes an undue burden on Omni, which is not a party to the underlying action.  Omni further objects to the subpoena to the extent it seeks documents or information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is less burdensome or less expensive than requiring third-party Omni to produce such documents or information.  As a non-party, Omni should not bear the

burden of searching for and providing such documents or information until Apple has exhausted all reasonable avenues of obtaining this information directly from alternative sources.

2.      Omni objects to the subpoena to the extent it seeks documents or information that are not proportionate to the needs of the case or not relevant to any party's claims or defenses.  Moreover, as the subpoena lacks both a copy of the underlying complaint or a description of the pertinent claims, Omni cannot determine the extent to which documents or information the subpoena seeks are relevant to the underlying litigation.  Omni is unable to discern whether the documents or information sought by the subpoena are discoverable, and what, if any, obligation it has to respond to the subpoena.

3.      Omni objects to the subpoena on the grounds that the requests are so unreasonably broad in scope as to be unduly burdensome.

4.      Omni objects to the time and place set by the subpoena for the deposition.  The time and place of the requested deposition were selected unilaterally without consulting with Omni about the availability of its witness(es) or its counsel.  To the extent Omni produces a witness to provide deposition testimony in response to the subpoena, Omni shall do so at a mutually agreeable time and place.

5.      Omni objects to the subpoena on the grounds that it demands that Omni produce a witness to provide deposition testimony at Omni's own expense.  To the extent that Omni produces a witness to provide deposition testimony in response to the subpoena, Omni shall only do so if properly compensated under applicable law for any costs, including attorney fees, incurred by Omni and its witness(es) in connection with the deposition.

6.      Omni objects to the subpoena on the grounds that it calls for documents or information over an unspecified or overly broad period of time and created after the filing of the complaint.

7.      Omni objects to the subpoena to the extent that it is vague, ambiguous, or unlimited in time or scope.

8.      Omni objects to the subpoena to the extent it fails to provide information sufficient to enable Omni to conduct a reasonable search for documents and information responsive to the subpoena, if any. Without such information, the subpoena would subject Omni to an unreasonable burden of conducting an overbroad inquiry and search for responsive documents or information.

9.      Omni objects to the subpoena to the extent it purports to require Omni to perform anything more than a reasonable and diligent search for documents (including electronic documents) from reasonably accessible sources (including electronic repositories).

10.     Omni objects to the subpoena to the extent it seeks electronically stored information that is not reasonably accessible to Omni.

11.     Omni objects to the subpoena to the extent it seeks information protected by any privilege, including the attorney-client privilege, work product immunity doctrine, common interest privilege, or any other applicable privilege, immunity, or restriction on discovery.  To the extent the subpoena seeks documents created because of litigation, Omni objects on the grounds that such documents are protected work product.  Any disclosure of privileged information by Omni in response to the subpoena shall not be deemed a waiver of any such privilege, and Omni expressly requests that any party that receives any such privileged information produced by Omni immediately return and not make use of any produced privileged information.

12.     Omni objects to the subpoena to the extent it seeks confidential financial, proprietary or trade secret information belonging to Omni or a third party, or any other information subject to a confidentiality agreement, protective order or legal duty of non-disclosure ("Confidential Information"), for example, insofar as the subpoena seeks information about "patent licensing offers by third parties to Omni via Omni's patent licensing program."  Omni will only produce information it deems confidential under a confidentiality agreement or protective order that it believes is suitable for the protection of its Confidential Information.  Even if an adequate protective order has been entered in the underlying action by the presiding court, Omni will only provide Confidential Information to the extent Omni can do so consistent with its legal, contractual and other confidentiality obligations.  Omni reserves the right to redact Confidential Information belonging to Omni or third parties, as well as information concerning irrelevant matters.

13.     Omni objects to the subpoena's definitions and instructions to the extent they purport to impose obligations on Omni in excess of any applicable federal or state codes of civil procedure, rules of evidence, or any other applicable law.

14.     Omni objects to the subpoena's definition of "Omni," "You," and "Your" on the grounds that the definition renders the subpoena overbroad, vague and ambiguous, and unduly burdensome.  These definitions call for speculation and a legal conclusion, and lead to the imposition of disproportionate discovery by seeking to include, among other things, other entities, including predecessors, affiliates, indirect parents, past or present directors, officers, agents, affiliates, representatives, consultants, attorneys, and the like.  Omni further objects to the subpoena to the extent it seeks information not currently in the possession, custody, or control of Omni.  For purposes of any request or topic incorporating the terms "Omni Bridgeway," "You" or "Your," the definitions are construed to mean only Omni Bridgeway, LLC.  Omni is not responding on behalf of any other person or entity.

15.     Omni objects to the subpoena to the extent it seeks documents or information that is not currently in the possession, custody, or control of Omni.

16.     Omni objects to the subpoena's definition of "MPH Patents" on the grounds that such definition renders the subpoena overbroad, vague and ambiguous, and unduly burdensome, especially insofar as the definition purports to broadly cover "any U.S. or foreign patent assigned to or owned by MPH," without establishing their relevance to any party's claims or defenses, and places the burden on Omni to determine what falls into the category Apple constructed.  To the extent any use of the defined term "MPH Patents" is understandable, Omni understands these requests as pertaining only to the enumerated patents U.S. Patent Nos. 8,346,949; 9,762,397; 9,712,494; 9,712,502; 9,838,362; 7,620,810; 7,937,581; and 8,037,302.

17.     Omni objects to the subpoena's definition of "MPH" on the grounds that the definition renders the subpoena overbroad, vague and ambiguous, and unduly burdensome, especially to the extent that it places the burden on Omni to identify "officers, directors, employees, partners, corporate parent(s), predecessors, subsidiaries, agents, or affiliates thereof, past or present," of "MPH Technologies Oy." Omni further objects to the definition insofar as it seeks information that is already in the parties' possession, such as those documents already produced in this litigation, documents equally available to the parties to the action, or information that could otherwise be obtained by Apple from any party to the case, or any other non-party sources that are more convenient, less burdensome, or less expensive, including information available to Apple from public sources.

18.     Omni objects to Instruction Nos. 10 through 14 on the grounds that they purport to impose obligations on Omni in excess of the Federal Code of Civil Procedure, the Federal Rules of Evidence, or any other applicable law.  Omni further objects to the extent that the instructions demand the production

of information or documents not kept in the ordinary course of business, especially the admonition of Instruction No. 10 purporting to require Omni to search "all files or other sources that contain responsive Documents and things, wherever located and whether active, in storage, or otherwise" and Instruction No. 14, which purports to require particular production processes for electronic records. Omni will comply with its obligations, if any, under the applicable law.

19.     Omni objects to the subpoena to the extent it seeks information relating to the knowledge, recollections, or mental impressions of former employees who are no longer employed by Omni, or any other information that is no longer in the possession, custody, or control of Omni.

20.     Omni objects to the subpoena's use of "communication" as overbroad, vague and ambiguous, especially to the extent that the definitions render the subpoena and its enumerated requests unduly burdensome and disproportionate to the needs of the case. Omni further objects to the extent the definition purports to impose burdens or requirements that exceed or differ from the requirements of Federal Rules of Civil Procedure 26(b) and 45, the local rules of this Court, or the discovery orders in this action.

Omni reserves the right to assert additional objections, or to supplement its objections and responses as appropriate, particularly if any additional information regarding the subpoena or the underlying claims at issue is provided.

**Responses and Objections to Subpoena Document Requests**

Subject to and without waiving the above-listed objections, Omni responds to the subpoena's enumerated requests as follows:

**REQUEST FOR PRODUCTION NO. 1:**

All Documents (including communications) related to any assessments, including financial assessments, of one or more of the MPH Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited in time; (2) it is vague and ambiguous as to the phrase "assessments"; (3) it not identify how "any assessments" may relate to claims in the underlying litigation; (4) it seeks information that is not within Omni's possession, custody or control; (5) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (6) it seeks protected or privileged information, including information prepared in anticipation of litigation; (7) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (9) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information. As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

**REQUEST FOR PRODUCTION NO. 2:**

Any Documents (including communications) concerning the value of any one or more of the MPH Patents (including, without limitation. for licensing purposes).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited in time; (2) it is vague and ambiguous as to the phrase "concerning the value"; (3) it is vague and ambiguous as to the phrase "for licensing purposes"; (4) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (5) it seeks protected or privileged information, including information prepared in anticipation of litigation; (6) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (7) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (8) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information. As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents (including communications) concerning any valuations, audits, or financial assessments of MPH.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, particularly insofar as the request calls for "any" valuations, audits, or financial assessments of MPH, and to the extent this request is not limited to any such valuations, audits, or financial assessments in which Omni might be involved; (2) it is vague and ambiguous as to the phrase "valuations, audits, or financial assessments"; (3) it seeks information that is not within Omni's possession, custody or control; (4) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (5) it seeks protected or privileged information, including information prepared in anticipation of litigation; (6) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (9) it is duplicative and/or does not identify how "valuations, audits, or financial assessments" are distinct from the "assessments" of Topic No.1; and (10) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or

less expensive than requiring Omni to produce such information. As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents (including communications) concerning Your financial interest in this Litigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited in time; (2) it is vague and ambiguous as to the phrase "financial interest"; (3) it not identify how any "financial interest" may relate to claims in the underlying litigation; (4) it seeks protected or privileged information, including information prepared in anticipation of litigation; (5) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (6) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (7) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information. As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents (including communications) concerning the scope of the claims, potential infringement or non-infringement by any entity, validity or invalidity of the MPH Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the parties to the underlying litigation, and purports to seek information about "any entity" in existence; (2) it is vague and ambiguous as to the phrase "the scope of the claims" insofar as it places the burden on Omni to determine what "claims" the subpoena concerns, particularly as the request purportedly concerns the indiscernible breadth of "any entity"; (3) it is vague and ambiguous as to the phrase "potential infringement or non-infringement"; (4) it is vague and ambiguous as to the phrase "validity or invalidity"; (5) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (6) it seeks protected or privileged information, including information prepared in anticipation of litigation; (7) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses, especially insofar as it purports to concern an indiscernible

breadth of "claims" and "entities"; (9) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information. As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

## REQUEST FOR PRODUCTION NO. 6:

All Documents (including communications) related to Your relationship with MPH.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 6:

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the underlying litigation; (2) it is vague and ambiguous, and unduly burdensome as to the phrase "related to Your relationship" particularly as it purportedly seeks information not related to the underlying litigation; (3) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses, particularly as the subpoena nowhere explains how this information is relevant to any party's claims or defenses and it seeks information not related to the underlying litigation; (4) it seeks protected or privileged information; (5) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (6) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information, especially to the extent this subpoena seeks information regarding a "relationship with MPH" as MPH is a party to the underlying litigation. As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

## REQUEST FOR PRODUCTION NO. 7:

All Documents (including communications) related to any assessments, including financial assessments, of any actual or potential litigation, including this Litigation, against any entity involving one or more of the MPH Patents.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 7:

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the underlying litigation; (2) it is unduly burdensome and overbroad particularly insofar as the request calls for "any" assessments of "any" litigation, especially to the extent this request is not limited to such assessments in which Omni is involved; (3) it is vague and ambiguous, and unduly burdensome as to the phrase "assessments" particularly as it purportedly seeks

information about any assessment, whether or not related to the underlying litigation; (4) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (5) it seeks protected or privileged information, including information prepared in anticipation of litigation, particularly to the extent it seeks information about "potential litigation," especially such information unrelated to the underlying litigation; (6) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (7) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (8) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information, especially to the extent this subpoena seeks information regarding "MPH Patents" as MPH is a party to the underlying litigation. As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

**REQUEST FOR PRODUCTION NO. 8:**

Your communications (including emails) related to this Litigation, or any other litigation, including potential litigation, involving MPH or the MPH Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the underlying litigation; (2) it is vague and ambiguous, and unduly burdensome as to the phrase "communications"; (3) it is vague and ambiguous as to the phrase "involving MPH or MPH Patents"; (4) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (6) it seeks protected or privileged information, including information prepared in anticipation of litigation, particularly to the extent it seeks information about "potential litigation," especially such information unrelated to the underlying litigation; (7) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (9) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information, especially to the extent this subpoena seeks information about communications "involving MPH," which is a party to the underlying litigation. As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

**REQUEST FOR PRODUCTION NO. 9:**

Your agreements with MPH related to this Litigation, or any other litigation, including potential litigation, involving MPH or the MPH Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following:  (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the underlying litigation; (2) it is vague and ambiguous, and unduly burdensome as to the phrase "agreements" insofar as it purportedly concerns any agreement, whether or not related to the underlying litigation; (3) it is vague and ambiguous as to the phrase "involving MPH"; (4) it is vague and ambiguous as to the phrase "validity or invalidity"; (5) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (6) it seeks protected or privileged information, including information prepared in anticipation of litigation, particularly to the extent it seeks information about "potential litigation," especially such information unrelated to the underlying litigation; (7) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (9) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information, especially to the extent this subpoena seeks "agreements with MPH," which is a party to the underlying litigation.  As a non-party, Omni should not be subjected to the burden of searching for and producing such documents or information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce documents in response to this request, but is willing to meet and confer regarding the subpoena as set forth above.

**Responses and Objections to Deposition Subpoena**

Subject to and without waiving the above-listed objections, Omni responds to the deposition subpoena as follows:

**DEPOSITION TOPIC NO. 1**

Any assessments, including financial assessments, of the MPH Patents.

**RESPONSE TO DEPOSITION TOPIC NO. 1**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following:  (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited in time; (2) it is vague and ambiguous as to the phrase "assessments"; (3) it not identify how "any assessments" may relate to claims in the underlying litigation; (4) it seeks information that is not within Omni's possession, custody or control; (5) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (6) it seeks protected or privileged information, including information prepared in anticipation of litigation; (7) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (9) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information.  As a non-party, Omni should not be subjected to the burden of searching for and producing

such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

**DEPOSITION TOPIC NO. 2**

Any Documents concerning the value of any one or more of the MPH Patents (including, without limitation, for licensing purposes).

**RESPONSE TO DEPOSITION TOPIC NO. 2**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited in time; (2) it is vague and ambiguous as to the phrase "concerning the value"; (3) it is vague and ambiguous as to the phrase "for licensing purposes"; (4) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (5) it seeks protected or privileged information, including information prepared in anticipation of litigation; (6) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (7) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (8) it calls for deposition testimony that would more properly be sought from an expert witness, including but not limited to testimony regarding the value of any patents; (9) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information. As a non-party, Omni should not be subjected to the burden of searching for and producing such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

**DEPOSITION TOPIC NO. 3**

Any valuations, audits, or financial assessments of MPH.

**RESPONSE TO DEPOSITION TOPIC NO. 3**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, particularly insofar as the request calls for "any" valuations, audits, or financial assessments of MPH, and to the extent this request is not limited to any such valuations, audits, or financial assessments in which Omni might be involved; (2) it is vague and ambiguous as to the phrase "valuations, audits, or financial assessments"; (3) it seeks information that is not within Omni's possession, custody or control; (4) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (5) it seeks protected or privileged information, including information prepared in anticipation of litigation; (6) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (9) it is duplicative and/or does not identify how "valuations, audits, or financial assessments" are distinct from the "assessments" of Topic

No.1; and (10) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information.  As a non-party, Omni should not be subjected to the burden of searching for and producing such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

**DEPOSITION TOPIC NO. 4**

Your financial interest in this Litigation.

**RESPONSE TO DEPOSITION TOPIC NO. 4**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following:  (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited in time; (2) it is vague and ambiguous as to the phrase "financial interest"; (3) it not identify how any "financial interest" may relate to claims in the underlying litigation; (4) it seeks protected or privileged information, including information prepared in anticipation of litigation; (5) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (6) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (7) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information.  As a non-party, Omni should not be subjected to the burden of searching for and producing such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

**DEPOSITION TOPIC NO. 5**

Any Documents concerning the scope of the claims, potential infringement or non-infringement by any entity, validity or invalidity of the MPH Patents.

**RESPONSE TO DEPOSITION TOPIC NO. 5**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following:  (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the parties to the underlying litigation, and purports to seek information about "any entity" in existence; (2) it is vague and ambiguous as to the phrase "the scope of the claims" insofar as it places the burden on Omni to determine what "claims" the subpoena concerns, particularly as the request purportedly concerns the indiscernible breadth of "any entity"; (3) it is vague and ambiguous as to the phrase "potential infringement or non-infringement"; (4) it is vague and ambiguous as to the phrase "validity or invalidity"; (5) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (6) it seeks protected or privileged information, including information prepared in anticipation of litigation; (7) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or

protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses, especially insofar as it purports to concern an indiscernible breadth of "claims" and "entities"; (9) it calls for deposition testimony that would more properly be sought from an expert witness, including but not limited to testimony regarding patent validity or infringement; and (10) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information. As a non-party, Omni should not be subjected to the burden of searching for and producing such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

## DEPOSITION TOPIC NO. 6

Your relationship with MPH.

## RESPONSE TO DEPOSITION TOPIC NO. 6

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the underlying litigation; (2) it is vague and ambiguous, and unduly burdensome as to the phrase "relationship" particularly as it purportedly seeks information not related to the underlying litigation; (3) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses, particularly as the subpoena nowhere explains how this information is relevant to any party's claims or defenses and it seeks information not related to the underlying litigation; (4) it seeks protected or privileged information; (5) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (6) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information, especially to the extent this subpoena seeks information regarding a "relationship with MPH" as MPH is a party to the underlying litigation. As a non-party, Omni should not be subjected to the burden of searching for and producing such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

## DEPOSITION TOPIC NO. 7

Any assessments, including financial assessments, of any actual or potential litigation, including this Litigation, against any entity involving any of the MPH Patents.

## RESPONSE TO DEPOSITION TOPIC NO. 7

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following: (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the underlying litigation; (2) it is unduly burdensome and overbroad particularly insofar as the request calls for "any" assessments of "any" litigation, especially to

the extent this request is not limited to such assessments in which Omni is involved; (3) it is vague and ambiguous, and unduly burdensome as to the phrase "assessments" particularly as it purportedly seeks information about any assessment, whether or not related to the underlying litigation; (4) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (5) it seeks protected or privileged information, including information prepared in anticipation of litigation, particularly to the extent it seeks information about "potential litigation," especially such information unrelated to the underlying litigation; (6) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (7) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (8) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information, especially to the extent this subpoena seeks information regarding "MPH Patents" as MPH is a party to the underlying litigation.  As a non-party, Omni should not be subjected to the burden of searching for and producing such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

## DEPOSITION TOPIC NO. 8

Your communications (including emails) related to this Litigation, or any other litigation, including potential litigation, involving MPH or the MPH Patents.

## RESPONSE TO DEPOSITION TOPIC NO. 8

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following:  (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the underlying litigation; (2) it is vague and ambiguous, and unduly burdensome as to the phrase "communications"; (3) it is vague and ambiguous as to the phrase "involving MPH or MPH Patents"; (4) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (6) it seeks protected or privileged information, including information prepared in anticipation of litigation, particularly to the extent it seeks information about "potential litigation," especially such information unrelated to the underlying litigation; (7) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (9) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information, especially to the extent this subpoena seeks information about communications "involving MPH," which is a party to the underlying litigation.  As a non-party, Omni should not be subjected to the burden of searching for and producing such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

## DEPOSITION TOPIC NO. 9

Your agreements with MPH related to this Litigation, or any other litigation, including potential litigation, involving MPH or the MPH Patents.

**RESPONSE TO DEPOSITION TOPIC NO. 9**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following:  (1) it is unduly burdensome and overbroad as it is not reasonably limited or discernible in scope, especially to the extent that the request is not limited to the underlying litigation; (2) it is vague and ambiguous, and unduly burdensome as to the phrase "agreements" insofar as it purportedly concerns any agreement, whether or not related to the underlying litigation; (3) it is vague and ambiguous as to the phrase "involving MPH"; (4) it is vague and ambiguous as to the phrase "validity or invalidity"; (5) it seeks information that is not reasonably accessible by Omni without undue burden or cost; (6) it seeks protected or privileged information, including information prepared in anticipation of litigation, particularly to the extent it seeks information about "potential litigation," especially such information unrelated to the underlying litigation; (7) it seeks information that is highly confidential, proprietary, that contains trade secrets, or is subject to a confidentiality agreement or protective order; and (8) it seeks information that is not proportionate to the needs of the case and not relevant to any party's claims or defenses; (9) it seeks information that is in the possession, custody, or control of a party to the underlying action or equally available from another source that is more convenient, less burdensome, or less expensive than requiring Omni to produce such information, especially to the extent this subpoena seeks "agreements with MPH," which is a party to the underlying litigation.  As a non-party, Omni should not be subjected to the burden of searching for and producing such information unless and until all reasonable means of obtaining that information directly from such other sources have been exhausted.

At this time, Omni is not willing to produce a witness to testify regarding this topic, but is willing to meet and confer regarding the subpoena as set forth above.

**DEPOSITION TOPIC NO. 10**

The authenticity and/or admissibility of all Documents produced in response to Apple's Subpoena.

**RESPONSE TO DEPOSITION TOPIC NO. 10**

In addition to the above-listed objections, which are incorporated herein by reference, Omni specifically objects to this request on multiple grounds, including but not limited to the following:  (1) it is seeking deposition testimony to authenticate records produced by Omni.  Such testimony is unnecessary and unduly burdensome as records can be authenticated by a Certificate of Authenticity; and (2) it is improper to require a third party such as Omni to produce a witness to provide deposition testimony on the subject matter of "admissibility" of documents in the underlying litigation.

At this time, Omni is not willing to produce a witness to testify regarding this topic.

As noted above, I invite you to contact me at jen@warrenkashwarren.com to set up a time to discuss the subpoena further.

Very Truly Yours,

Jennifer A. Kash

# EXHIBIT C




OMNI
BRIDGEWAY

Annual Report 2023



Omni Bridgeway is a global leader
in financing and managing legal risk.

## Industry acknowledgement

We are honoured to receive endorsement
and recognition for Omni Bridgeway's industry
leadership and pioneering solutions.



**Find out more at**
*omnibridgeway.com/acknowledgement*

**Omni Bridgeway acknowledges the traditional custodians of the lands
on which we live, work, and operate. We pay respect to their connections
to land, sea, and community and to Elders past, present, and emerging.**



# Contents

## Highlights

| | |
|---|---|
| Group at a glance | 2 |
| Estimated value from future completions | 4 |
| A balanced and diversified portfolio | 5 |
| FY23 highlights | 6 |

## Overview

| | |
|---|---|
| Chairman's report | 8 |
| Managing Director's report | 10 |
| Geographic reach | 16 |
| Regional highlights | 18 |
| ESG and corporate social responsibility | 20 |
| Global risk, regulation and governance | 22 |

## Directors' report | 24

| | |
|---|---|
| Letter from the Chair of the Nomination and Remuneration Committee | 35 |
| Remuneration Report | 36 |
| Auditor's Independence Declaration | 45 |

## Financial report

| | |
|---|---|
| Consolidated Statement of Comprehensive Income | 46 |
| Consolidated Statement of Financial Position | 47 |
| Consolidated Statement of Cash Flows | 48 |
| Consolidated Statement of Changes In Equity | 49 |
| Notes to the Financial Statements | 51 |
| Directors' Declaration | 103 |
| Independent Auditor's Report | 104 |

## Shareholder and other information

| | |
|---|---|
| Shareholder information | 109 |
| Corporate information | 112 |
| Glossary | 113 |
| Non-IFRS financial information and disclosure | 118 |
| IEV attribution assumptions | 119 |

All figures are in Australian dollars (AUD, A$) unless otherwise stated.

# Group at a glance



**Alternative investment manager with ~$2.5bn FUM**

**Proven 35+ year track record of high investment returns**

**Global focus with extensive reach in Americas, APAC and EMEA**

**Diversified, scalable, returns focused platform**

**Uncorrelated to macro economic dynamics**

Omni Bridgeway

## How we create value

Our strategic priorities leverage the strength of our platform and our expertise in litigation finance and dispute management. Utilising specialist capabilities in origination and risk management, we provide innovative solutions and comprehensive support from case inception to completion.

Executing on these priorities enables us to extend access to justice for our clients, improve risk adjusted returns across our portfolios, and create long term growth for our fund investors and shareholders.

## Strategic priorities

Enterprise-wide capability in developing unique products and fund structures to expand market reach, scale and drive returns.

### Scale platform

- Upsize Funds 4 and 5
- Finalise Fund 8
- Launch unique new funds
- Grow value of portfolio
- Leverage sourcing and origination expertise

### Optimise capital structure

- Enhance financial flexibility and capacity
- Maximise capital reallocation opportunities
- Increase capital partnerships

### Create earnings resilience

- Improve cost coverage and support sustainable growth through improved operational efficiencies
- Expand into new markets and areas of law
- Drive competitive advantage in pricing and structuring
- Diversify income streams through secondary transactions

### Innovate and lead

- Launch unique fund structures and products
- Continue to drive secondary market evolution
- Accelerate risk adjusted returns
- Maintain top performance culture and attract, retain and develop the best industry talent



**Return on investor capital**

Risk adjusted returns to external fund investors and shareholders through matter completions and secondary market transactions.



**Cost and risk mitigation**

Support clients to enable them to pursue legal recoveries without cost or risk.



**Access to justice**

Provide the ability for the small and impecunious claimant, or those who face powerful opponents, for access to justice.



**Community support**

Pro bono and other support for the communities in which we live and work.

# Estimated value from future completions

## $30.5bn EPV

**Estimated Portfolio Value[1]**

## $3.9bn IEV

**Implied Embedded Value[2]**
**($26.0bn unconditionally funded EPV)**

IEV is based on the realisation of the current unconditionally funded portfolio, utilising a normalised 15% EPV conversion rate.

### $2.9bn
**IEV provisionally attributable to NCI**

### $1.0bn
**IEV provisionally attributable to OBL[3,4]**

~$20m per annum
**Estimated management fees[4] from NCI to OBL**

~$240m
**Potential performance fees[4,5] from NCI to OBL**

1. Includes all current investments (unconditional, conditionally funded, IC approved and investments disclosed as income yet to be recognised).
2. Includes current unconditional investments and those disclosed as income yet to be recognised.
3. Based upon OBL equity co-investment income rights.
4. Further information on the provisional attribution of IEV, estimated management fees and potential performance fees used in this report is available on page 119.
5. Based on the Group historic 1.1x ROIC and achieving 20% IRR hurdle of completed investments.

# A balanced and diversified portfolio

The portfolio is strategically balanced offering growth potential in all regions. We anticipate an ongoing trend of increasing investments in the Americas and EMEA.

Our diversified model will continue to be a critical comparative advantage providing mitigation of competition, regulatory impact and portfolio concentration risks; we have consistently grown, innovated and strengthened our platform and business offering in contrast to our peers.



**EPV[1] by region**

- ● APAC    31%
- ● Americas    40%
- ● EMEA    29%

**EPV[1] by funding source**

- ● Balance sheet    <1%
- ● Funds 2&3    11%
- ● Fund 4    30%
- ● Fund 5    45%
- ● Fund 6    13%
- ● Fund 8    <1%

**EPV[1] by investment type**

- ● Single party    35%
- ● Class actions    26%
- ● Arbitration    25%
- ● Law firm    8%
- ● Other[2]    6%

## EPV profile

| Future completions | # | Fund size | Average duration | FY24 | FY25 | FY26 | FY27+ | Total | IEV |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Possible completion of EPV $m | | | | | |
| Balance sheet | 5 | n/a | 8.3 yrs | 22 | – | 4 | 5 | 31 | 5 |
| Funds 2&3 | 23 | $189m | 4.4 yrs | 1,084 | 1,257 | 74 | 803 | 3,218 | 483 |
| Fund 4 | 40 | US$500m | 1.4 yrs | 1,240 | 2,356 | 2,679 | 2,876 | 9,151 | 1,373 |
| Fund 5[3] | 57 | US$500m | 1.6 yrs | 2,185 | 2,512 | 1,086 | 4,091 | 9,874 | 1,481 |
| Fund 6[4] | 146 | €188m | 7.4 yrs | 415 | 827 | 647 | 1,798 | 3,687 | 553 |
| Fund 7[3] | – | US$100m | – | – | – | – | – | – | – |
| Fund 8[5,6] | 3 | €150m | 0.4 yrs | 8 | 7 | 11 | 27 | 53 | 8 |
| Funded EPV[7] | 274 | | 5.0 yrs | 4,954 | 6,959 | 4,501 | 9,600 | 26,014 | 3,903 |
| Conditionally funded | 13 | | | | | | | 2,127 | |
| IC approved | 14 | | | | | | | 2,334 | |
| Total EPV[1] | 301 | | | | | | | 30,475 | |

1. Includes all current investments (unconditional, conditionally funded, IC approved and investments disclosed as income yet to be recognised).
2. Includes appeal, commercial and corporate funding.
3. Fund 5 and Fund 7 are not consolidated within the Group Consolidated Financial Statements, here they are presented at 100%.
4. Fund size is €150m plus an over commitment allowance of 25%.
5. Investments warehoused on OBL balance sheet, fund size subject to completion of the debt facility.
6. The principal protection insurance extends the indemnity to €270 million which facilitates a second series or an upsize of series I.
7. Includes current unconditional investments and those disclosed as income yet to be recognised.

# Financial performance

**For the 12 months ended 30 June 2023**

**Total gross income and revenue**

## $333.0m

+51% on FY22

**Net profit after tax**

## $0.9m

+203% 2H23 v 1H23

**EPV conversion rate**

## 14%

Life to date completed investments[1]

**Funds under management**

## ~$2.5bn

Across a balanced portfolio

**Cash and receivables[2]**

## $360.4m

Plus access to up to $60m debt

**Implied embedded value[2,4]**

## $3.9bn

+9% on FY22

**Commitments[2,3] ($m)**

## $544.2m +17%



**EPV[2,3] ($bn)**

## $30.5bn +12%



1. Reflects completions in Funds 1 to 5 and OBL balance sheet since their inception, excluding partial secondary market sales. Reflects Fund 6 completions since OBE acquisition in 2019, including investments acquired and funded subsequently. Fund 1 includes metrics up to 31 May 2023, the date of its deconsolidation.
2. Fund 5 is not consolidated within the Group Consolidated Financial Statements, here it is presented at 100%.
3. Includes all current investments (unconditional, conditionally funded, IC approved and investments disclosed as income yet to be recognised).
4. Includes current unconditional investments and those disclosed as income yet to be recognised.
5. IRR information prior to FY12 is not available due to the difficulty in extracting it from legacy systems.

# Strategic initiatives



## Finalise new fund

Finalise the first series of our €300m fund focused on global judgement enforcement investments by securing a limited recourse debt facility of up to €135m with standby equity of up to €15m to be provided by OBL.



## Secondary markets

The demand for mid-cycle, quality legal risk assets in the secondary market is a testament to our strong sourcing and underwriting expertise.



## Innovation

Greatly enhanced our foundational capabilities by embracing cloud technologies and fortifying data governance practices to facilitate our ability to scale.



## Leadership

Omni continues to pave the way in the regulatory arena with leadership roles in ELFA (Chairman) and ILFA (Board member) to ensure a stable operating environment that fosters growth and profitability.



## Returns

Our diversified and resilient platform and unrivalled expertise in sourcing and underwriting quality investments has potential to generate strong cash returns for our investors as the market matures.



## Growth

We continued to lay the groundwork for growth by expanding our scope and geographic reach into developing markets including Paris, Milan and Miami.



Since 2000, we have realised **$5.0bn** for clients, of which **$1.7bn** in investment proceeds have flowed to the Group.

ROIC
1.10x

IRR[5]
77%

Life to date completed investments[1]

# Chairman's report



FY23 was a milestone year, marked by successful execution of key strategies including substantially completing the build-out of our global platform in existing key markets, which we upgraded and upscaled, to solidify Omni Bridgeway's position as the industry's leading manager of legal assets.

**Michael Kay**
Non-Executive Director and Chairman

I am delighted to report we have achieved each of the key goals we set for FY23:

- Generating $283 million investment income from matter completions and secondary market disposals.
- Increasing our estimated portfolio value by 12% to $30.5 billion.
- Committing a record $544 million to new investments, up 17%.
- Expanding into new locations and key jurisdictions within United States and Europe.
- Advancing our modelling capabilities and specialised functions to support how we price risk.
- Completing an integration across all back-office operations and regional hubs.
- Strengthening our Board, Investment Committees, and management teams.

## Strategy

As we continue the implementation of our strategic plan, the development and evolution of our business is apparent. We have significantly advanced our pricing and modelling capabilities using highly sophisticated probability analytics, resulting in more precise evaluations to help achieve greater risk adjusted returns from positive case outcomes. Risk is not only on the downside, but also in undervaluing the upside, and in FY23 we continued to enhance our assessment capabilities globally across the full investment lifecycle.

We note the evolving use of fair value accounting and reporting by some of our peers. We intend to explore the use of fair value reporting to assist with appropriate peer comparisons and to enhance the assessment of the embedded value in our assets.

The feasibility of launching two new similarly structured funds, aiming for higher management fees and lower performance fees, one of which may be focused on investments with a positive ESG profile, is ongoing.

We continued to unlock opportunities in the secondary market completing two transactions which diversified income sources and generated gross proceeds of approximately $76 million. Secondary market sales are likely to be a meaningful contribution to our business, validating our underlying business model, as we recycle capital, de-risk the portfolio and accelerate returns.

Our boots-on-the-ground approach to business development, jurisdictional eminence, and origination of investment opportunities versus 'fly in, fly out' is what distinguishes us from our competitors.

We have completed the expansion in the United States, Italy, and France to ensure sufficient presence in these attractive and developing markets and continue to have a geographic footprint that exceeds any of our peers.

This was achieved through a combination of fully remote and hybrid in-office roles, allowing us to attract and retain top global talent. We secured first-mover advantage in several markets, evidenced by early investment opportunities and the notable market profile we've received.

With the strategic build-out substantially complete in our existing key markets, our focus for FY24 is on operational efficiency and expense discipline. Our platform – combined with targeting improved pricing and duration risk protection – will result in outperformance and value creation to support our leading market position.

## Capital management

The Board will continue to make risk adjusted capital allocation decisions that are appropriate for our operating circumstances, including the availability of franking credits, merger and acquisition opportunities, capital deployment requirements to increase the asset base, and the share price relative to the implicit value of Omni Bridgeway.

In August 2022, the Group initiated an on-market share buy-back program for an aggregate amount of up to $50 million. Whilst we believe that investing in Omni Bridgeway's shares at opportune times will be value accretive to our shareholders and send a strong signal to the market of our confidence in the outlook for the

business, we instead elected to invest in our platform and deploy capital to new and existing investments. This is expected to deliver strong and accretive returns over time.

## Board and management renewal

After more than eight years in the role, Andrew Saker will retire as Managing Director and Chief Executive Officer (CEO) of the Group. On behalf of the Board, I'd like to thank him for his extraordinary commitment and leadership and for his achievements during his tenure. We now have a truly global platform with operations in Australia, the United States, Asia, Canada, the UK, continental Europe, and the Middle East. The Group has transformed from a balance sheet funder to a co-investor and manager of non-recourse financing investing in legal assets across unique fund structures, managing approximately $2.5 billion. This has allowed Omni Bridgeway to scale rapidly, at lower risk and, as the funds mature, at higher risk adjusted returns.

Mr Saker laid the foundations for growth and innovation that will continue to serve our clients and shareholders well into the future. I would also like to acknowledge his absolute focus on driving our business and on the continued execution of our strategy during the CEO transition. On behalf of everyone at Omni Bridgeway, I wish Andrew the very best for the future and record our thanks and appreciation for the extraordinary job he has done over the past eight years.

Executive Director, Managing Director and Chief Investment Officer (CIO) of EMEA, Raymond van Hulst, will be appointed CEO upon Mr Saker's retirement. The succession will take effect on 26 October 2023 at this year's AGM.

Mr van Hulst previously held a wide range of senior roles having been a key member of the legacy Omni Bridgeway team for over 20 years, as such, he brings a breadth of experience of legal risk asset management.

Since the merger with Omni Bridgeway Holding B.V in 2019, Mr van Hulst has focused on the globalisation of the enforcement investment strategy and the integration of the businesses. His experience will provide business continuity and a smooth transition.

We made other important leadership appointments including Guillaume Leger as Global Chief Financial Officer in September 2022, Hannah van Roessel as Co-Chief Investment Officer in EMEA in February 2023 and Ian Munro as Global Head of People and Culture in May 2023.

After 21 years of service, Michael Bowen stepped down as Non-Executive Director in November 2022. In line with our stated objective of Board renewal, in April 2023, we appointed Michael Green as Non-Executive Director based in the United Kingdom. Mr Green's 30+ years in the international financial services sector, including asset management, insurance/reinsurance, product and risk management, and business development and transformation, adds considerable experience to the Board.

We also intend to explore the appointment of another northern hemisphere-based director to reflect our significant and growing operations in that region.

The Board currently comprises four Non-Executive Directors and two Executive Directors resulting in a majority independent Board. In terms of Board diversity, women currently represent 33% of the Board and 50% of the Non-Executive Directors.

As one of our core values, we take a broad view of diversity including seeking a range of perspectives, skill sets and backgrounds in our Board composition in addition to gender and other considerations.

## Macro environment

With a challenging global economy facing ongoing geopolitical disruption, stressed financial markets, and high inflation – coinciding with the removal of financial and economic interventions in key markets – the pace of economic growth continues to slow, and market volatility is anticipated in the short to medium term.

Omni Bridgeway, as an alternative asset manager and investor in litigation and enforcement assets, offers investors a model that is typically uncorrelated with economic cycles and macro events. Demand for our capital increases as other capital sources become more restricted. The number of insolvencies and general commercial disputes are likely to increase; this creates opportunities, improves our efficiencies and enhances our scalability.

Omni Bridgeway has a pricing model that provides a natural hedge against inflation. Typically, investment costs are passed on to the client and reimbursed on successful completion of the investment.

Further, returns are structured as a multiple of costs, that covers inflation, or as a percentage of the damages including interest that typically ameliorates the impact of inflation. We are also increasingly protected against duration risk as our contracted returns reflect the time value of money.

The emerging global market for legal finance continues to mature, and competition is contracting as capital becomes constricted. We may see smaller specialised operations enter the market to facilitate discrete and limited books of business, but we do not anticipate these to directly compete with our model.

Our strong capital position, and continued access to capital, amid an uncertain economic environment, positions us well within the competitive and macro landscapes. Our diversified model will continue to be a critical comparative advantage; we have consistently grown, innovated and strengthened our platform and business offering in contrast to others in the asset class.

## New Investment Committee members

We welcomed four Investment Committee members to our team.

Ms Leora Ben-Ami is a US based intellectual property attorney, globally recognised in the biotechnology, life sciences and pharmaceuticals sectors, and has held several leadership positions in top-tier law firms.

Judge Winifred Y. Smith (Ret) 's distinguished career includes serving on the bench of California's Alameda County Superior Court for over two decades, covering a multitude of civil matters and culminating in being selected as Presiding Judge.

Mr Geoffrey Senogles is a damages and valuation expert with extensive experience in testifying in litigation and international arbitration matters, based in Switzerland.

Ms Ariana J Tadler is the founding partner of Tadler Law LLP and has 30 years experience advocating for consumers and investors while litigating securities, consumer and data breach class actions and complex matters.

Their appointments expand the depth of expertise that can be drawn on for particular investment decisions and add outside perspective, helping us prevent group think and further bolstering our rigorous assessment process.

## Summary

On behalf of the Board, I would like to thank management and staff for this milestone year of exceptional effort and achievement.

We have strengthened core facets of our business and continue to set the highest industry standards as we transition to the next phase of our strategy with Mr van Hulst as CEO elect.

We are well positioned to realise the full benefit of our strategy and will deliver increasing and sustainable value to our stakeholders in FY24 and beyond.

**Michael Kay**
Chairman

# Managing Director's report



I am pleased to announce several notable achievements during FY23 and report on a strong finish to the year, underpinned by gathering market momentum and the effectiveness of our diversified funds management strategy.

**Andrew Saker**
Managing Director & Chief Executive Officer

---

2H23 NPAT turnaround on 1H23
# 203%

Litigation investment proceeds
# $283.4m

IYTBR at 30 June 2023
# $55.2m

Annual commitments
# 17% growth

Estimated portfolio value
# 12% growth

Implied embedded value provisionally attributable to OBL
(excl. management and performance fees)
# $1.0bn
$3.9bn total IEV

## Record gross income and strong 2H23 profit

The Group realised a profit after tax (before NCI) of $0.9 million, a notable 2H23 turnaround of $61.1 million and a 203% improvement compared to 1H23.

This demonstrates the variability of returns from investments with binary outcomes, lower expenses and signals momentum heading into FY24.

Material NCI distributions were made, accelerating anticipated income for shareholders in FY24.

In FY23, we achieved a significant milestone generating $283.4 million from 33 investment completions and secondary market transactions, plus $55.2 million income yet to be recognised from conditionally completed investments. This excludes $86.6 million in third-party income from the sale of an investment vehicle in December 2022.

Additionally, we experienced growing management fees, which increased by 31% compared to the previous year, reaching $7.5 million.

Higher FY23 expenses predominately relate to the expansion of the platform, strategic investments in new operating locations and marketing efforts including increased headcount to 224, from 199, and expenses which were previously subdued due to reduced expenditure during COVID-19.

Total expenses in the second half were 9% lower than the first half, reflecting non-recurring items and initial savings from a renewed focus on expense discipline.

We streamlined processes, optimised workflows and enhanced productivity.

As a result of these initiatives, we anticipate:

• Further expense discipline in FY24.
• Continued improvement in operational efficiencies.
• Value created by investment managers in excess of our cost base.

Impairment expense and adverse cost charges of $13.1 million, up from $8.1 million in FY22, reflects the Group's best estimate of the exposure across several investments.

| $m | 2H23 | 1H23 | Change from 1H23 | FY23 | FY22 | Change from FY22 |
|---|---|---|---|---|---|---|
| **Consolidated Group** | | | | | | |
| Litigation investments proceeds[1] | 139.6 | 96.1 | 45% | 235.7 | 217.3 | 8% |
| Cash proceeds on sale of participation in Fund 1 assets | 47.7 | – | | 47.7 | – | |
| **Litigation income proceeds (grossed up to include all Funds at 100%)** | **187.3** | **96.1** | **95 %** | **283.4** | **217.3** | **30 %** |
| Third party income from sale of investment vehicle | – | 86.6 | | 86.6 | – | |
| Less third party interest of Fund 5 | (33.6) | (18.2) | | (51.8) | (12.6) | |
| **Litigation investments proceeds** | **153.7** | **164.5** | **(7%)** | **318.2** | **204.7** | **55%** |
| Management fees | 4.0 | 3.5 | 14% | 7.5 | 5.7 | 31% |
| Interest revenue and other | 5.1 | 2.2 | | 7.3 | 10.6 | |
| **Total gross income and revenue** | **162.8** | **170.2** | **(4%)** | **333.0** | **221.0** | **51%** |
| | | | | | | |
| Litigation investments costs derecognised (non-cash) | (45.2) | (61.5) | | (106.7) | (131.8) | 19% |
| Derecognition of subsidiary and recognition of residual interest in F1 | (20.5) | – | | (20.5) | – | |
| Reclassification to share of income from associates | 0.2 | (2.5) | | (2.3) | – | |
| Third party share of sale of investment vehicle | – | (86.6) | | (86.6) | – | |
| | | | | | | |
| **Total income (reflecting Consolidated Group)** | **97.2** | **19.6** | **396%** | **116.8** | **89.2** | **31%** |
| | | | | | | |
| Litigation investments – impairment and adverse costs | (9.4) | (3.7) | (154%) | (13.1) | (8.1) | (61%) |
| Amortisation of litigation investments – claims portfolio | (1.3) | (2.7) | 52% | (4.0) | (5.7) | 28% |
| Employee expenses | (35.0) | (39.0) | 10% | (74.0) | (59.1) | (25%) |
| Other expenses | (14.5) | (17.6) | 18% | (32.1) | (25.5) | (26%) |
| Fair value adjustments of financial assets and liabilities | 2.6 | – | 100% | 2.6 | 7.4 | (65%) |
| **Profit / (loss) before tax** | **39.6** | **(43.4)** | **191%** | **(3.8)** | **(1.8)** | **(111%)** |
| | | | | | | |
| Income tax benefit / (expense) | (8.6) | 13.3 | (165%) | 4.7 | 8.3 | (44%) |
| **Profit / (loss) after tax** | **31.0** | **(30.1)** | **203%** | **0.9** | **6.5** | **(86%)** |

We continued to make strategic business investments to generate higher levels of future income, particularly in developing markets including Italy and France. We are now the largest manager of legal risk in the world with a presence in five continents, across 14 countries.

This expansion in our productive capacity delivered significant efficiency gains in key business metrics relating to our investment managers. The EPV per investment manager increased 22% to $341 million during the year, and, over the last four years, has achieved a compound annual growth rate of 14%.

Another notable metric is new EPV created per investment manager which grew 16% in the period to $138 million.

This important measure reflects that we are leveraging our talent to produce more EPV per investment manager enhanced by our ability to attract, retain and develop the best talent in the industry globally. Furthermore, it also highlights we have generated significant value over and above costs for the period.

| $m | FY23 | FY22 | Change from FY22 |
|---|---|---|---|
| Efficiency ratios | | | |
| EPV / investment manager | 341 | 279 | 22% |
| New investment EPV / investment manager | 138 | 119 | 16% |
| Management fees[2] / cash operational expenses[3] | 16% | 20% | (20%) |
| Total expenditure[3] / IEV | 3% | 2% | 50% |
| Working capital ratio | 2.6:1 | 2.3:1 | 13% |
| Headcount | 224 | 199 | 13% |
| Number of locations | 26 | 23 | 13% |
| EPV | 30,475 | 27,202 | 12% |

1. Data includes interest income on purchased claims. 1H23 and FY22 have been retrospectively adjusted to reflect this.
2. Includes management and servicing contribution from Fund 6, which is recognised as an equity contribution.
3. Excluding amortisation, impairments, adverse costs, interest and LTIP.

## Balance sheet

The Group continues to maintain a strong financial position based on $129.2 million cash and receivables on OBL balance sheet and access of up to $60 million undrawn debt. We have sufficient capital and dry powder to support growth, deployment obligations, liquidity requirements and corporate initiatives.

Across various businesses, there is no universal standard for determining the ideal level of liquidity. For Omni Bridgeway, assessing the appropriate liquidity level involves our evaluation of the Group's needs in light of potential completions for the forthcoming period, funding requirements for new investments and essential working capital. We believe that retaining a minimum of 12 months' cash to cover operational expenses is both prudent and effective. This approach ensures that we maintain financial stability and balance sheet resilience.

In May 2022, we secured a five-year, $250 million institutional debt facility to enhance capital efficiency and provide greater flexibility. This facility allowed us to redeem $148 million of outstanding Fixed Rate Notes and Bonds on 8 July 2022, in advance of their maturity.

In March 2023, we accessed an additional $40 million for general working capital purposes. The carrying value was $181.6 million, at 30 June 2023 ($190 million proceeds, net of $8.4 million capitalisation and amortisation costs relating to the debt issuance, and is classified as non-current debt).

## Cashflow

The cash generated during the year was driven by key completions and collection of receivables. We anticipate significant potential cash inflows from investment completions as our funds mature, and as secondary market transactions become a larger portion of our income.

| Consolidated Group (non-IFRS presentation) $m | FY23 | FY22 |
|---|---|---|
| Proceeds from litigation investments - claims portfolio | 4.8 | 13.4 |
| Proceeds from litigation investments - purchase claims | 0.7 | 6.4 |
| Proceeds from litigation investments - intangible assets | 121.8 | 273.3 |
| Proceeds from disposal of subsidiaries | 75.8 | – |
| | **203.1** | **293.1** |
| | | |
| Management and performance fees received | 8.8 | 12.6 |
| Interest received | 1.8 | 0.3 |
| | **213.7** | **306.0** |
| | | |
| Payments to suppliers and employees | (106.0) | (74.1) |
| Income tax paid | (3.6) | (4.8) |
| Other operating activity outflows | (19.5) | (7.4) |
| **Total cashflows from business operation** | **84.6** | **219.7** |
| | | |
| Payments for litigation investments - claims portfolio | (16.8) | (14.6) |
| Payments for litigation investments - purchase claims | – | – |
| Payments for litigation investments - intangible assets | (157.7) | (105.6) |
| Payments for litigation investments - capitalised overhead and employee costs | (7.8) | (6.7) |
| Other investing activity outflows | (2.2) | (3.9) |
| **Total cashflows used in litigation investments** | **(184.5)** | **(130.8)** |
| | | |
| Contributions from NCI | 135.9 | 43.6 |
| Distributions to NCI | (93.2) | (113.3) |
| | 42.7 | (69.7) |
| Other financing activity outflows | 15.1 | (4.6) |
| **Total cashflows from finance activities** | **57.8** | **(74.3)** |
| | | |
| **Net increase/(decrease) in cash and cash equivalents** | **(42.1)** | **14.6** |
| Net foreign exchange difference | 0.1 | 1.8 |
| Cash and cash equivalents at beginning of period | 159.0 | 142.6 |
| **Cash and cash equivalents at end of period** | **117.0** | **159.0** |
| | | |
| **Trade and other receivables** | **140.8** | **127.8** |

## Unlocking secondary market opportunities

Embracing a culture of continuous innovation is instrumental in our adaptation to evolving market conditions and staying ahead of emerging industry trends including utilising the secondary market.

During the year, we completed two strategic transactions which diversified our income sources and yielded gross cash proceeds of approximately $76 million.

In a significant milestone, the sale of a participation in Fund 1 assets allowed us to recycle capital, de-risk the portfolio, and expedite returns.

Secondary market transactions will play a pivotal role in and become a meaningful contributor to our income generation, whilst also controlling the liquidity of an investment, ensuring a diversified income stream, accelerating realisations in our portfolio and mitigating risk.

## Developments in specific investments

The Group's balance sheet investment in the Brisbane Floods class action, Wivenhoe Dam, completed in June 2023. A final tranche of income of $16.0 million was recognised in 4Q23 and reflects the finalisation of the loss assessment by external counsel. Receipt of the final cash distribution of $13.7 million is anticipated in late August 2023 and is reflected in the balance sheet receivable balance at 30 June 2023.

The Westgem investment on the Group's balance sheet is fully impaired. In June 2023, the High Court of Australia declined to grant special leave to appeal the Supreme Court of Western Australia Court of Appeal's decision.

The appeal petition to the US Supreme Court in relation to the fully impaired Fund 4 investment was denied in April 2023. As there are no further avenues for appeal, the investment was removed from our portfolio during the Quarter. The EPV of this investment was $1.6 billion with an estimated completion date of FY24.

## Portfolio overview[1]

At 30 June 2023, our portfolio consisted of over 300 investments with a net carrying value of $741.8 million, including Fund 5 at 100%.

Our annual commitments, including conditional and unconditional capital commitments, amounted to $544.2 million, marking a 17% increase from the previous year and a compound annual growth rate of 25% since FY19.

New commitments, across 98 investments relating to matters that are newly funded, conditionally approved or have had updated budgets, are diverse in both investment type and area of law.

These significant investment commitments have allowed us to diversify our global portfolio across various jurisdictions, geographies, case types, clients, and service providers, positioning us strategically for potential growth and opportunities in diverse markets.

The current pipeline of indicative investment opportunities is approximately $195 million across 22 term sheets with clients.

### FY23 commitments by investment type



| ● | Single party | 30% |
| ● | Class actions | 30% |
| ● | Law firm | 18% |
| ● | Arbitration | 11% |
| ● | Other | 11% |

### FY23 commitments by area of law



| ● | Mixed Portfolio | 12% |
| ● | Anti-trust | 10% |
| ● | Patent | 9% |
| ● | Bilateral investment treaty | 8% |
| ● | Securities class action | 8% |
| ● | Insolvency | 7% |
| ● | Breach of contract | 7% |
| ● | Other | 39% |

---

1. Includes all current investments (unconditional, conditionally funded, IC approved and investments disclosed as income yet to be recognised).

## Completions

The data included in the table below reflects investment completions in Funds 1 to 6 and on balance sheet since their inception. Fund 1 includes metrics up to 31 May 2023, the date of its deconsolidation. The Fund 4 performance metrics are impacted by a small number of completions, several of which have been both large and negative. With partial completions prior to and one completion since 30 June 2023, the performance metrics have improved to 0.05x ROIC and 7% IRR. Whilst these metrics remain lower than our historical performance, we are confident that with further successful outcomes the performance metrics will improve materially.

| Portfolio | # | Average duration | EPV | EPV conversion rate | Financial outcome $ weighted average | ROIC | IRR |
|---|---|---|---|---|---|---|---|
| Fund 1 | 35 | 3.5 yrs | $2,023m | 11% | 69% | 0.38x | 12% |
| Fund 2&3[1] | 18 | 1.9 yrs | $609m | 16% | 43% | 0.91x | 89% |
| Fund 4 | 11 | 1.3 yrs | $2,425m | 4% | 51% | (0.16x) | (18%) |
| Fund 5[2] | 13 | 1.7 yrs | $1,137m | 7% | 76% | 1.05x | 54% |
| Fund 6[3] | 230 | 3.2 yrs | – | 19 % | 80% | 3.07x | 177% |
| Fund 7 | – | – | – | – | – | – | – |
| Fund 8 | – | – | – | – | – | – | – |
| Balance sheet[4] | 196 | 3.0 yrs | $5,455m | 20% | 78% | 1.64x | 80% |

## Estimated value from future completions

We continue to provide quantitative information on the value of future completions from our funded portfolio by applying our long term past performance metrics.

Based on a normalised EPV conversion rate of 15%, the implied embedded value (**IEV**) of our portfolio is $3.9 billion. This calculation includes returns from completions of our existing funded investments.

The IEV attributed to Omni Bridgeway is around $1.0 billion. This excludes management and performance fees which we anticipate will become an increasingly important source of our future revenues.

Based upon the IEV analysis and related assumptions, the funds' terms entitle us to potential performance fees, from the existing portfolio, of approximately $240 million based on the Group historic 1.1x ROIC and achieving 20% IRR hurdle of completed investments.

Performance fees are subject to the sequencing and timing of fund waterfall proceeds and sufficient certainty of earning positive income, above specific hurdle rates, in each respective fund and are subject to potential clawback.

In addition, for FY24 we estimate that approximately $22 million of management fees could be generated.

These figures, and together with EPV and IEV, are based on several assumptions noted on page 119 including key concepts which are in the Glossary on page 113.

Despite completions momentum in 2H23, we had deferred completions which will result in potential income being recognised in FY24, or later.

It's important to clarify that EPV deferral does not imply a loss in value; we still consider the matters to be of high quality with positive prospects of success.

In some cases a deferral may result in higher compensation or a potentially larger loss claim. Further to this, using the secondary market as a lever to control cash flow, address deteriorating IRR and accelerate liquidity also reduces the impact of EPV slippage on our earnings profile.

| At 30-Jun-2023 | Possible completion period (PCP) | | | | | Sensitivity analysis | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | EPV conversion rate to IEV | | 15% EPV conversion rate |
| $m | FY24 | FY25 | FY26 | FY27+ | TOTAL | 10% | 20% | PCP delay of 12 months |
| **Funded EPV** | 4,954 | 6,959 | 4,501 | 9,600 | 26,014 | 26,014 | 26,014 | 26,014 |
| | | | IEV at 15% EPV conversion rate | | | | | |
| Balance sheet | 3 | – | 1 | 1 | 5 | 3 | 6 | 5 |
| Funds 2&3 | 163 | 189 | 11 | 120 | 483 | 322 | 644 | 483 |
| Fund 4[5] | 186 | 353 | 403 | 431 | 1,373 | 915 | 1,830 | 1,373 |
| Fund 5[2,5] | 328 | 377 | 162 | 614 | 1,481 | 987 | 1,975 | 1,481 |
| Fund 6[5,6] | 62 | 124 | 97 | 270 | 553 | 369 | 737 | 553 |
| Fund 8 | 1 | 1 | 2 | 4 | 8 | 5 | 11 | 8 |
| **Total IEV** | 743 | 1,044 | 676 | 1,440 | 3,903 | 2,601 | 5,203 | 3,903 |
| **IEV provisionally attributable to OBL** | 133 | 334 | 156 | 380 | 1,003 | 621 | 1,373 | 973 |

1. Excludes the partial investment completion of the secondary market sales.
2. Fund 5 is not consolidated within the Group Consolidated Financial Statements, here it is presented at 100%.
3. Data is current at 30 June 2023. As a large portion of the acquired assets did not have assigned EPV, total EPV is not available. The conversion rate relates to the portion of the portfolio that had assigned EPV..
4. IRR information prior to FY12 is not available due to the difficulty in extracting it from legacy systems.
5. Excluding performance fee entitlement.
6. Utilises NCI's historic share of proceeds, being a blend of A, B, C, D investment specific waterfalls.

## Transformation

For the past eight years, I have had the privilege of leading Omni Bridgeway and successfully establishing a global funds management platform spanning the Americas, APAC, and EMEA regions.

As co-investors and managers of non-recourse funds, we specialise in legal asset investments across diverse fund structures, managing approximately $3 billion in assets. This strategic approach allowed us to scale rapidly in an emerging asset class while mitigating risks, leading to higher risk-adjusted returns as the funds mature.

Our dispute finance team, consisting of origination and risk management specialists, are part of a world class alternative investment management firm, reflecting leadership, innovation, and pioneering solutions in legal risk management as evidenced by 60+ awards since 2015.

Our balanced and diversified portfolio has grown 16 times its original size since 2015, providing effective mitigation against competition, regulatory intervention, and portfolio concentration risks.

We now have enterprise wide capability in developing unique products and fund structures to expand market reach, scale and improve returns.

In line with our commitment to further innovate and progress, we have enhanced the way we price and structure investment terms to address extended duration, an inherent attribute of the asset class.

With a leading platform and sophisticated risk management tools in place, the business is in a prime position to capitalise on sustainable growth, leveraging operational efficiencies for greater returns.

| | January 2015 | June 2023 |
|---|---|---|
| Global presence | ~30 people, 4 countries, 9 cities | 224 people, 14 countries, 26 cities |
| Number of investments | 30 | 301 |
| Estimated portfolio value | $1.8bn | $30.5bn |
| Funding | OBL balance sheet funding | 8 funds using 3rd party capital and OBL co-funding |
| Expertise | Merits funding | Disputes, arbitration, settlement, post judgement enforcement and distressed asset recoveries |
| Industry recognition | In 2013, The American Lawyer awarded our founders the 'Top 50 Innovators for Big Law in the Last 50 Years'. | In 2023 alone, 10+ key industry awards, notably: Chambers Band 1 in Litigation Funding in all major regions (excluding the UK), Global Asset Tracing, International Arbitration. Lawdragon recognised 14 team members as top Global 100 in Litigation Funding. |

## Capital raising

In 1Q24, we expect to complete the initial capital raising for Fund 8, a global enforcement fund, totalling €300 million. We are in the advanced stages to close a limited recourse debt facility of up to €135 million, along with standby equity of up to €15 million provided by OBL. This debt is backed by an existing principal protection insurance policy and the investments made by Fund 8.

The enforcement investments, previously held on the Group's balance sheet, will transfer to Fund 8 upon completion. Additionally, the insurance policy offers an option to extend the indemnity to €270 million, creating a potential option for a second series of Fund 8.

The insurance is a distinctive and advantageous feature. It allows the fund, which has an eight-year structure, to pursue investment opportunities with historically high internal rate of returns and return on invested capital and provides principal protection to the underlying debt.

We are also progressing the upsizing of Funds 4 and 5 and anticipate a first close in 1H24. The investor appetite indicates confidence in the embedded value of our investments and the potential for improved returns, which we believe will be sufficient to generate performance fees.

## Outlook

Our success is a testament to the dedication of the Omni Bridgeway team, whose commitment to achieving business goals, maximising investment outcomes and providing access to justice for our clients has been notable.

Our diversified and resilient platform, coupled with unrivalled expertise in sourcing and underwriting quality investments, positions us well to create value for shareholders through strong cash returns.

With a stabilising operating environment post-COVID-19 pandemic and a significant investment pipeline, secondary market opportunities, and completion momentum, we are confident in our underlying business model and foresee continued future growth.

Our key goals for FY24 include:

- Achieving new commitments of $625 million or equivalent value through improved pricing and attribution terms.
- Exploring transition to or adding fair value reporting.
- Finalising the establishment of Fund 8, our new global enforcement fund.
- Increasing FUM via first closing of series II of Fund 4 and Fund 5 and potential launch of new funds.
- Continued focus on cost coverage initiatives.

- Accelerating realisations and mitigating risk through secondary market transactions.
- Moderately expanding the UK team to increase our presence in the second largest litigation finance market.
- Aiming for approximately $95 million of cash operational expenses.

Finally, this is my last full year result as Managing Director and Chief Executive Officer as we transition to Raymond van Hulst.

I would like to thank investors, the Board and management for the support they have extended to me and wish the Group well in the future.

**Andrew Saker**
Managing Director &
Chief Executive Officer

# Extensive reach in Americas, APAC and EMEA

## ~$220bn

**estimated addressable market in the rapidly growing $1tn global legal market**

Omni Bridgeway
is well positioned
to tap into these
addressable markets.



Canada
$4bn[2]

United States
$156bn[1]

○ **Estimated addressable market\***

● **Omni Bridgeway locations**

\* Figures are approximate and may be
rounded. All data at 30 June 2023.
1-7. Data is based on several sources.
Reports noted on page 117.

## 35+ years' experience

| | Public listing (ASX) | Entered USA | Entered Canada |
|---|---|---|---|
| | 2001 | 2011 | 2016 |

IMF Bentham



| 1986 | 1990 | 2001 | 2015 |
|---|---|---|---|
| Founded as Omni Finance | Distressed asset recovery and restructuring | Asset tracing and enforcement intelligence | Entered Asia |

**United Kingdom**

$13bn[3]

**Asia**

$21bn[5]

**Continental Europe**

$21bn[4]

**Australia & New Zealand**

$4bn[6,7]

Launched external funding model

2017

Entered UK

2018

**Merger of IMF Bentham and Omni Bridgeway**

2019

Transacted first secondary market disposals

2022

Diversified, scalable, returns-focused platform offering full capability across the litigation finance spectrum

2017

Acquired ROLAND ProzessFinanz, Germany

2018

Entered Middle East

2021

Entered New Zealand and Latin America

## Regional highlights

### Industry recognition

Our footprint, deep market relationships, and proven track record of successful outcomes for claimants is undisputed, and industry recognition continues to reflect this.



Omni Bridgeway's industry accolades continued to grow in FY23. We received the most recognition of any litigation funder by Chambers and Partners, a third-party market research report based solely on client, market, and peer feedback.

Top-tier media coverage of Omni Bridgeway grew significantly in FY23, signalling the continued rise of our brand and reputation amid a greater market understanding of legal finance and the critical role funders play in the management of legal risk.


## 220+
**People**


## 14
**Countries**


## 26
**Locations**



# Americas

**Canada, United States, Latin America**


### Jim Batson
**Managing Director and
Co-Chief Investment Officer – US**


### Matthew Harrison
**Managing Director and
Co-Chief Investment Officer – US**


### Paul Rand
**Managing Director and
Chief Investment Officer – Canada**

In FY23, Omni Bridgeway continued its strategic growth in the Americas in response to market demand. New locations, Investment team hires and promotions, and appointments in Legal, Risk & Compliance and Marketing and Business Development grew the company's footprint, market share, and recognition. Growth was further supported by our unique value proposition in the Americas including dedicated intellectual property and judgement enforcement capabilities.

### FY23 achievements and highlights

Expanded operations into Chicago and Miami, and grew the Investment Team in Dallas, Houston, Minneapolis, Montreal, New York, Toronto and Washington, representing 24% growth in the Americas.

The US based Judgement Enforcement team completed its first full fiscal year, generating enforcement and merits-plus-enforcement investment opportunities.

Growing market interest in funding of commercial disputes, combined with strong appetite for class action funding drove an increase in funding opportunities in Canada.

The US deepened its focus on class actions, mass torts, and LatAm to provide more client solutions and broader market coverage.

The Canada, US, and LatAm teams were each recognised as Band 1 leaders in litigation support by Chambers and Partners.

**Videos on company market insights**



**From our Americas team**
*omnibridgeway.com/insights/americas*



# APAC

**Asia-Pacific including Asia, Australia, New Zealand**



### Tom Glasgow

**Managing Director and Chief Investment Officer – APAC | Portfolio Manager – Global International Arbitration**



# EMEA

**Europe, Middle East, Africa**



### Raymond van Hulst

**Executive Director, Managing Director and Co-Chief Investment Officer – EMEA**



### Hannah van Roessel

**Managing Director and Co-Chief Investment Officer – EMEA**

In FY23 we continued to advance our strategic market priorities and internal capabilities in the region, appointing investment team members to new leadership positions and adding key hires in the construction and insolvency sectors. While the region's slower post-COVID-19 reopening continued to affect activity early in the year, by the second half we saw an uptick in new applications, new investments, case completions and business development. Market awareness and development continues to increase across the wider APAC region, whilst demand remains very strong in more established markets like Australia, Singapore and Hong Kong.

The EMEA team continued its expansion in FY23, further solidifying the company's regional position as the largest and most experienced funding team. New operations were established in Italy and France while the investment team grew in Dubai and Geneva. Key appointments were also made in Tax and a global head of People & Culture based in EMEA.

## FY23 achievements and highlights

Exceeded new investment targets for the APAC region.

Expanded the Investment Team in Hong Kong and Singapore with strategic hires who bring specialised expertise.

Appointed Tom Glasgow (Singapore) as sole APAC Managing Director and CIO, Kristen Smith (Melbourne) as Portfolio Manager for Australia, and Ruth Stackpool-Moore (Singapore) as Senior Investment Manager.

Continued to diversify and cross-pollinate our offering in APAC including leveraging our increased capability in insolvency, construction, insurance, international arbitration and enforcement disputes to the benefit of the wider APAC region.

Increased internal cross-border collaboration is resulting in the development of new business opportunities for APAC clients with disputes across the globe and vice-versa, underscoring the value of our unique global portfolio and hub structure.

## FY23 achievements and highlights

In addition to establishing operations in Paris, France and Milan, Italy we expanded resources in Dubai with investment managers specialised in local enforcement and construction matters.

Expanded global capability in intellectual property with the first EMEA-based appointment of an IP specialised investment manager in Germany.

Expanding the collective redress portfolio across various EMEA jurisdictions, including a sizeable investment in a cross-collateralised portfolio of opt-out group claims in Portugal.

Appointed Hannah van Roessel as Managing Director and Co-Chief Investment Officer for EMEA, and Kees de Visser as Chair of the Investment Committee for the region.

The Board of Directors announced Raymond van Hulst, Executive Director, Managing Director and Co-CIO of EMEA as CEO successor upon Andrew Saker's retirement in October 2023.



**From our APAC team**
*omnibridgeway.com/insights/apac*



**From our EMEA team**
*omnibridgeway.com/insights/emea*

# ESG and corporate social responsibility

We are committed to good stewardship of investor funds and believe that making a positive impact on the environment and the societies in which we operate is an integral part of delivering long term value for our stakeholders.

Optimising environmental, social and governance outcomes that support value creation requires ongoing focus and effort commensurate with the scale of our business and its operations.

Last financial year, we adopted the globally recognised reporting Standard provided by the Sustainability Accounting Standards Board (**SASB**) and its guidance for companies in the Asset Management & Custody Activities sector. The Standard has a particular focus on the information needs of institutional investors and was chosen by the International Sustainability Standards Board (**ISSB**) and the IFRS Foundation in November 2021 as the preferred reporting framework for harmonising sustainability disclosures for financial markets globally.

In August 2022, the IFRS Foundation assumed responsibility for SASB Standards when it merged with the Value Reporting Foundation, which previously maintained these Standards. In line with the ISSB's guidance, our sustainability disclosures have been prepared in accordance with the SASB Standards until they are replaced by IFRS Sustainability Disclosure Standards.

In accordance with ASX Listing Rule 4.10.3, our ESG Report is available on our corporate website at *https://omnibridgeway.com/investors/environmental-social-governance*.

## Responsible investment

Omni Bridgeway is committed to responsible investment. Our core business delivers a clear social benefit; our heritage was built on the desire to increase access to justice, particularly for the small and impecunious claimant. In addition, financing claims against wrongdoers for misconduct can have a deterrent effect, which in turn, benefits society more broadly.

We are a leading global provider of funding and specialised skills for litigation, arbitration and enforcement processes and our core values reflect the principles of fairness, transparency and acting ethically and responsibly that characterised our beginnings.

Some of our funds include a screening process to prohibit the financing of investments that have negative ESG characteristics.

We continue to consider the feasibility of launching a new fund focused on investments with a positive ESG profile.



**Environmental footprint**
Carbon Offset Program implemented in FY23

**ESG screening**
ESG criteria for some of our funds before extending finance

**ESG reporting**
Transparent reporting in our public disclosures



**Access to justice**
Assist those who cannot afford justice against strong opponents, especially through financing of class actions

**Community support**
Volunteer Days Program and pro bono activities where we live and work

**Diversity and inclusion**
Systems to promote equal access, opportunity and advancement for employees

**Positive impact on the economy**
Financing allows companies to invest in their businesses

**Deter potential malfeasance**
Hold wrongdoers to account with a potential deterrent effect

**Robust risk management**
Consistent investment in cyber resilience and working towards Tier 3 NIST Rating



## Environmental

Notwithstanding that our business has a comparatively limited environmental impact, we are focused on reducing our environmental footprint relating to travel, building premises and energy consumption.

Omni Bridgeway has adopted a local 'boots-on-the-ground' approach to business development, jurisdictional know-how, and origination of investment opportunities with our employees working from 26 global locations as opposed to a 'fly in, fly out' strategy. This is achieved through a combination of fully remote and hybrid in-office roles, allowing us to attract and retain top talent, be the largest global funder by headcount and geographic coverage but reduce our reliance on global travel, resulting in a lower carbon footprint.

In August 2022, we began using an end-to-end carbon offsetting travel solution for our Australia and North America teams to assist us to reduce our carbon footprint. This program delivers a set of tools for making sustainable travel decisions. During FY23, we offset 180 tonnes of $CO_2$ emissions for some of our travel. We will look to extend this program in FY24.

Across our business, we encourage all employees to adopt work practices that promote environmental sustainability, including providing recycling programs, digital filing and electronic invoicing systems and use of water and energy savings devices.

In future years, we will look to provide quantitative data, where available, in line with evolving regulatory requirements.



## Social

As a provider of legal finance and risk solutions, people are core to our success.

We are committed to workplace diversity and recognise the value of attracting and retaining a diverse workforce and creating a culture that supports our people to deliver their best.

Several initiatives have been implemented to promote staff engagement and retention including employee surveys, provision of a flexible work environment (where possible), leave programs, including parental leave for both primary and secondary carers, access to Employee Assistance Programs and ongoing training and development.

We are also active participants in our community, introducing a paid volunteer leave scheme in FY23 allowing employees to take two days of paid leave to engage in volunteering activities.



## Governance

Omni Bridgeway is committed to the highest standards of conduct and to being a responsible corporate citizen. It is critical that we lead by example, with a strong corporate governance framework; a central component to effective compliance and risk management. To achieve this goal, we seek to have clear and effective governance policies and procedures which are regularly updated and contained in our Corporate Governance Manual. The Board strives to ensure that these policies and principles are embedded into the culture of the global organisation.

Our Code of Conduct is supported by our policies including our Whistleblower, Anti-Bribery and Corruption, and Securities Trading policies.

Our Compliance Program includes regulatory identification and change management, regulatory relationship management, new risk assessments, monitoring and testing, breach and incident identification, analysis, training, and reporting.

The objectives and expectations to managing risk is set out in our Risk Management Policy in a proactive and effective manner and provides supporting guidance including a Risk Management Framework.

A key risk is the protection of digital information. We have made consistent investment in cyber resilience and have adopted an IT and Cybersecurity Risk Management Policy which describes our overall policies and procedures. Work continues towards attaining a maturity Tier 3 rating under the National Institute of Standards and Technology (**NIST**) Cybersecurity Framework, which integrates industry standards and best practices to help manage cybersecurity risks.

We are committed to ensuring appropriate communication with key stakeholders; shareholders, investor partners and clients – as set out in our ESG Report.



We are committed to workplace diversity and recognise the value of attracting and retaining a diverse workforce and creating a culture that supports our people to deliver their best.

# Global risk, regulation and governance

As the industry continues to grow and evolve, there have been minor regulatory developments in some of the markets in which we operate.

### Developing regulatory landscape

**APAC** In Australia, following a change in the federal government in May 2022, a more favourable regulatory landscape emerged for third-party funders. The new government unwound some of the regulatory changes implemented by the previous government. As a result, funded class actions in Australia are now exempt from the managed investment scheme (**MIS**) regime, and litigation funders are exempt from holding an Australian Financial Services Licence (**AFSL**) and other financial services regulatory requirements.

In Asia, success-based fee arrangements for lawyers in arbitration were legalised in both Singapore and Hong Kong in 2022. We consider that these developments create opportunities to finance law firms acting under these arrangements.

**Europe** In September 2022, the EU Parliament approved a report into litigation funding and requested the European Commission to propose a Directive. Proposed rules included a duty on claimants to disclose third-party funding and a fee cap on funders. If enacted, Member States would then have time to implement the Directive in their domestic law. In June 2023, the International Legal Finance Association (**ILFA**) published a report which criticised the proposed reforms. In late June 2023, it was reported that the Commission has planned to conduct a study of the existing European litigation funding landscape before implementing any new rules.

In July 2023, the German Federal Parliament (Bundestag) passed a Bill to implement the EU Collective Redress Directive. This will be considered by the Federal Council (Bundesrat) in September and is expected to come into force in October. Aspects of the Bill have been subject to criticism, including late changes which restrict the amount that a litigation funder may agree to receive from the proceeds of a successful claim to 10%. Although these limitations will have little direct impact on our business, we will monitor any future impact of the changes.

**UK** In late July 2023, in PACCAR Inc and Others v Competition Appeal Tribunal and Others, the UK Supreme Court overturned earlier decisions in the case and held that the litigation funding agreements (**LFAs**) at issue were "damages-based agreements" within the meaning of the relevant legislation in England.

As a result, the LFAs were subject to the Damages-Based Agreement Regulations 2013 (**DBA Regulations**) which set out certain requirements for an agreement to be lawful and enforceable.

It was accepted that the LFAs considered by the UK Supreme Court were non-compliant with the DBA Regulations, and therefore unenforceable. Omni Bridgeway, through its highly diversified investment portfolio, has very limited exposure to this development. The DBA Regulations are specific to English litigation and arbitration with particular pricing structures and have little or no impact on our other markets, including continental Europe, the Americas or APAC. We do not anticipate any material impact on existing investments and remain confident that the UK will be a key market for litigation funding.

**US** In the US, the Government Accountability Office (**GAO**), which provides research reports to Congress, conducted an inquiry into the US litigation funding industry. Representatives from ILFA (including Omni Bridgeway) participated in the inquiry. In December 2022, the GAO published a report. The report surveyed the third-party litigation finance market, discussed pros and cons and distinguished between commercial and consumer funding. The report made no specific recommendations.

Some US courts have set rules requiring disclosure of litigation funding arrangements. Omni Bridgeway continues to review and consider the implications of those rules. The US Chamber of Commerce's Institute for Legal Reform continues to lobby for litigation finance legislation at the federal and state level. Dispute funders, including Omni Bridgeway, monitor and respond via ILFA to maintain a level playing field.

**Global** Omni Bridgeway continues to play an active role in key industry associations around the world, including ILFA and the new European Litigation Funders Association (**ELFA**). Omni Bridgeway's Managing Director Enforcement & EMEA, Wieger Wielinga, is the inaugural chairman of ELFA.

### Endorsements from our clients and peers



Omni Bridgeway's team has impressive depth and breadth, and openness to any subject matter.

**Chambers and Partners
Litigation Support Guide 2023**



Extremely effective and efficient. They are collaborative, hands-on and solution-oriented.

**Chambers and Partners
Litigation Support Guide 2023**



They have a very strong commercial awareness.

**Chambers and Partners
Litigation Support Guide 2023**

# 1,723 applications

## 1. Origination

Opportunities are primarily originated through potential clients, advisors, other third parties or internally by formulating a funding idea.
The investing process begins with the execution of a confidentiality agreement.

A disciplined approach to the assessment of financial and legal merits including a risk analysis of potential investments.
Our Investment Committees are comprised of highly respected, experienced legal and investment professionals.

# 505 reviewed

## 2. Application review

Opportunities are evaluated by numerous factors including the type and strength of the case, pricing and risk analysis, likely duration, and an estimate of the capital required.

**39 funded
18 IC approved
& conditionally
funded**

## 4. Monitoring and realisation

An investment may take between 1 and 5 years to complete.

The IM will monitor developments in the investment as it progresses and receive periodic updates from the lawyers.

In certain jurisdictions, we may provide insight and strategic guidance concerning the investment and settlement opportunities.

## 3. Funding decision

The Investment Committee (IC) receives a due diligence report which is prepared by the Investment Manager (IM).

The IC decides whether to recommend to the applicable fund. This requires unanimous approval.

## 5. Distribution of proceeds

If an investment is successful, the claimant's lawyers will deduct the fees owing to the Group from the claim proceeds, and pay the balance to the client.

If the claim fails, the Group does not recover its investment and may also be responsible for paying the defendant's costs on the terms agreed with client, if not covered by ATE or adverse cost insurance.

# Directors' report
## Board of Directors



## Michael Kay
**Non-Executive Chairman**

**Appointed**   July 2015

**Committee membership**    

Bachelor of Laws
(University of Sydney, Australia)

Michael Kay has been the Non-Executive Chairman since July 2015. He brings a wealth of commercial experience, with a sound track-record of building successful businesses.

In his last executive role, he was Chief Executive Officer and Managing Director of salary packaging company McMillan Shakespeare Limited. He was previously Chief Executive Officer of national insurer AAMI and before that spent 12 years in private legal practice.

**Directorships of other listed entities within the past three years**
• Chairman and Non-Executive Director of City Chic Collective Limited (ASX: CCX) (appointed October 2018)



## Andrew Saker
**Managing Director & CEO and Chief Strategy Officer – US**

**Appointed**   January 2015

**Committee membership**   n/a

Bachelor of Commerce (Accounting & Finance) (University of Western Australia)
Associate Member, Chartered Accountants Australia and New Zealand

Andrew Saker was appointed Managing Director & Chief Executive Officer in January 2015. Since then, he has led a transformational strategy of geographic expansion, product diversification, and migrating the company's business model from capital management to fund management.

In 2019 Mr Saker led the merger, and subsequent integration, of the IMF Bentham and Omni Bridgeway legacy businesses to form the global Omni Bridgeway Group. Omni Bridgeway is now the largest funding team in the world and the global leader in financing and managing legal risks.

Mr Saker has lived and worked in Australia, Asia and the United States.

Until his appointment as Managing Director & Chief Executive Officer, Mr Saker was a Registered Company Liquidator of the Australian Securities & Investments Commission and an Official Liquidator of the Supreme and Federal Courts.

Mr Saker has announced that he will be retiring from the Group on 26 October 2023, after which he will have a consulting role with the Group for a period of 12 months.

**Directorships of other listed entities within the past three years**
Nil



## Raymond van Hulst
**Executive Director, Managing Director and Chief Investment Officer – EMEA**

**Appointed**   April 2020

**Committee membership**   n/a

Masters of Business Administration (INSEAD)
Masters in Management
(University of Groningen, The Netherlands)

Raymond van Hulst has been appointed CEO elect for the company and scheduled to take over as CEO as per the AGM in October 2023.

Mr van Hulst has over 20 years' experience in structuring and managing innovative solutions for complex and high value litigation funding and legal enforcement matters. He has been leading one of the largest teams of litigators, recovery, business intelligence and asset-tracing specialists in the industry, while being responsible for several special projects and the company's strategic initiatives, operations and investment activities across the EMEA region.

Mr van Hulst has established three institutionally backed funds aimed at funding legal disputes and enforcement matters, including in joint venture with the International Finance Corporation, part of the World Bank for the Distressed Asset Recovery Program. He has headed Omni Bridgeway's Investment Committee for these funds. Mr van Hulst also led Omni Bridgeway's acquisition of its German funding business, Roland ProzessFinanz, in 2017.

Mr van Hulst was previously with ABN AMRO Bank Structured Finance, based out of India and Europe.

**Directorships of other listed entities within the past three years**
Nil

## Committee membership

Ⓐ  Audit and Risk Committee
Ⓒ  Corporate Governance Committee

Ⓝ  Nomination and Remuneration Committee

🟤  Chair of Committee
🔵  Member of Committee



## Karen Phin
**Non-Executive Director**

**Appointed**     August 2017

**Committee membership**  

Bachelor of Arts and Bachelor of Laws (Honours)
(University of Sydney, Australia)
Graduate Australian Institute
of Company Directors

Karen Phin has over 25 years'
experience advising Australian listed
companies on capital management,
capital raisings and mergers and
acquisitions. Until 2014, Ms Phin was
a Managing Director and Head of Capital
Advisory at Citigroup in Australia and
New Zealand. Prior to joining Citigroup,
she spent 12 months at ASIC as a Senior
Specialist in the Corporations group.
From 1996 to 2009, Ms Phin was
a Managing Director at UBS AG, where
she established and led the Capital
Management Group.

**Directorships of other listed entities
within the past three years**
- Non-Executive Director of ARB
  Corporation Limited (ASX: ARB)
  (appointed June 2019)
- Non-Executive Director of Magellan
  Financial Group Limited (ASX: MFG)
  (retired September 2022)
- Member of the Takeovers Panel
  (since 2015)



## Christine Feldmanis
**Non-Executive Director**

**Appointed**     November 2018

**Committee membership**  

Bachelor of Commerce
(University of Wollongong, Australia)
Master of Applied Finance
(Macquarie University, Australia)
Fellow of the Australian Institute
of Company Directors
Trustee Fellow of the Association
of Superannuation Funds of Australia
Senior Fellow of the Financial Services
Institute of Australasia
Certified Practising Accountant

Christine Feldmanis is a qualified
accountant, investment, governance,
and risk management specialist with
over 30 years' experience in the finance
and investment industry. Ms Feldmanis
was previously Managing Director of an
ASX-listed boutique funds management
incubator business and Chief Finance
Officer of the NSW Treasury Corporation.

**Directorships of other listed entities
within the past three years**
- Non-Executive Director of United
  Malt Limited (ASX: UMG) (appointed
  January 2023)
- Chair and Non-Executive Director
  of Bell Financial Group Ltd (ASX: BFG)
  (appointed February 2020)
- Non-Executive Director of Perpetual
  Equity Investment Company Limited
  (ASX: PIC) (retired November 2020)



## Michael Green
**Non-Executive Director**

**Appointed**     April 2023

**Committee membership**   

Bachelor of Arts (honours) Economics
(University of Exeter, UK)

Michael Green has over 20 years'
experience in the global investment
industry. Mr Green was International
CEO for both Morgan Stanley Investment
Management and for American Century
Investments where he was a member of
their respective Executive Management
Committees and was a board member
for a number of local entities and global
fund structures. In 2020, Mr Green
became a co-opted non-executive
member of the Investment Oversight
Committee for the London CIV, the
local government pension fund asset
pooling company.

**Directorships of other listed entities
within the past three years**
- Chairman, Non-Executive Director,
  Independent Trustee and Head of the
  Investment Committee of Lloyd's of
  London Pension Scheme (LON: LLOY)
  (appointed May 2007)

## Board of Directors continued

## Officers



### Michael Bowen

**Non-Executive Chairman (retired)**

| | |
|---|---|
| **Appointed** | December 2001 |
| **Retired** | November 2022 |

Bachelor of Laws, Jurisprudence and Commerce (University of Western Australia)

Michael Bowen was a partner of global law firm DLA Piper and joined Thomson Geer in 2020. He practises primarily corporate, commercial and securities law with an emphasis on mergers, acquisitions, capital raisings and resources.

He has been admitted as a barrister and solicitor of the Supreme Court of Western Australia since 1979 and is also admitted as a solicitor of the High Court of Australia.

He is a Certified Public Accountant and a member of the Australian Society of Accountants.

**Directorships of other listed entities within the past three years**
- Non-Executive Director of Emerald Resources NL (ASX: EMR) (appointed September 2022)
- Non-Executive Director of Lotus Resources Limited (ASX: LOT) (appointed February 2021)
- Non-Executive Director of Genesis Minerals Limited (ASX: GMD) (appointed October 2021)
- Non-Executive Director of Trek Metals Limited (ASX: TKM) (retired September 2020)



### Guillaume Leger

**Global Chief Financial Officer**

| | |
|---|---|
| **Appointed** | August 2022 |

Graduate Diploma Public Accounting (HEC Montréal)
Bachelor Accounting Sciences (Université du Québec à Montréal)

Guillaume Leger joined the Company in August 2022, and oversees the company's global financial operations including investor relations, capital raising, financial planning, treasury, corporate development and financial reporting.

Mr Leger was formerly the Group Controller for Circle K – Alimentation Couche-Tard, Inc., a publicly traded Fortune 200 company. Mr Leger also previously served as CFO at Citigroup in Hong Kong after holding a range of senior positions across Citigroup's business in North America, Asia, New Zealand, Australia and Brazil.

His early career included progressive roles within PwC and Deloitte, starting in 1996. He is a CFA Charterholder and a Canadian CPA.



### Jeremy Sambrook

**Global General Counsel and Company Secretary**

| | |
|---|---|
| **Appointed** | January 2016 |

Bachelor of Laws (University of Bristol, United Kingdom)

Jeremy Sambrook is an experienced corporate lawyer with a broad in-house legal and private practice background, having practised in the UK, Hong Kong, the Channel Islands and Australia.

Mr Sambrook was appointed as General Counsel and Company Secretary in 2016 and has built out the global legal, compliance and risk function, in line with the international growth of the business, to a team of legal and compliance specialists across APAC, North America and EMEA.

## Operating and financial review

### Principal activities

The Group's principal activities were:

- the investment into, and management of, Funds (or Fund-like structures) that are focused on investing into litigation, dispute resolution and enforcement matters globally; and

- the continued holding of direct investments into similar litigation, dispute resolution, and enforcement matters.

The Group invests by entering into funding agreements with claimants, liquidators, banks, creditors, or law firms to provide funding, recovery, enforcement and associated services; or purchasing awards, claims or rights to action, non-performing loans and distressed debt.

Overlaying the principal activities is the Funds management aspect of the Group that:

- provides services to external third party capital;

- generates recurring management and service fees; and

- provides the opportunity for further return through performance fees depending on a Fund's performance.

There were no significant changes to the principal activities of the Group during the year.

### Nature of operations

The Group is an alternative asset manager investing in legal risk management which is typically non-cyclical and uncorrelated to underlying economic conditions.

Since 2017, investment activities are undertaken through its Funds management platform extending to the Americas, APAC and EMEA regions:

- **Funds 1, 2&3** – First Generation Funds – were established by the Group in 2017 with a European distribution waterfall and a preferred return to external Fund investors. Fund 1 was deconsolidated on 31 May 2023 following the sale of a participation in Fund 1 assets and is now recognised as an investment in associates. Funds 2&3 are consolidated within the Group Consolidated Financial Statements with distributions to OBL including a management fee and a residual profit share that eliminate upon consolidation, whilst the NCI component will vary depending upon the status of the NCI distribution waterfall.

- **Fund 4 and Fund 5** – Second Generation Funds – were established by the Group in 2019 with an American distribution waterfall, periodic management fees and transactional performance fees. Fund 4 investments are consolidated into the Group, with external investor's share shown as NCI. Fund 4 management and performance fees are charged to the investors of Fund 4 and therefore appear in the Consolidated Statement of Comprehensive Income. Fund 5 is brought in at the Group's attributable 20% share of income, assets and liabilities with no associated NCI. Fund 5 management and performance fees are included in the Consolidated Statement of Comprehensive Income.

- **Fund 6 and Fund 7** – purchased by the Group in 2019 through the acquisition of OBE - have a hybrid deal-by-deal and Fund level waterfall together with management fees.

- **Fund 8** is an insured leveraged structure focused on global enforcement.

The waterfalls and fee structures in the various Funds in part determine the attribution of profits, net assets and distributions between the Group's equity holders and non-controlling interests.

Whilst the Group manages the Funds' investment activity, diversification and opportunities using third party capital, it is a committed litigation investment funder in its own right, holding a meaningful capital interest (5%-25%) in each Fund, with the exception of Fund 1 where the Group holds an entitlement to distributions on completed investments as per its waterfall.

Whether by direct investment or via a Fund structure, the objective is to successfully complete (e.g. by settlement, court judgement, arbitral award or enforcement recovery) litigation investments. The successful completion of an investment and the timing of that completion is, in many respects, beyond the Group's control and it may take several years between making an initial investment and finalising a completion.

The Group is also able to sell a partial or full interest in litigation investments into the secondary market rather than continuing to hold the entirety of the investment through to completion. Secondary sales improve the liquidity, mitigate completion and duration risk of these investments while also accelerating realisations and retaining most of the upside potential.

If the underlying litigation, arbitration, recovery or enforcement action is successful, the Group earns a return from the resolution sum obtained.

Where the Group has purchased the award, claim or right to action, non-performing loan or distressed debt the return will be the resolution sum less any legal or professional fees and any residual success fee component to the vendor. Otherwise, the resolution sum is shared with the funded client(s) in accordance with the contracted funding terms. The share to the Group will generally be the amount invested plus a return defined as either:

- a multiple of the amount invested; or

- a percentage of the realised amount; or

- a combination of the above.

In some instances (e.g. Australian class action litigation) the presiding court or tribunal of the underlying litigation may be involved to approve a settlement and that involvement can extend to consideration of the litigation funding terms.

Generally, the multiple or percentage return to the Group increases as the duration of an investment extends. If the underlying litigation, arbitration, recovery or enforcement is unsuccessful the Group generally does not generate any financial return.

## Operating and financial review (continued)

In certain jurisdictions, the investment terms may require the Group to pay an amount of adverse costs to the litigation counterparty. In certain circumstances, the Group can obtain insurance to protect any of deployed capital, commission and adverse costs exposure.

### Employees

At 30 June 2023, the Group employed 224 permanent staff (2022: 199).

### Operating results for the financial year

The Group made a profit after tax (before NCI) for the year of $0.9 million (2022: $6.5 million). This is reflective of the variability of returns from investments with binary outcomes and non-linear periods for completions.

The total gross proceeds and investment revenue in FY23 was $231.6 million. This reflects the Group's consolidated share of Fund 5 at 20%, at 100% the value was $283.4 million[1].

In FY23, the loss attributable to the equity holders of the Parent reduced from $42.8m for the first half year to $31.7m for the year, this reflects the Group made a profit of $11.1m attributable to shareholders in the last half year.

The value created through scaling our team of legal asset specialists improved operational efficiencies during the year. On average, the Group has increased its EPV per investment manager ratio by 14% and new investment EPV per investment manager ratio by 9%.

Costs in the year were consistent with growth targets. Employee expenses increased 25% on the prior year. The change predominately relates to headcount growth to 224 people from 199 at 30 June 2022, which is reflected in the improvement in commitment levels, whist still achieving significant efficiency gains. Corporate overheads reflect resumed levels of pre-COVID-19 expenditure for certain categories, new operating locations and investment in marketing efforts.

*Excerpts from Consolidated Statement of Comprehensive Income for the year ended 30 June 2023*

| | 2023 $'000 | 2022 $'000 | Change % |
|---|---|---|---|
| Gross proceeds and investment revenue[1] | **231,552** | 204,713 | 13% |
| Costs of derecognition or disposal of litigation investments | **(129,541)** | (131,778) | (2%) |
| Other revenue and income | **14,799** | 16,246 | (9%) |
| **Total income** | **116,810** | **89,181** | **31%** |
| Other expenses, fair value adjustments and tax benefits | **(115,948)** | (82,699) | 40% |
| **Profit after tax** | **862** | **6,482** | **(87%)** |

1. Gross proceeds and investment revenue is calculated as the sum of proceeds on derecognition of litigation investments – intangible assets, proceeds on derecognition of litigation investments – purchased claims, revenue from litigation investments – claims portfolio and gross proceeds from litigation investment in associates for the consolidated group. It is categorised as non-IFRS information prepared in accordance with ASIC Regulatory Guidance 230 – Disclosing non-IFRS financial information, issued in December 2011. The $231.6 million reflects the Group's 20% interest in Fund 5. If the 80% attributable to external investors of $51.8 million had been included, the total would be $283.4 million as per the Investment Portfolio Report at 30 June 2023, lodged with ASX on 31 July 2023.
   Refer to Appendix for more detail on non-IFRS disclosures.

### Non-controlling interest (NCI)

The loss attributable to the Group's equity holders in FY23 was $31.7 million with a profit of $32.5 million attributable to NCI. This disproportionate attribution is primarily due to the status of the First Generation Funds' distribution waterfalls which prioritised the return to NCI during the period. For Funds 2&3, the NCI portion is dependent on the status of the waterfall which progresses from initially 100% going to NCI, and then 100% to OBL and finally a back end profit share.

### Consolidated Statement of Financial Position

The Group continues to maintain a solid financial position based on:

• Strong liquidity and working capital levels

• Debt refinancing which was settled on 8 July 2022

• Limited net debt and total equity

• Continued growth of litigation investments

*Litigation investments*

At 30 June 2023, the carrying value of litigation investments was $596.7 million (2022: $550.9 million) with more than 300 active litigation investments. This reflects the Group's consolidated share of Fund 5 at 20%. At 100%, the value was $741.8 million (2022:$635.1 million).

All investments are generally carried at cost, except for litigation investments - investment in associates, which was recognised at fair value at date of deconsolidation of Fund 1. There is typically a lag between investment commitment and capital deployment.

## Operating and financial review (continued)

### Liquidity and capital resources

The Group continues to maintain an adequate financial position with appropriate liquidity and working capital levels sufficient for continued portfolio growth and commitments to litigation investments.

At 30 June 2023, the Group had limited net debt and an appropriate level of equity.

### Working capital

|  | 2023 $'000 | 2022 $'000 | Change % |
|---|---|---|---|
| Current assets | **266,725** | 293,083 | (9%) |
| Current liabilities (excluding debt)[1] | **103,727** | 128,329 | (19%) |
| **Net working capital** | **162,998** | **164,754** | **(1%)** |
| Working capital ratio | **2.6:1** | 2.3:1 | 13% |

1. Current liabilities exclude debt for the purposes of calculating the working capital. There was no debt due within 12 months as at 30 June 2023 and the debt as at 30 June 2022 was fully repaid in July 2022.

### Capital structure

A strong capital position was maintained at 30 June 2023, built on the Group's cash holdings, limited net debt and total equity. This capital structure enables the the business to grow its operations, meet deployment obligations and support corporate initiatives.

### Profile of interest-bearing debt

The profile of the Group's interest-bearing debt at 30 June 2023 is summarised in the table below.

|  | 2023 $'000 | 2022 $'000 | Change % |
|---|---|---|---|
| Omni Bridgeway Bonds | **–** | 76,000 | (100%) |
| Fixed Rate Notes | **–** | 72,000 | (100%) |
| Leases | **2,933** | 2,755 | 6% |
| Current | **2,933** | 150,755 | (98%) |
| Borrowings | **181,639** | – | 100% |
| Leases | **15,008** | 11,173 | 34% |
| Non-current | **196,647** | 11,173 | 1660% |
| **Total interest-bearing debt** | **199,580** | **161,928** | **23%** |

### Debt refinance

On 8 July 2022, the Group made an initial draw down of $150 million on the new 5-year, $250 million institutional debt facility to redeem the Bonds and Fixed Rate Notes in advance of their maturities on 22 December 2022 and 8 January 2026 respectively. The facility is provided by Northleaf Capital Partners and Pacific Equity Partners and included $100 million of undrawn debt capital. In March 2023, the Group drew $40 million of the undrawn capital to optimise its medium term capital management.

The facility terms include a variable rate of interest based on the BBSW Bid rate plus a fixed margin of 7.00% per annum, a maturity date of 1 July 2027, a security interest over all present and after-acquired property of OBL and guarantees and security provided by certain wholly owned subsidiaries.

The facility provides a comparative improvement with the removal of the restrictive requirement to hold cash and receivables equivalent to 75% of the debt (being $142.5 million at 30 June 2023) which related to the Bonds and Fixed Rate Notes.

As at 30 June 2023, the drawn components of the combined facility are classified as non-current borrowings.

## Operating and financial review (continued)

### Consolidated Statement of Cash Flows

The consolidated Statement of Cash Flows illustrates that there was a decrease in cash and cash equivalents for the year ended 30 June 2023 of $42.0 million (2022: increase of $16.3 million).

In relation to the movement in cash:

- Operating activities: $130.4 million net cash outflows (2022: $74.5 million)

- Investing activities: $30.6 million net cash inflows (2022: $163.5 million)

Across both operating and investing activities per IFRS classifications, the aggregate cash flows include:

- Proceeds from litigation investments: $127.3 million

- Management and performance fee proceeds: $8.8 million

- Payments for litigation investments: $182.3 million

Financing activities $57.8 million net cash inflows (2022: net cash outflows $74.3 million) include:

- Contributions from NCI: $135.9 million

- Distributions to NCI: ($93.2) million

## Investment activity

### FY23 overview

Commitments and completions are the key drivers of our business and they continued to grow in FY23, demonstrated by a particularly strong last half year. Key metrics and highlights included:

- Generated investment income in FY23 of $338.6 million, reflecting Fund 5 at 100%, (from income recognised, income yet to be recognised (IYTBR) and secondary market transactions), with $119.8 million provisionally attributable to OBL. The gross proceeds and investment revenue of $231.6 million in the Consolidated Financial Statements reflects the Group's consolidated share of Fund 5 at 20%.

- Recognised $182.4 million income, reflecting Fund 5 at 100%, from diversified sources in a strong 4Q23, representing approximately 65% of annual income recognised.

- Achieved FY23 commitments target with a commitment to fund $544.2 million to investments, representing $11.0 billion of new EPV (from matters that were newly funded, conditionally approved or had increased investment opportunities). These commitments continued to expand the portfolio's diversification and reduce concentration.

- Estimated portfolio value (EPV) of $30.5 billion, up 12% in FY23 after completions, reductions from impaired investments and the Fund 1 deconsolidation. This comprised $26.0 billion from unconditional investments and $4.5 billion from conditionally-funded and Investment Committee-approved investments. At 30 June 2023 there are 301 active litigation investments in the portfolio.

- Implied embedded value (IEV) is $3.9 billion at 30 June 2023 for funded investments.

- EPV conversion rate for FY23 was 14% reflecting adjusted litigation proceeds.

### Secondary market sales

During the year, we continued to unlock opportunities in the secondary market while diversifying income streams, recycling capital, and accelerating returns to our investors.

Secondary market transactions relating to Fund 1 during FY23 generated gross cash proceeds of $75.7 million, excluding $86.6 million from the third-party's share of sale of an investment vehicle in December 2022, comprising:

- $28.0 million from an investment disposal in December 2022.

- $47.7 million from the sale of a participation in Fund 1 assets which completed on 31 May 2023.

This risk management strategy allows us to reduce duration and completion risks, while enhancing liquidity and preserving internal rates of return.

We expect this market will continue to evolve and we anticipate that it will provide a meaningful contribution to future sources of income.

Subject to achieving appropriate return metrics, we have identified investments (spread across all our funds) as potential candidates, either in whole or in part, for secondary market transactions.

## Investment activity (continued)

### Fund summary and distribution profiles

The majority of our 301 investments reside within a Fund, with less than 2% of total investments remaining on the Group's Consolidated Statement of Financial Position with a minimal carrying value of $9.5 million.

The Funds 2&3 structure provide OBL shareholders with a back-end return of our capital and a substantial profit share, which we will attribute to OBL in future periods.

Our Second Generation Funds, Fund 4 and Fund 5, are demonstrating good progress and will generate returns and fees when the funds are more mature, further completions occur and performance crystallises the outcome from the waterfall.

#### Fund 1
Secondary market transactions in FY23 relating to Fund 1 resulted in the deconsolidation of the subsidiary on 31 May 2023. The residual interest in Fund 1 is recognised as an investment in associate within the Group Consolidated Financial Statements. Fund 1 operational metrics, effective from 1 June 2023 are not disclosed.

#### Funds 2&3
The investment period of Funds 2&3 have expired and they are in their "harvest" phase.

For Funds 2&3 there is $120 million capital and returns outstanding to the Fund NCI at 30 June 2023 and $30.1 million of cash proceeds from litigation and current receivables. The receipt and distribution will further pay down the Funds 2&3 NCI.

#### Fund 4 and Fund 5
Fund 4 and Fund 5 continue to deploy capital and have approximately US$245 million in available capacity including recycling of capital. We plan on executing a first close of a series II upsizing in 1H24 of around US$400 million to US$600 million with existing investors. A second close is planned with other new investors to follow.

#### Fund 6
Fund 6 is in harvest mode. Merits investment opportunities are being funded by Fund 5 and enforcement investment opportunities will flow to Fund 8 once closed.

#### Fund 7
Fund 7 is being restructured and discontinued.

#### Fund 8
The enforcement investments that are warehoused on the OBL balance sheet will transfer to Fund 8 upon completion, which is anticipated in 1Q24.

As part of establishing the first series of the €300 million Fund 8, we are in advanced stages to close a limited recourse debt facility of up to €135 million with standby equity to be provided by OBL of up to €15 million.

The debt will be secured against an already acquired principal protection insurance policy as well as the Fund 8 investments.

#### New funds
We are exploring the creation of new Funds, both structured in a similar manner and potentially dedicated to ESG and low-risk investment strategies, which, together with the upsizing of Funds 4 and 5, will increase our funds under management.

#### Fund distribution profiles
The following is a Fund summary and distribution profile at 30 June 2023:

| Portfolio | Fund size | Phase | Committed | Capital called | Capital deployed | Capital committed - undeployed | Capital uncommitted | Other (costs and recycled profits) | Total distributions (capital and returns) | NCI (A$) | OBL (A$) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Fund breakdown | | | | | Outstanding amounts yet to be attributable to | |
| Funds 2&3[1] | $189m | Harvest | 100% | $163m | $134m | $44m | ($4m) | $15m | ($67m) | $120m | $41m |
| Fund 4 | US$500m | Investing | 86% | US$236m | US$225m | US$190m | US$72m | US$13m | (US$74m) | $196m | $49m |
| Fund 5[2] | US$500m | Investing | 85% | US$168m | US$134m | US$262m | US$74m | US$30m | (US$19m) | $179m | $45m |
| Fund 6[3,4] | €188m | Harvest | 100% | €91m | €94m | €112m | (€18m) | €50m | – | $142m | $7m |
| Fund 7[2] | US$100m | n/a | 4% | US$4m | US$4m | – | US$96m | – | – | $5m | <$1m |
| Fund 8[5,6] | €150m | Launched | 4% | – | <€1m | €6m | €144m | – | – | – | – |

1. Fund 2&3 capital uncommitted represents the over commitment allowance.
2. Fund 5 and Fund 7 are not consolidated within the Group Consolidated Financial Statements, here they are presented at 100%.
3. Data for Fund 6 is current at 31 March 2023.
4. Fund size is €150m plus an over commitment allowance of 25%.
5. Investments warehoused on OBL balance sheet, fund size subject to completion of the debt facility.
6. The principal protection insurance extends the indemnity to €270 million which facilitates a second series or an upsize of series I.

## Investment activity (continued)

### Fund performance

The following table demonstrates ROIC and IRR for completed investments.

| | Completed investment performance[1] | | | | | |
| | 1 Year | | 3 Year | | 5 Year | |
| | ROIC | IRR | ROIC | IRR | ROIC | IRR |
|---|---|---|---|---|---|---|
| Balance sheet | 1.01x | 17% | 2.12x | 31% | 1.70x | 35% |
| Fund 1 | (0.20x) | – | 0.51x | 10% | 0.40x | 12% |
| Funds 2&3 | 1.16x | 36% | 0.08x | 3% | 0.84x | 64% |
| Fund 4 | (0.96x) | (43%) | (0.25x) | 75% | n/a | n/a |
| Fund 5 | 2.87x | 127% | 1.05x | 54% | n/a | n/a |
| Fund 6 | 2.65x | 50% | 2.08x | 60% | n/a | n/a |
| **Total** | **0.02x** | **–** | **0.74x** | **22%** | **0.99x** | **29%** |

1. Fund 1 to Fund 5 since their respective dates of inception and for Fund 6 since 2019 merger.

### Specific investments

The Group's balance sheet investment in the Brisbane Floods class action, Wivenhoe Dam, completed in June 2023. A final tranche of income of $16.0 million was recognised and reflects the finalisation of the loss assessment by external counsel. The final cash distribution of $13.7 million is anticipated to be received in late August 2023 and is reflected in the balance sheet receivable balance at 30 June 2023.

The Westgem investment on the Group's balance sheet remains fully impaired. In June 2023, the High Court of Australia declined to grant special leave to appeal the Supreme Court of Western Australia Court of Appeal's decision.

The appeal petition to the US Supreme Court in relation to the fully impaired Fund 4 investment was denied in April 2023. As there are no further avenues for appeal, the investment was removed from our portfolio. The EPV of this investment was $1.6 billion with an estimated completion date of FY24.

## Shareholders

### Dividends

The Company considers its capital management options in light of the cash position and performance of the Group at the time as well as the likely demand for cash over the ensuing 12-month period. In determining the appropriate mechanism to deliver returns to shareholders, the Board will consider both semi-annual dividends and share buy-backs. Relevant considerations include the source and nature of income and the prevailing share price relative to the intrinsic value and the franking credit balance.

Based on the FY23 profit result and expected capital requirements, the Directors have not declared an interim or final dividend for the year (2022:Nil).

### Shareholder returns

The following summary of operating results reflects the Group's performance for the year ended 30 June 2023:

| | 2023 | 2022 |
|---|---|---|
| Basic loss per share (cents per share) | **(11.50)** | (17.17) |
| Diluted loss per share (cents per share) | **(11.50)** | (17.17) |
| Return on assets (NPAT/average assets) | **0.1%** | 0.6% |
| Return on equity (NPAT/average equity) | **0.1%** | 0.9% |
| Net debt/equity ratio %[1] | **8.2%** | n/a |

1. As cash and short term deposits are greater than total debt, net debt (cash and short term deposits less total debt) is positive as at 30 June 2022.

### Shares issued during the year

On 7 December 2022, the Company issued 7,755,446 shares to the vendors of OBE relating to the 2019 acquisition in satisfaction of the third tranche of variable deferred consideration and second and final tranche of deferred consideration.

On 30 August 2022, the Company issued 2,768,359 shares relating to the FY20 LTIP vesting.

### Share options – unissued shares

As at 30 June 2023 there were 15,421,416 share performance rights on issue (2022: 15,929,183).

## Risk management

### Risk management framework

Omni Bridgeway's risk management framework is overseen by the Board and includes our Risk Policy, Risk Strategy and Risk Appetite Statement setting out the arrangements for identification, assessment, monitoring, management and reporting of risks. Our Risk Policy describes our approach to risk management and as a key corporate governance policy is available on the OBL website. The Policy is supported by our Risk Appetite Statement which is set by the Board to be aligned with our business strategy.

Our Audit and Risk Committee receives at least quarterly reporting on risks measured against our risk appetite and ensures that we maintain our robust processes and systems for management of our identified current and anticipated risks. The Board requests and receives additional reporting on risk culture across the Group, including the results of risk culture surveys.

In FY23, we continue to evolve our risk management focus to respond to new and emerging risks whilst remaining focused on the quality of our investment management processes. The below 'Key risks and responses' table sets out some of our material risks and risk treatment responses.

### Key risks and responses

| Risk | Description | Risk response |
|---|---|---|
| **Investment governance and sourcing** | Our biggest risk is our ability to maintain a high standard of investment decision making which has underpinned our historical success. | Risk management policies and procedures are designed to ensure the continued high quality of investment decisions as well as diversity and reduced concentration risk. The role of the investment committees is a key pillar of our investment risk management process. |
| **Investment duration** | The timing of the completion of our investments is uncertain and generally entirely outside of our control. If a material number of investments are delayed this can produce a high level of earnings volatility. | Pricing structure which increases with duration, portfolio diversification and active use of the secondary market are the primary ways in which we have sought to navigate duration risk. |
| **Competition** | Increased competition in any market may result in a potential reduction in market share or, at the least, an on-going challenge to convert a larger portion of the addressable market in order to maintain growth. | We manage competition through diversity of products and operating markets and ownership of investments while relying on our sourcing and underwriting expertise. As an established market leader we will continue to maintain pricing integrity and a floor in our pricing. |
| **Capital raising** | The rate of growth of the business in terms of investment commitments requires us to have the ability to raise capital, enabling us to be competitive in the markets in which we operate. The global increase in interest rates has increased the competition for third party capital. | We seek to maintain our excellent track record through continued focus on risk management across all facets of the business and have a continuous engagement program with private capital markets. |
| **Cybersecurity** | A major systems and/or data breach may have material adverse consequences for the business and its reputation. The business holds a high level of sensitive case material surrounding its investments, a data breach could result in the loss of privilege in such material and a breach of confidentiality obligations. | The Board has oversight of our Cybersecurity Risk Management Framework and receives regular reporting on cybersecurity matters. Our cybersecurity risk management framework is supported by our cybersecurity, electronic communications, privacy, data breach management and other cyber related policies that set out requirements for ensuring the security of the confidential and personal information maintained in our systems and mechanisms for escalating and resolving breaches. Our employees are a critical line of defence in cybersecurity risk detection and we employ regular cybersecurity training, friendly phishing exercises as well as simulated cyber threat scenario workshops to reinforce cyber awareness.<br><br>We invest in security hardware, software and systems and regularly submit to external IT audits to prevent attacks and detect (and learn from) new attack tools, methodologies and targets.<br><br>As part of our continuous focus on cybersecurity and in response to an increased focus globally on cybersecurity risks, we have undertaken an assessment and review of our cybersecurity risk management practices to benchmark against the NIST framework and ensure that we are meeting global best practices and standards in cybersecurity. |
| **Regulatory, compliance and conduct** | We are subject to global regulatory requirements. A material failure in compliance may result in a liability for damages, regulatory fines and reputational damage. | The group has developed an effective compliance risk management framework to ensure that we meet our global regulatory requirements.<br><br>The Global Head of Risk and Compliance leads the risk and compliance function and ensures that the compliance framework is supported by global policies as well as a robust compliance monitoring, Board reporting and training program to instill best practice across our international network. Our global policies include internal breach reporting procedures as well as a Whistleblower Policy to enable policy violations and misconduct to be reported, escalated and managed using a transparent process. |

## Significant events after reporting date

Apart from that disclosed in this report, no other circumstances have arisen since 30 June 2023 that have significantly affected, or may significantly affect the consolidated entities' operations, the results of those operations, or the consolidated entities state of affairs in the future financial years.

## Likely developments and expected results

The Group does not provide forecasts considering the difficulty in estimating the timing of the finalisation of its investments but provides an indication of its view of the possible completion dates and EPV in the quarterly portfolio reports.

The Group expects demand for its funding to continue in each of its markets. Competition is expected to increase in coming years with new entrants in each market. Litigation funding is considered non-cyclical or uncorrelated to underlying economic conditions.

## Environmental regulation and performance

The Consolidated Entity's operations are not presently subject to significant environmental regulation under the laws of the Commonwealth and the States of Australia.

## Indemnification and insurance of directors and officers

During the financial year, the Company has paid premiums in respect of an insurance contract insuring all the directors and officers of the Group against any legal costs incurred in defending proceedings for conduct other than, amongst others:

(a) wilful breach of duty; or

(b) contravention of sections 182 or 183 of the Corporations Act 2001, as may be permitted by section 199B of the Corporations Act 2001.

The total amount of premiums paid under the insurance contract referred to above was $2.3 million during the current financial year (2022: $2.2 million).

## Indemnification of auditors

To the extent permitted by law, the Company has agreed to indemnify its auditors, as part of the terms of its audit engagement against claims by third parties arising from the audit (for an unspecified amount). No payment has been made to indemnify BDO during or since the financial year.

## Directors' meetings

The number of meetings of directors held during the period under review, and the number of meetings attended by each director, were as follows:

| | Board Meetings | Project Sub Committee Meetings | Audit and Risk Committee | Remuneration Committee | Nomination Committee | Corporate Governance Committee |
|---|---|---|---|---|---|---|
| Total number of meetings held: | 9 | 2 | 4 | 3 | 1 | 2 |
| **Meetings attended:** | | | | | | |
| M Kay | 9 | 2 | 4 | 3 | 1 | 2 |
| A Saker | 9 | 1,1* | 3* | 1* | 1* | 2* |
| R van Hulst | 8 | 1,1* | 1* | 0 | 1* | 0 |
| M Bowen[1] | 3 | 1* | 2 | 2 | 0 | 0 |
| K Phin | 9 | 2 | 4 | 3 | 1 | 2 |
| C Feldmanis | 9 | 1,1* | 4 | 3 | 1 | 2 |
| M Green[2] | 2*,3 | 1* | 1 | 0 | 1 | 1* |

* Attended by invitation
1. Retired November 2022.
2. Appointed April 2023.

## Letter from the Chair of the Nomination and Remuneration Committee

Dear Shareholder

I present the FY23 Remuneration Report on behalf of the Board of Directors (**Board**). As part of our ongoing commitment to transparency and responsible corporate governance, this report outlines our remuneration framework and practices during the fiscal year.

As our qualitative investment business is characterised by an average three-year investment cycle, we believe it is important that our remuneration framework aligns with the overarching goals of our long-term business strategy while providing an effective mechanism to attract, motivate and retain high calibre employees with a long-term outlook.

The remuneration structure for KMP, senior executives and investment managers is comprised of both fixed and "at risk" components. The fixed remuneration component is benchmarked against market standards in our various operating regions. The "at risk" element is structured as:

- a Short-Term Incentive Plan (**STIP**) that provides for an annual cash payment, subject to the achievement of key financial and non-financial performance objectives; and

- an equity based Long-Term Incentive Plan (**LTIP**) that provides for an annual grant of performance rights with a three-year vesting cycle tested against the Company's Total Shareholder Return (**TSR**) and Compound Annual Growth Rate (**CAGR**) of the investment asset balance.

The Board conducted a review of the remuneration framework in 2021 and, as part of this process, Mercer confirmed that the principles and structure of our STIP and LTIP are well-aligned with industry peers and the broader market. Following this review, the Board determined to increase the TSR weighting in the LTIP vesting conditions to 80% and reduce the weighting of the investment asset CAGR to 20%. In addition, forfeiture and clawback provisions were incorporated into the LTIP rules which maintain alignment of shareholder and employee's interests beyond vesting.

The foundations of the STIP and LTIP have remained constant, whilst the performance hurdles and other elements have evolved with the business to ensure executive reward and shareholder value remain closely aligned. This is reflected in the vesting determination at the conclusion of FY23:

- 50% of LTIP performance rights are due to vest based upon the relevant metrics for their three-year performance between 1 July 2020 and 30 June 2023.

- in light of the statutory loss in FY23, there have been no STIP payments awarded to senior employees.

The Board values the insights and perspectives of shareholders and will continue to assess the appropriateness of the performance hurdles for the at-risk remuneration component to ensure they are aligned with the creation of long-term shareholder value. Given the importance of our people to the success of OBL, our goal is to incentivise and reward our exceptional team in the optimal manner for all stakeholders.

Yours faithfully

**Karen Phin**

Chair of the Nomination and Remuneration Committee

## Remuneration Report (Audited)

This Remuneration Report outlines the director and Key Management Personnel (**KMP**) remuneration arrangements of the Group in accordance with the requirements of the *Corporations Act 2001* (Cth) and its Regulations. For the purposes of this report, KMP of the Group are defined as those persons having authority and responsibility for planning, directing and controlling the major activities of the Group, directly or indirectly, including any director (whether executive or otherwise) of Omni Bridgeway Limited (OBL).

### Key management personnel

Details of OBL's KMP for the 2023 financial year are:

### (i) Directors

| | |
|---|---|
| **Michael Kay** | Non-Executive Director and Chairman |
| **Andrew Saker** | Managing Director & CEO and Chief Strategy Officer - US |
| **Raymond van Hulst** | Executive Director, Managing Director and Co-Chief Investment Officer – EMEA |
| **Michael Bowen** | Non-Executive Director (retired on 30 November 2022) |
| **Karen Phin** | Non-Executive Director |
| **Christine Feldmanis** | Non-Executive Director |
| **Michael Green** | Non-Executive Director (formally appointed on 28 April 2023) |

### (ii) Executives

| | |
|---|---|
| **Stuart Mitchell** | Group Chief Financial Officer (resigned effective 30 September 2022) |
| **Jeremy Sambrook** | Group General Counsel and Company Secretary |
| **Guillaume Leger** | Global Chief Financial Officer (appointed 1 September 2022) |

There were no other changes to OBL's KMP after the reporting date and before the financial report was authorised for issue.

### Remuneration Committee

The Remuneration Committee determines and reviews the remuneration arrangements for the Board and KMP. This involves an assessment of the appropriateness of the nature and amount of the emoluments on a periodic basis by reference to relevant employment market conditions.

Mercer Consulting (Australia) Pty Ltd was engaged in 2021 to review our remuneration structure. The review led to some adjustment in the STIP and LTIP. The Board is satisfied that the review was free from undue influence by eligible participants, KMP or other LTIP participants.

### Remuneration philosophy

The performance of the Group is heavily dependent upon the quality of its directors, KMP and staff generally. Accordingly, the Company must attract, motivate, and retain high calibre directors and personnel.

The Group embodies the following principles in its remuneration framework:

- determination of appropriate market rates for the fixed remuneration component recognising that the majority of investment professionals are most comparable to partners in private practice professional services businesses; and

- establishment of appropriate performance hurdles for the variable at-risk remuneration component.

### Remuneration structure

The structure of non-executive director and executive or KMP remuneration structures are separate and distinct.

### Non-executive director remuneration structure

All non-executive directors enter into service agreements with the Company in the form of a letter of appointment. The letter summarises the Board policies and terms, including remuneration, relevant to the office of Director.

Fees and payments to non-executive directors reflect the demands which are made on, and the responsibilities of, the non-executive directors.

Non-executive directors' fees and payments totalled $601,101 (including superannuation), as disclosed in the following tables in this report.

At the 2015 Annual General Meeting, shareholders approved payments up to $700,000 to non-executive directors.

There are no retirement allowances for non-executive directors, nor do they have a variable at-risk remuneration component. Non-executive directors may elect to have a portion of their remuneration paid into their personal superannuation plans.

## Remuneration Report (Audited) (continued)

### Executive & KMP remuneration structures

#### *Objective*

The Group aims to reward executives, KMP and other staff with a level and mix of compensation elements commensurate with their position and responsibilities, within the following framework:

- reward for Group and individual performance against targets set to appropriate benchmarks;

- align the interests with shareholders;

- link rewards with the internal strategic goals of the Group; and

- ensure total compensation is competitive by market standards.

#### *Structure*

All executives and KMP have employment contracts. Details of these contracts are provided below in the following Executive & KMP Employment Contracts table.

Remuneration consists of two key elements: (i) fixed component, consisting of base salary, retirement contributions, and benefits; and (ii) variable at-risk component, consisting of (i) short-term incentive plan (STIP) and (ii) long-term incentive plan (LTIP).

#### Fixed remuneration component

The levels of fixed remuneration are reflective of employment conditions in respective locations and consider skills, experience, and responsibility. Reference is generally to the private practice professional services market within which the Company competes for talent. Investment managers are invariably at or around the partner level of legal practices prior to joining the Group.

Fixed compensation is reviewed annually by the Nomination and Remuneration Committee. The process consists of a review of Group and individual performance, relevant comparative compensation in the market and internally and, where appropriate, external advice on policies and practices.

#### Variable at-risk remuneration component (short & long-term)

#### *Objective*

The objective of the variable compensation component is to reward executives in a manner aligned with the objectives and internal key performance indicators of the Group. The total potential incentive available is set at a level to provide sufficient incentivization to achieve the operational and strategic targets at a reasonable cost.

#### *Structure*

There is a STIP based on one-year performance and a LTIP tied to three-year performance. The STIP & LTIP are products of and subject to external remuneration review and are reflective of industry standards.

#### Short-Term Incentive Plan

The purpose of STIP is to provide an annual 'at-risk' incentive to participants linked to the achievement of specific financial and non-financial performance goals. The STIP performance measures reflect the core drivers of short-term performance and also provide a framework for delivering sustainable value to the Group, its shareholders and other stakeholders.

#### Long-Term Incentive Plan

The LTIP is tied to the Group's long-term performance. It encourages equity ownership and directly aligns shareholders' and participants' interests, whilst also not being a cash drain.

There are 2 tranches of LTIP. The relative proportion between each can be changed by the Remuneration Committee each year.

| Key Features of Variable Remuneration Component | | |
|---|---|---|
| | **STIP** | **LTIP** |
| **Participants** | Executive directors & KMP (participant may substitute their allocation with rights equivalent to LTIP rights) Senior employees | All executive directors & KMP. Senior employees |
| **Participation % of TFR** | *Pre-1 July 2021 employees:* | *Pre-1 July 2021 employees:* |
| | – LTIP Executive – | – Executive max 100% |
| | – Other max 40% | – Other max 60% |
| | *Post-1 July 2021 employees:* | *Post-1 July 2021 employees:* |
| | – Level 1 participant max 40% | – Executive max 100% |
| | – Level 2 participant max 35% | – Senior participant max 60% |
| | – Level 3 participant max 30% | – Junior participant max 30% |
| | – Level 4 participant max 20% | |

## Remuneration Report (Audited) (continued)

| Key Features of Variable Remuneration Component | | |
|---|---|---|
| | **STIP** | **LTIP** |
| **Payment frequency and type** | Annual in cash | Annual grant of performance rights with 3-year vesting |
| | | Each right over OBL ordinary shares is issued for |
| | | no consideration or exercise price |
| | | The number of rights issued at the beginning of each service period is determined by reference to individual's TFR and the Company's VWAP at either (i) 30 June of the preceding Financial Year; or 31 December of the preceding Half Financial Year, depending on when a participant became eligible to participate in the LTIP |

Tranche 1 – Total Shareholder Return (TSR) = 80%
OBL's TSR compared to a peer group comprising entities from the ASX diversified financials industry group with a market capitalisation of < $1bn

Tranche 2 – Capital deployed = 20%
The amount of capital deployed to litigation investments

**Performance criteria**

(i) Group's financial
Positive consolidated net profit before tax for the year, as a gating requirement.

(ii) Individual
Key performance indicators (KPIs) are targeted to the individual's role and their ability to influence the strategic and commercial objectives of the Group incorporated in the approved business plan and budget, risk and compliance policies and procedures, and cultural, leadership and behavioural expectations

Tranche 1 – (TSR) = 80%
Vesting depends on Company's Percentile ranking over the vesting period compared to the peer group:

| Percentile rank | % tranche 1 – TSR vesting |
|---|---|
| less than 50th | nil |
| equal to 50th | 50% |
| between 50-75% | 50-100% determined on a straight line basis |
| 75th or above | 100% |

Tranche 2 – Capital deployed = 20%

Vesting depends on the CAGR of Capital deployed over the vesting period

| CAGR | % tranche 2 – Funds deployed |
|---|---|
| less than 5% | nil |
| equal to 5% | 50% |
| between 5 -7% | 50-100% determined on a straight line basis |
| 7% or above | 100% |

**Other**

- Good leaver/bad leaver provisions in respect to unvested rights
- Malus event provisions in respect to fraud, dishonest behaviour, or gross misconduct
- 12-month clawback provisions.

## Remuneration Report (Audited) (continued)

### Executive & KMP Employment Contracts

| **Andrew Saker** Managing Director & CEO and Chief Strategy Officer – US | |
|---|---|
| Contract commenced | 5 January 2015 |
| Gross annual salary package | $1,250,000 (excluding super) + a USA cost-of-living allowance |
| Salary review | By the Board from time to time |
| Notice period | 6 months by the Group or 12 months by the employee |
| Termination payment arrangements | As approved at the 21 November 2018 AGM (i) notice period (ii) 12 months' salary, (iii) statutory entitlements, and (iv) If termination occurs due to the provision of notice by OBL, or due to the provision of notice by Mr Saker following a material breach by the Company of the executive services agreement or a material diminution of Mr Saker's role or due to redundancy or Mr Saker's ill health, then, in addition to the above, Mr Saker shall be entitled to receive a potential further amount calculated by reference to the number of shares Mr Saker would have received had he retained the good leaver proportion of his unvested performance rights. Any such payment is contingent on the level of satisfaction of the performance conditions associated with the referenced performance rights and shall be calculated by reference to the 5-day-VWAP calculated at the time such performance rights would have vested if they had been held for the full performance period. |
| STIP / LTIP Participation level | Pre-1 July 2021 employee – "Executive" |

| **Raymond van Hulst** Executive Director, Managing Director and Chief Investment Officer – EMEA | |
|---|---|
| Contract commenced | 21 April 2020 |
| Gross annual salary package | CHF620,000 |
| Salary review | Annually |
| Notice period | 3 months by either the Group or employee |
| Termination payment arrangements | Statutory entitlements, notice period, and subject to good or bad leaver status unvested LTIP |
| STIP / LTIP Participation level | Pre-1 July 2021 employee – "Other" |
| New Contract | Based on Raymond van Hulst's appointment as CEO, a new contract will be entered into, effective on 26 October 2023. |

Remuneration Report (Audited) (continued)

**Executive & KMP Employment Contracts**

| **Jeremy Sambrook** Group General Counsel and Company Secretary | |
|---|---|
| Contract commenced | 18 January 2016 |
| Gross annual salary package | $500,000 (including super) |
| Salary review | Annually |
| Notice period | 6 months by either the Group or employee |
| Termination payment arrangements | Statutory entitlements, notice period, and subject to good or bad leaver status unvested LTIP |
| STIP / LTIP Participation level | Pre-1 July 2021 employee – "Executive" |

| **Stuart Mitchell** Group Chief Financial Officer (handover to G. Leger effective 1 September 2022) | |
|---|---|
| Contract commenced/concluded | 12 November 2018 /30 September 2022 |
| Gross annual salary package | $450,000 (including super) |
| Salary review | Annually |
| Notice period | 6 months by either the Group or employee |
| Termination payment arrangements | Statutory entitlements, notice period, and subject to good or bad leaver status unvested LTIP |
| STIP / LTIP Participation level | Pre-1 July 2021 employee – "Other" |

| **Guillaume Leger** Global Chief Financial Officer (handover from S. Mitchell effective 1 September 2022) | |
|---|---|
| Contract commencement | 12 August 2022 |
| Gross annual salary package | USD500,000 plus safe harbour |
| Salary review | Annually |
| Notice period | 3 months by either the Group or employee |
| Termination payment arrangements | Statutory entitlements, notice period, and subject to good or bad leaver status unvested LTIP |
| STIP / LTIP Participation level | Post-1 July 2021 employee – Level 1 participant/Senior Participant |
| Appointment performance rights | Rights with personal KPI & continuity of service hurdles: |
| | – 140,752 rights; for period 1 September 2022 – 30 June 2023 |
| | – 60,307 rights; for period 1 September 2022 – 30 June 2024 |

## Remuneration Report (Audited) (continued)
### Remuneration of Key Management Personnel

| 2023 | Fixed Remuneration | | | Variable Remuneration | | | | |
|---|---|---|---|---|---|---|---|---|
| | Short-term benefits | | Post-employment | Long-term benefits | Share based payments | | | |
| | Salary & fees $ | Cash bonus accrued $ | Super-annuation / pension $ | Employee entitlements $ | Share performance rights $ | Termination payments $ | Total remuneration $ | Performance related % |
| *Directors* | | | | | | | | |
| M. Kay | 203,526 | – | 21,370 | – | – | – | 224,896 | – |
| A. Saker | 1,974,251 | – | 25,292 | (1,566) | 622,391 | – | 2,620,368 | 24% |
| R. van Hulst | 1,044,057 | – | 49,759 | 8,830 | 183,260 | – | 1,285,906 | 14% |
| M. Bowen[1] | 37,707 | – | 3,959 | – | – | – | 41,666 | – |
| K. Phin | 135,747 | – | 14,253 | – | – | – | 150,000 | – |
| C. Feldmanis | 150,000 | – | – | – | – | – | 150,000 | – |
| M. Green | 34,539 | – | – | – | – | – | 34,539 | – |
| *Executives* | | | | | | | | |
| S. Mitchell[2] | 108,037 | – | 6,323 | (100,704) | 167,618 | 87,749 | 269,023 | 62% |
| J. Sambrook | 480,231 | – | 25,292 | 27,603 | 248,321 | – | 781,447 | 32% |
| G. Leger | 686,111 | – | 7,478 | 51,602 | 802,616 | – | 1,547,807 | 52% |
| **Total** | **4,854,206** | **–** | **153,726** | **(14,235)** | **2,024,206** | **87,749** | **7,105,652** | |

1.  Michael Bowen retired on 30 November 2022.
2.  Stuart Mitchell left the Group on 31 August 2022. The negative employee entitlements reflects the payments of his accrued entitlements.

| 2022 | Fixed Remuneration | | | Variable Remuneration | | | | |
|---|---|---|---|---|---|---|---|---|
| | Short-term benefits | | Post-employment | Long-term benefits | Share based payments | | | |
| | Salary & fees $ | Cash bonus accrued $ | Super-annuation / pension $ | Employee entitlements $ | Share performance rights $ | Termination payments $ | Total remuneration $ | Performance related % |
| *Directors* | | | | | | | | |
| M. Kay | 204,451 | – | 20,445 | – | – | – | 224,896 | – |
| A. Saker | 1,951,827 | – | 23,568 | 134,937 | 1,105,319 | – | 3,215,651 | 34% |
| H. McLernon | 488,216 | – | 11,784 | (873,526) | 600,816 | 882,489 | 1,109,779 | 54% |
| R. van Hulst | 792,252 | – | 36,429 | 18,275 | 141,033 | – | 987,989 | 14% |
| M. Bowen[1] | 90,909 | – | 9,091 | – | – | – | 100,000 | – |
| K. Phin | 135,273 | – | 14,727 | – | – | – | 150,000 | – |
| C. Feldmanis | 150,000 | – | – | – | – | – | 150,000 | – |
| *Executives* | | | | | | | | |
| S. Mitchell | 430,707 | – | 23,568 | 33,712 | 245,762 | – | 733,749 | 33% |
| J. Sambrook | 446,377 | – | 23,568 | 27,531 | 264,042 | – | 761,518 | 35% |
| **Total** | **4,690,012** | **–** | **163,180** | **(659,071)** | **2,356,972** | **882,489** | **7,433,582** | |

The following table outlines the proportion of maximum STIP earned by KMP in the 2023 financial year.

| 2023 | Maximum STIP opportunity (% of TFR) | Maximum STIP opportunity ($) | % of maximum earned | % of STIP forfeited |
|---|---|---|---|---|
| Andrew Saker[1] | – | – | – | – |
| Raymond van Hulst | 25% | 193,945 | – | 100% |
| Stuart Mitchell | 40% | 180,000 | – | 100% |
| Guillaume Leger | – | – | – | – |
| Jeremy Sambrook[1] | – | – | – | – |

1.  Elected to receive 100% of variable remuneration as LTIP.

Non-executives (M. Kay, M. Bowen, K. Phin, C. Feldmanis, M. Green) did not participate in STIP. They have not been included in the table. Any awards of STIP for FY23 will, in accordance with the Company's remuneration cycle, be determined in the coming months.

## Remuneration Report (Audited) (continued)

### Share performance rights – Granted and vested during the year – Key Management Personnel

| | | | | Granted during the year | | | | | | | |
| | | | | Tranche 1 | | Tranche 2 | | Total | | | Value remaining to be expensed to profit & loss |
| | Grant date | Vesting date | Expiry Date | Awarded during the year | Fair value per rights at grant date[1] | Awarded during the year | Fair value per rights at grant date[1] | awarded during the year | value granted during the year | Vested during the years | |
| 2023 | | | | Number | $ | Number | $ | Number | $ | Number | $ |
| *Executive Directors* | | | | | | | | | | | |
| A. Saker | 01-Jul-22 | 30-Jun-25 | 01-Jul-37 | 129,431 | 1.85 | 32,358 | 3.32 | 161,789 | 346,876 | 131,949 | 146,582 |
| R. van Hulst | 01-Jul-22 | 30-Jun-25 | 01-Jul-37 | 90,080 | 1.85 | 22,520 | 3.32 | 112,600 | 241,414 | 30,353 | 204,027 |
| | | | | | | | | | | | |
| *Executives* | | | | | | | | | | | |
| S. Mitchell | 01-Jul-22 | 30-Jun-25 | 01-Jul-37 | – | 1.85 | – | 3.32 | – | – | 21,031 | |
| J. Sambrook | 01-Jul-22 | 30-Jun-25 | 01-Jul-37 | 117,479 | 1.85 | 29,370 | 3.32 | 146,849 | 314,844 | 26,147 | 292,295 |
| G. Leger | 01-Jul-22 | 30-Jun-25 | 01-Jul-37 | 170,531 | 1.85 | 42,633 | 3.32 | 213,164 | 457,024 | – | 304,682 |
| G. Leger Bonus T1[2] | 14-Jul-22 | 30-Jun-23 | 14-Jul-37 | 140,752 | 3.85 | – | – | 140,752 | 541,895 | 140,752 | – |
| G. Leger Bonus T2[2] | 14-Jul-22 | 30-Jun-24 | 14-Jul-37 | – | – | 60,307 | 3.78 | 60,307 | 227,659 | – | 108,379 |
| **Total** | | | | **648,273** | | **187,188** | | **835,461** | **2,129,712** | **350,232** | **1,055,965** |

1. The performance rights vested in current year is subject to fx adjustment, which has been estimated for the year end reporting purpose.
2. Guillaume Leger's T1 and T2 Bonus is included in addition to performance rights.

| | | | | Granted during the year | | | | | | | |
| | | | | Tranche 1 | | Tranche 2 | | Total | | | Value remaining to be expensed to profit & loss |
| | Grant date | Vesting date | Expiry Date | Awarded during the year | Fair value per rights at grant date[1] | Awarded during the year | Fair value per rights at grant date[1] | awarded during the year | value granted during the year | Vested during the years | |
| 2022 | | | | Number | $ | Number | $ | Number | $ | Number | $ |
| *Executive Directors* | | | | | | | | | | | |
| A. Saker | 30-Nov-21 | 30-Jun-24 | 01-Jul-36 | 273,622 | 1.41 | 68,406 | 3.09 | 342,028 | 597,181 | 374,057 | 705,826 |
| H. McLernon | – | – | – | – | – | – | – | – | – | 289,634 | 137,355 |
| R. van Hulst | 30-Nov-21 | 30-Jun-24 | 01-Jul-36 | 59,222 | 1.41 | 14,806 | 3.09 | 74,028 | 129,253 | 27,880 | 145,873 |
| | | | | | | | | | | | |
| *Executives* | | | | | | | | | | | |
| S. Mitchell | 01-Jul-21 | 30-Jun-24 | 01-Jul-36 | 58,008 | 1.79 | 14,502 | 3.42 | 72,510 | 153,431 | 80,796 | 167,618 |
| J. Sambrook | 01-Jul-21 | 30-Jun-24 | 01-Jul-36 | 93,458 | 1.79 | 23,364 | 3.42 | 116,822 | 247,195 | 75,410 | 225,772 |
| **Total** | | | | **484,310** | | **121,078** | | **605,388** | **1,127,060** | **847,777** | **1,382,444** |

Non-executives (M. Kay, M. Bowen, K. Phin, C. Feldmanis, M. Green) did not participate in LTIP. They have not been included in the table.

The fair value of performance rights is determined at the time of grant as prescribed in AASB 2. For details on the valuation of performance rights, including models and assumptions used, refer to Note 32.

### Share performance right holdings of Key Management Personnel

| | Balance 1 July 2022 Number | Movement for the year | | | Balance 30 June 2023 Number | | |
| | Total | Granted as remuneration | Exercised | Lapsed | Total | Vested | Unvested |
| 2023 | Number | Number | Number | Number | Number | Number | Number |
| *Executive Directors* | | | | | | | |
| A. Saker | 2,808,524 | 367,122 | – | (414,676) | 2,760,970 | 2,334,547 | 426,423 |
| R. van Hulst | 162,068 | 112,600 | (16,725) | (40,962) | 216,981 | 30,353 | 186,628 |
| | | | | | | | |
| *Executives* | | | | | | | |
| S. Mitchell | 262,152 | – | – | (77,274) | 184,878 | 154,643 | 30,235 |
| J. Sambrook | 311,674 | 146,849 | – | (26,147) | 432,376 | 168,705 | 263,671 |
| G. Leger | – | 414,223 | – | – | 414,223 | 140,752 | 273,471 |
| **Total** | **3,544,418** | **1,040,794** | **(16,725)** | **(559,059)** | **4,009,428** | **2,829,000** | **1,180,428** |

## Remuneration Report (Audited) (continued)

| 2022 | Balance 1 July 2021 Total Number | Movement for the year Granted as remuneration Number | Exercised Number | Lapsed Number | Balance 30 June 2022 Total Number | Vested Number | Unvested Number |
|---|---|---|---|---|---|---|---|
| *Directors* | | | | | | | |
| A. Saker | 2,527,171 | 342,028 | – | (60,675) | 2,808,524 | 2,202,598 | 605,926 |
| H. McLernon | 2,390,355 | – | (1,723,993) | (258,927) | 407,435 | 289,634 | 117,801 |
| R. van Hulst | 92,652 | 74,028 | – | (4,612) | 162,068 | 27,880 | 134,188 |
| | | | | | | | |
| *Executives* | | | | | | | |
| S. Mitchell | 202,748 | 72,510 | – | (13,106) | 262,152 | 133,612 | 128,540 |
| J. Sambrook | 207,084 | 116,822 | – | (12,232) | 311,674 | 142,558 | 169,116 |
| **Total** | **5,420,010** | **605,388** | **(1,723,993)** | **(349,552)** | **3,951,853** | **2,796,282** | **1,155,571** |

Non-executives (M. Kay, M. Bowen, K. Phin, C. Feldmanis, M. Green) did not participate in LTIP. They have not been included in the table.

## Interests of Key Management Personnel

| 2023 | Shares Balance 1 July 2022 Number | Received as remuneration Number | Share performance rights exercised Number | Net change other[1] Number | Balance 30 June 2023 Number | Bonds Number | Notes Number |
|---|---|---|---|---|---|---|---|
| *Directors* | | | | | | | |
| M. Kay | 570,000 | – | – | – | 570,000 | – | – |
| A. Saker | 182,068 | – | – | – | 182,068 | – | – |
| R. van Hulst | 3,045,379 | – | 16,725 | 1,669,179 | 4,731,283 | – | – |
| M. Bowen | 1,114,620 | – | – | – | 1,114,620 | – | – |
| K. Phin | 27,266 | – | – | – | 27,266 | – | – |
| C. Feldmanis | 60,656 | – | – | – | 60,656 | – | – |
| | | | | | | | |
| *Executives* | | | | | | | |
| S. Mitchell | 134,941 | – | – | – | 134,941 | – | – |
| J. Sambrook | 8,446 | – | – | – | 8,446 | – | – |
| G. Leger | – | – | – | – | – | – | – |
| **Total** | **5,143,376** | **–** | **16,725** | **1,669,179** | **6,829,280** | **–** | **–** |

| 2022 | Shares Balance 1 July 2021 Number | Received as remuneration Number | Share performance rights exercised Number | Net change other[1] Number | Balance 30 June 2022 Number | Bonds Number | Notes Number |
|---|---|---|---|---|---|---|---|
| *Directors* | | | | | | | |
| M. Kay | 470,000 | – | – | 100,000 | 570,000 | – | – |
| A. Saker | 182,068 | – | – | – | 182,068 | – | – |
| H. McLernon | 4,185,982 | – | 1,723,993 | (5,909,975) | – | – | – |
| R. van Hulst | 2,153,551 | – | – | 891,828 | 3,045,379 | – | – |
| M. Bowen | 1,114,620 | – | – | – | 1,114,620 | 1,500 | – |
| K. Phin | 27,266 | – | – | – | 27,266 | – | – |
| C. Feldmanis | 45,656 | – | – | 15,000 | 60,656 | – | 80 |
| | | | | | | | |
| *Executives* | | | | | | | |
| S. Mitchell | 134,941 | – | – | – | 134,941 | – | – |
| J. Sambrook | 8,446 | – | – | – | 8,446 | – | – |
| **Total** | **8,322,530** | **–** | **1,723,993** | **(4,903,147)** | **5,143,376** | **1,500** | **80** |

1. Net change other relates to shares bought or sold on market.

Shares above are held nominally by the Directors or the other key management personnel.

Remuneration Report (Audited) (continued)

**Loans to Key Management Personnel**

There have been no loans provided to KMP in 2023 (2022: nil).

**Transactions with Key Management Personnel**

During the period, the Group obtained legal advice from a legal firm associated with Michael Bowen, Thomson Geer Lawyers of $55,012 (2022: $37,886). The legal advice was obtained at arm's length. The Group engages a number of different law firms for its external legal advice and its relationship with Thomson Geer is not exclusive. Michael Bowen did not participate in any board decisions to appoint external counsel when Thomson Geer was being considered for engagement. Refer to Note 36 for details.

**– End of Remuneration Report –**

# Auditor's Independence Declaration



| | |
|---|---|
| Tel: +61 8 6382 4600 | Level 9, Mia Yellagonga Tower 2 |
| Fax: +61 8 6382 4601 | 5 Spring Street |
| www.bdo.com.au | Perth, WA 6000 |
| | PO Box 700 West Perth WA 6872 |
| | Australia |

**DECLARATION OF INDEPENDENCE BY GLYN O'BRIEN TO THE DIRECTORS OF OMNI BRIDGEWAY LIMITED**

As lead auditor of Omni Bridgeway Limited for the year ended 30 June 2023, I declare that, to the best of my knowledge and belief, there have been:

1.  No contraventions of the auditor independence requirements of the *Corporations Act 2001* in relation to the audit; and

2.  No contraventions of any applicable code of professional conduct in relation to the audit.

This declaration is in respect of Omni Bridgeway Limited and the entities it controlled during the period.

*Glyn O'Brien*

**Glyn O'Brien**

**Director**

**BDO Audit (WA) Pty Ltd**

Perth

22 August 2023

BDO Audit (WA) Pty Ltd ABN 79 112 284 787 is a member of a national association of independent entities which are all members of BDO Australia Ltd ABN 77 050 110 275, an Australian company limited by guarantee. BDO Audit (WA) Pty Ltd and BDO Australia Ltd are members of BDO International Ltd, a UK company limited by guarantee, and form part of the international BDO network of independent member firms. Liability limited by a scheme approved under Professional Standards Legislation.

# Consolidated Statement of Comprehensive Income

for the year ended 30 June 2023

| | | Consolidated | |
| --- | --- | --- | --- |
| | | 2023 | 2022 |
| | Note | $'000 | $'000 |
| **Continuing operations** | | | |
| Revenue from contracts with customers | 2 | **11,469** | 21,867 |
| Interest revenue | 3 | **9,009** | 8,368 |
| Net gain on derecognition of litigation investments - intangible assets | 4 | **44,666** | 49,029 |
| Net gain on disposal of litigation investments - purchased claims | 12 | **1,019** | 790 |
| Net gain on disposal of subsidiaries | 34 | **46,078** | – |
| Other income | 5 | **4,569** | 9,127 |
| **Total income** | | **116,810** | 89,181 |
| | | | |
| Finance costs | 6(a) | **2,688** | 1,397 |
| Amortisation of litigation investments - claims portfolio | 6(b) | **4,042** | 5,650 |
| Depreciation expense | 6(c) | **3,917** | 3,455 |
| Employee benefits expenses | 6(d) | **73,992** | 59,149 |
| Corporate and office expenses | 6(e) | **18,146** | 17,411 |
| Other expenses | 6(f) | **6,790** | 3,602 |
| Impairment expense and adverse costs - litigation investments | 6(g) | **13,102** | 8,120 |
| Share of loss/(profit) in associates | 35 | **555** | (387) |
| **Loss before tax and fair value adjustments** | | **(6,422)** | (9,216) |
| Fair value adjustment of financial assets and liabilities | | **2,610** | 7,424 |
| **Loss before tax** | | **(3,812)** | (1,792) |
| Income tax benefit | 7 | **(4,674)** | (8,274) |
| **Profit for the year** | | **862** | 6,482 |
| | | | |
| **Attributable to:** | | | |
| Equity holders of the Parent | 8 | **(31,659)** | (45,645) |
| Non-controlling interests | 34 | **32,521** | 52,127 |
| | | | |
| **Other comprehensive income** | | | |
| Items that may be subsequently reclassified to profit or loss: | | | |
| Movement in foreign currency translation reserve | | **6,340** | 8,599 |
| Items that will not be subsequently reclassified to profit or loss: | | | |
| Movement in foreign currency translation reserve attributed to non-controlling interests | 34 | **6,291** | 10,465 |
| Other comprehensive income net of tax | | **12,631** | 19,064 |
| **Total comprehensive income for the year** | | **13,493** | 25,546 |
| | | | |
| **Attributable to:** | | | |
| Equity holders of the Parent | | **(25,319)** | (37,046) |
| Non-controlling interests | | **38,812** | 62,592 |
| | | | |
| **Loss per share attributable to the equity holders of the Company (cents per share)** | | | |
| Basic loss per share (cents per share) | 8 | **(11.50)** | (17.17) |
| Diluted loss per share (cents per share) | 8 | **(11.50)** | (17.17) |

The above Consolidated Statement of Comprehensive Income should be read in conjunction with the accompanying notes.

# Consolidated Statement of Financial Position

**as at 30 June 2023**

| | | Consolidated | |
| --- | --- | --- | --- |
| | | 2023 | 2022 |
| | Note | $'000 | $'000 |
| **Assets** | | | |
| **Current assets** | | | |
| Cash and cash equivalents | 18 | **117,016** | 158,966 |
| Trade and other receivables | 22 | **140,770** | 127,754 |
| Contract costs | 23 | **939** | 939 |
| Other assets | 24 | **8,000** | 5,424 |
| **Total current assets** | | **266,725** | 293,083 |
| | | | |
| **Non-current assets** | | | |
| Trade and other receivables | 22 | **45,661** | 36,638 |
| Litigation investments - claims portfolio | 11 | **125,775** | 106,123 |
| Litigation investments - purchased claims | 12 | **37,423** | 47,040 |
| Litigation investments - intangible assets | 13 | **370,085** | 394,684 |
| Litigation investments - financial assets | 14 | **7,078** | 3,071 |
| Litigation investments - investment in associates | 35 | **56,336** | – |
| Goodwill | 16 | **103,304** | 95,567 |
| Right of use assets and other plant and equipment | 25 | **18,446** | 14,869 |
| Investment in associates | 35 | **6,981** | 5,031 |
| Contract costs | 23 | **1,644** | 2,583 |
| Other assets | 24 | **17,788** | 12,751 |
| Deferred tax assets | 7 | **77,589** | 63,809 |
| **Total non-current assets** | | **868,110** | 782,166 |
| **Total assets** | | **1,134,835** | 1,075,249 |
| | | | |
| **Liabilities** | | | |
| **Current liabilities** | | | |
| Trade and other payables | 26 | **50,110** | 41,953 |
| Income tax payable | | **8,007** | 7,464 |
| Provisions | 27 | **31,238** | 25,124 |
| Lease liabilities | 28 | **2,933** | 2,755 |
| Debt securities | 19 | **–** | 148,000 |
| Litigation investments - deferred consideration | 15 | **3,342** | 21,872 |
| Other financial liabilities | 29 | **8,097** | 29,161 |
| **Total current liabilities** | | **103,727** | 276,329 |
| | | | |
| **Non-current liabilities** | | | |
| Provisions | 27 | **1,291** | 1,243 |
| Lease liabilities | 28 | **15,008** | 11,173 |
| Borrowings | 19 | **181,639** | – |
| Litigation investments - deferred consideration | 15 | **4,325** | – |
| Other financial liabilities | 29 | **10,750** | 16,568 |
| Deferred tax liabilities | 7 | **30,879** | 30,282 |
| Other liabilities | | **2,930** | 155 |
| **Total non-current liabilities** | | **246,822** | 59,421 |
| **Total liabilities** | | **350,549** | 335,750 |
| **Net assets** | | **784,286** | 739,499 |
| | | | |
| **Equity** | | | |
| Contributed equity | 20 | **449,854** | 406,963 |
| Reserves | 21(a) | **18,488** | 9,759 |
| Accumulated losses | 21 | **(119,491)** | (87,832) |
| | | | |
| **Equity attributable to equity holders of the parent** | | **348,851** | 328,890 |
| Non-controlling interests | 34 | **435,435** | 410,609 |
| **Total equity** | | **784,286** | 739,499 |

The above Consolidated Statement of Financial Position should be read in conjunction with the accompanying notes.

# Consolidated Statement of Cash Flows

for the year ended 30 June 2023

| | | Consolidated | |
| --- | --- | --- | --- |
| | | 2023 | 2022 |
| | Note | $'000 | $'000 |
| **Cash flows from operating activities** | | | |
| Proceeds from litigation investments - claims portfolio | | **4,822** | 13,434 |
| Payments for litigation investments - claims portfolio | | **(16,792)** | (14,554) |
| Proceeds from management and performance fees | | **8,773** | 12,586 |
| Payments to suppliers and employees | | **(106,014)** | (74,079) |
| Interest received | | **1,775** | 318 |
| Interest paid | | **(19,428)** | (7,475) |
| Income tax paid | | **(3,564)** | (4,777) |
| **Net cash flows used in operating activities** | 10 | **(130,428)** | (74,547) |
| | | | |
| **Cash flows from investing activities** | | | |
| Proceeds from litigation investments - purchased claims | | **662** | 6,427 |
| Proceeds from litigation investments - intangible assets | | **121,824** | 273,294 |
| Payments for litigation investments - intangible assets | | **(157,725)** | (105,559) |
| Payments for litigation investments - capitalised overheads and employee costs | | **(7,786)** | (6,734) |
| Payments for plant and equipment | | **(730)** | (1,850) |
| Loans to related parties | | **(1,443)** | (2,107) |
| Proceeds from disposal of subsidiaries | 34 | **75,757** | – |
| **Net cash flows from investing activities** | | **30,559** | 163,471 |
| | | | |
| **Cash flows from financing activities** | | | |
| Payments of borrowing costs | | **(9,436)** | – |
| Repayment of debt | | **(149,440)** | – |
| Proceeds from issue of borrowings | 19 | **190,000** | – |
| Payments of lease liabilities | | **(4,335)** | (4,576) |
| Contributions from non-controlling interests | 34 | **135,854** | 43,617 |
| Distributions to non-controlling interests | 34 | **(93,166)** | (113,335) |
| Payments for debt insurance | | **(9,998)** | – |
| Payments of share buy-back scheme | | **(1,660)** | – |
| **Net cash flows from/(used in) financing activities** | | **57,819** | (74,294) |
| | | | |
| Net (decrease)/increase in cash and cash equivalents held | | **(42,050)** | 14,630 |
| Net foreign exchange difference | | **100** | 1,688 |
| Cash and cash equivalents at beginning of year | | **158,966** | 142,648 |
| **Cash and cash equivalents at end of year** | 18 | **117,016** | 158,966 |

The above Consolidated Statement of Cash Flows should be read in conjunction with the accompanying notes.

# Consolidated Statement of Changes in Equity

**for the year ended 30 June 2023**

| | Notes | Issued capital $'000 | Share based payment reserve $'000 | Foreign currency translation reserve $'000 | Option premium reserve $'000 | Convertible note reserve $'000 | Fund equity reserve $'000 | Accumulated losses $'000 | Total $'000 | Non-controlling interests $'000 | Total equity $'000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| At 1 July 2022 | | 406,963 | 32,273 | (19,806) | 3,404 | 3,832 | (9,944) | (87,832) | 328,890 | 410,609 | 739,499 |
| Profit/(loss) for the year | | – | – | – | – | – | – | (31,659) | (31,659) | 32,521 | 862 |
| Other comprehensive income | | – | – | 6,340 | – | – | – | – | 6,340 | 6,291 | 12,631 |
| Total comprehensive income/(loss) for the year | | – | – | 6,340 | – | – | – | (31,659) | (25,319) | 38,812 | 13,493 |
| **Equity Transactions:** | | | | | | | | | | | |
| Shares issued | | 13,839 | (19,399) | – | – | – | – | – | (5,560) | – | (5,560) |
| Share based payments, net of tax | | – | 9,868 | – | – | – | – | – | 9,868 | – | 9,868 |
| Shares issued to settle deferred and variable deferred consideration | | 30,712 | – | – | – | – | – | – | 30,712 | – | 30,712 |
| Contributions from non-controlling interests | | – | – | – | – | – | – | – | – | 135,854 | 135,854 |
| Distributions to non-controlling interests | | – | – | – | – | – | – | – | – | (93,166) | (93,166) |
| Share Buy-back Scheme | | (1,660) | – | – | – | – | – | – | (1,660) | – | (1,660) |
| Deconsolidation of Subsidiary | | – | – | 7,553 | – | – | (2,789) | – | 4,764 | (49,518) | (44,754) |
| Changes in the proportion of equity held by non-controlling interests | | – | – | – | – | – | 7,156 | – | 7,156 | (7,156) | – |
| At 30 June 2023 | 20, 21, 34 | 449,854 | 22,742 | (5,913) | 3,404 | 3,832 | (5,577) | (119,491) | 348,851 | 435,435 | 784,286 |

The above Consolidated Statement of Changes in Equity should be read in conjunction with the accompanying notes.

# Consolidated Statement of Changes in Equity
continued

| | Notes | Issued capital $'000 | Share based payment reserve $'000 | Foreign currency translation reserve $'000 | Option premium reserve $'000 | Convertible note reserve $'000 | Fund equity reserve $'000 | Accumulated losses $'000 | Total $'000 | Non-controlling interests $'000 | Total equity $'000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **At 1 July 2021** | | 389,501 | 28,327 | (28,405) | 3,404 | 3,832 | (22,599) | (42,187) | 331,873 | 430,474 | 762,347 |
| Profit/(loss) for the year | | – | – | – | – | – | – | (45,645) | (45,645) | 52,127 | 6,482 |
| Other comprehensive income | | – | – | 8,599 | – | – | – | – | 8,599 | 10,465 | 19,064 |
| **Total comprehensive income/(loss) for the year** | | **–** | **–** | **8,599** | **–** | **–** | **–** | **(45,645)** | **(37,046)** | **62,592** | **25,546** |
| **Equity Transactions:** | | | | | | | | | | | |
| Shares issued | | 6,522 | (6,522) | – | – | – | – | – | – | – | – |
| Share based payments, net of tax | | – | 10,468 | – | – | – | – | – | 10,468 | – | 10,468 |
| Shares issued to settle deferred and variable deferred consideration | | 10,940 | – | – | – | – | – | – | 10,940 | – | 10,940 |
| Contributions from non-controlling interests | | – | – | – | – | – | – | – | – | 43,617 | 43,617 |
| Distributions to non-controlling interests | | – | – | – | – | – | – | – | – | (113,335) | (113,335) |
| Changes in the proportion of equity held by non-controlling interests | | – | – | – | – | – | 12,655 | – | 12,655 | (12,739) | (84) |
| **At 30 June 2022** | 20, 21, 34 | **406,963** | **32,273** | **(19,806)** | **3,404** | **3,832** | **(9,944)** | **(87,832)** | **328,890** | **410,609** | **739,499** |

The above Consolidated Statement of Changes in Equity should be read in conjunction with the accompanying notes.

# Notes to the Financial Statements

**for the year ended 30 June 2023**

## About this Report

The financial report of Omni Bridgeway Limited (**OBL, Company, Parent**) and its subsidiaries (**Group, Consolidated Entity**) for the year ended 30 June 2023 was authorised for issue in accordance with a resolution of the directors on 22 August 2023. The principal activities of the entities within the consolidated group are:

i.   the investment into and management of Funds (or Fund-like structures) that are focused on investing into litigation and dispute resolution matters globally; and

ii.  the continued holding of direct investments into similar litigation and dispute resolution matters.

Omni Bridgeway Limited (ABN 45 067 298 088) is a for profit company incorporated and domiciled in Australia and limited by shares that are publicly traded on the Australian Securities Exchange (ASX code: OBL).

This section sets out the basis upon which the Group's Financial Statements are prepared. Specific accounting policies are described in the respective notes to the Financial Statements. This section also shows information on new or amended accounting standards and interpretations and their impact on the financial position and performance of the Group.

### a.  Basis of preparation

The financial report is a general purpose financial report, which has been prepared in accordance with the requirements of the *Corporations Act 2001*, Australian Accounting Standards and other authoritative pronouncements of the Australian Accounting Standards Board. The financial report has been prepared on a historical cost basis, except for the financial assets and liabilities that have been measured at fair value.

The amounts contained within this report have been rounded to the nearest $1,000 or $100,000 (where rounding is applicable) under the option available to the Company under ASIC Corporations (Rounding in Financial/Directors' Reports) Instrument 2016/191.

### b.  Compliance with IFRS

The financial report also complies with International Financial Reporting Standards (**IFRS**), as issued by the International Accounting Standards Board.

### c.  Basis of consolidation

The consolidated financial statements comprise the financial statements of Omni Bridgeway Limited and its subsidiaries at 30 June 2023. Control is achieved when the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee.

The Group includes Fund collective investment vehicles over which Omni Bridgeway Limited has the right to direct the relevant activities of the Fund under contractual arrangements and has exposure to variable returns from the Fund collective investment vehicles. See Note 34.

The financial results of the subsidiaries are prepared for the same reporting period as the Company, using consistent accounting policies.

A change in the ownership interest of a subsidiary, without a loss of control, is accounted for as an equity transaction.

In preparing the consolidated financial statements, all intercompany balances and transactions, income and expenses and profits and losses resulting from intra-group transactions have been eliminated in full.

*Foreign currency*

The Group's consolidated financial statements are presented in Australian dollars, which is also the Parent's functional currency. The Group determines the functional currency of each entity in the Group. The Group uses the direct method of consolidation and on disposal of a foreign operation, the gain or loss that is reclassified to profit or loss reflects the amount that arises from using this method.

*Transactions and balances*

Transactions in foreign currencies are initially recorded by each entity in the Group at their respective functional currency spot rates at the date the transaction first qualifies for recognition. Monetary assets and liabilities denominated in foreign currencies are converted at the functional currency spot rates of exchange at the reporting date.

Exchange differences arising on settlement or conversion of monetary items are recognised in profit or loss.

Non-monetary items that are measured in terms of historical cost in a foreign currency are translated using the exchange rates at the dates of the initial transactions. Non-monetary items measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair value is determined. The gain or loss arising on translation of non-monetary items measured at fair value is treated in line with the recognition of gain or loss on change in fair value of the item (i.e. translation differences on items whose fair value gain or loss is recognised in other comprehensive income or profit or loss are also recognised in other comprehensive income or profit or loss, respectively).

*Group companies*

On consolidation, the assets and liabilities of foreign operations are translated into Australian dollars at the rate of exchange prevailing at the reporting date and their statements of profit or loss are translated at exchange rates prevailing at the dates of the transactions. The exchange differences arising on translation for consolidation purposes are recognised in other comprehensive income. On disposal of a foreign operation, the component of other comprehensive income relating to that particular foreign operation is recognised in profit or loss.

## About this Report (continued)

### d. New and amended accounting standards and interpretations adopted during the year

The accounting policies adopted are consistent with those followed in the preparation of the Group's annual consolidated financial statements for the year ended 30 June 2022. All new and amended accounting standards and interpretations effective from 1 July 2022 were adopted by the Group with no material impact.

### e. New and amended accounting standards and interpretations issued but not yet effective

The new and amended standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's financial statements that the Group reasonably expects will have an impact on its disclosures, financial position or performance when applied at a future date, are disclosed below. The Group intends to adopt these new and amended standards and interpretations, if applicable, when they become effective. Of the other standards and interpretations that are issued, but not yet effective, as these are not expected to impact the Group, they have not been listed.

#### *Amendments to IAS 1: Classification of Liabilities as Current or Non-current*

In January 2020, the IASB issued amendments to paragraphs 69 to 76 of IAS 1 to specify the requirements for classifying liabilities as current or non-current. The amendments clarify:

- What is meant by a right to defer settlement

- That a right to defer must exist at the end of the reporting period

- That classification is unaffected by the likelihood that an entity will exercise its deferral right.

That only if an embedded derivative in a convertible liability is itself an equity instrument would the terms of a liability not impact its classification.

The amendments are effective for annual reporting periods beginning on or after 1 January 2023 and must be applied retrospectively. The Group has assessed the impact of the amendments on current practice and it is not expected to have a material impact on the Group.

#### *Amendments to IAS 12 – Deferred Tax related to Assets and Liabilities arising from a Single Transaction*

On 7 May 2021, the IASB issued amendments to IAS 12, requires companies to recognise deferred tax on transactions that, on initial recognition, give rise to equal amounts of taxable and deductible temporary differences. The amendments are effective for annual reporting periods beginning on or after 1 January 2023. The amendments should be applied on a modified retrospective basis. The amendments are not expected to have a material impact on the Group.

### f. Significant accounting judgements, estimates and assumptions

The preparation of the Group's consolidated financial statements requires management to make judgements, estimates and assumptions that affect the reported amounts of revenues, expenses, assets and liabilities, and the accompanying disclosures, and the disclosure of contingent liabilities at the date of the consolidated financial statements.

#### *Key judgements*

In the process of applying the Group's accounting policies, management has made the following judgements, which have the most significant effect on the amounts recognised in the consolidated financial statements:

#### *Consolidation of entities in which the Group holds less than a majority voting right (de facto control)*

The Group has assessed the entities in which it has an interest to determine whether or not control exists and the entity is, therefore, consolidated into the Group. These entities are listed in Notes 33 and 34. For those entities consolidated with an interest less than 51%, the Group uses judgement to determine that it has power to direct the relevant activities of the investee under contractual arrangements and sufficient exposure to variable returns. In reviewing whether the Group has power and sufficient exposure to variable returns the Group considers whether it is acting as a principal or as an agent of the entity.

#### *Taxation*

The Group's accounting policy for taxation requires management's judgement in assessing whether deferred tax assets and certain deferred tax liabilities are recognised on the Statement of Financial Position. Deferred tax assets, including those arising from tax losses, capital losses and temporary differences, are recognised only where it is considered more likely than not that they will be recovered, which is dependent on the generation of sufficient future taxable profits.

Assumptions about the generation of future taxable profits depend on management's estimates of future cash flows as contained in the Group's yearly budget. These depend on estimates of future income, operating costs, capital expenditure, dividends and other capital management transactions.

Judgements and assumptions are also required about the application of income tax legislation. These judgements and assumptions are subject to risk and uncertainty, hence there is a possibility that changes in circumstances will alter expectations, which may impact the amount of deferred tax assets and deferred tax liabilities recognised in the Statement of Financial Position and the amount of other tax losses and temporary differences not yet recognised. In such circumstances, some or all of the carrying amounts of recognised deferred tax assets and liabilities may require adjustment, resulting in a corresponding credit or charge to the Statement of Comprehensive Income.

#### *Litigation investments*

Classification of litigation investments as either Claims Portfolio, Purchased Claims, Intangible Assets or Financial Assets requires judgement on the circumstances and contracts attached to the investment. Refer to Notes 11 - 14 on the accounting policies for litigation investments.

#### *Significant estimates and assumptions*

The key assumptions concerning the future and other key sources of estimation uncertainty at the reporting date, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year, are described below. The Group based its assumptions and estimates on parameters available when the consolidated financial statements were prepared.

## About this Report (continued)

Existing circumstances and assumptions about future developments, however, may change due to market changes or circumstances arising that are beyond the control of the Group. Such changes are reflected in the assumptions when they occur.

### Impairment of financial and non-financial assets

The Group assesses impairment of all required financial and non-financial assets at each reporting date by evaluating conditions specific to the Group and to the particular asset that may lead to impairment. Impairment exists when the carrying value of an asset or cash generating unit exceeds its recoverable amount, which is the higher of its fair value less costs of disposal and its value in use. The Group primarily relies on value in use calculations based on Discounted Cash Flows (**DCF**) models. The cash flows are derived from either the Group's budget or from estimates made by investment managers. The recoverable amount is sensitive to the discount rate used for the DCF model as well as the expected future cash-inflows and the growth rate used for extrapolation purposes. These estimates are most relevant to goodwill and other intangibles recognised by the Group. Refer to individual notes for further information around impairment of financial and non- financial assets.

### Fair value measurement of financial liabilities through profit or loss

When deferred and variable deferred consideration meets the definition of a financial liability at fair value through profit or loss, it is subsequently remeasured to fair value at each reporting date. The determination of the fair value is based on option pricing methodology. The key inputs are detailed in the Notes 17 and 29.

### Provision for adverse costs

The Group raises a provision for adverse costs upon an underlying litigation receiving a losing judgement in certain jurisdictions that require adverse costs to be paid to the litigations' counter party. If an appeal is lodged, the Group still raises a provision. The provision raised is the Group's best estimate of the amount of adverse costs it will have to remit. Typically, this estimate is between nil to 80% of the amount spent by the plaintiff, on the basis that there is only one defendant per the litigation. Refer to Notes 27 and 30 for further details on adverse costs.

### Share-based payments

Estimating fair value for share-based payment transactions requires determination of the most appropriate valuation model, which depends on the terms and conditions of the grant. This estimate also requires determination of the most appropriate inputs to the valuation model including the expected life of the performance rights, volatility dividend yield and risk-free rate and making assumptions about them. For the measurement of the fair value of performance rights at the grant date, the Group uses a Monte-Carlo simulation model and Black-Scholes model. The assumptions and models used for estimating fair value for share-based payment transactions are disclosed in Note 32.

### Measurement of non-controlling interests (NCI)

Profits and losses are attributed to non-controlling interests in line with the allocation of profit distributions under the terms of the respective agreements with non-controlling investors. Therefore, at the end of each reporting period, the non- controlling interests represents the non-controlling shareholders' share of net assets, as would be distributed under the relevant shareholders or investors agreements at the balance date.

### Revenue recognition – estimating variable consideration on management and performance fees

The Group estimates variable considerations to be included in the transaction price for management and performance fees. Management fees are based on the level of external investors net deployed capital per quarter and any uncertainty is resolved at the end of the same quarter. Therefore, management fee revenues are recognised quarterly in arrears, corresponding with the delivery of performance obligations. The calculation of performance fees is subject to individual investment and overall portfolio returns with some uncertainties. Accordingly, performance fee revenue is not recognised until it is highly probable that a significant reversal in the amount of cumulative revenue recognised will not occur.

### Net gain/loss on derecognition of Litigation investments – intangible assets

The Group recognises proceeds and derecognises carrying costs on disposal in accordance with the investments' funding terms. In some instances, the calculation requires certain estimates and assumptions to be made. Refer to Note 13 for further information.

### Fair value of residual interest held in a former subsidiary

For all subsidiaries where there is more than 50% ownership interest and voting rights, the Group's power to direct the relevant activities of the investee is subject to a without-cause kick-out right exercisable by a third party, the Group is considered to be acting as an agent and thus has no control. The Group's retained power is able to significantly influence the financial and operating activities of the investee. The retained residual interest is equity accounted for as an investment in associates and initially recognised at the fair value. The Group uses Investment Managers' best estimate to calculate the present value of probability-weighted cashflows from matters held in the associate which represents the fair value of the retained residual interest held by the Group. Refer to Note 35 for further information.

### Litigation investments – purchased claims

The Group initially recognises litigation investments – purchased claims at fair value. These are subsequently measured at amortised cost by applying the credit-adjusted effective interest rate based on estimated cash flows. Refer to Note 12 for further information.

### Litigation investments – financial assets

The Group initially recognises litigation investments – financial assets at fair value. These are subsequently measured at fair value through the profit & loss. Refer to Note 14 for further information.

### Expected credit losses (ECLs) of receivables

The Group uses Investment Managers' best estimate to calculate ECLs for receivables. The provision is based on assessment of customer segments that have similar loss patterns. Refer to Note 22 for further information.

## A. RESULTS FOR THE YEAR

### Note 1: Segment information

The Group operates in one industry, being funding and provision of services in relation to legal dispute resolution. For management purposes, the Group is organised into operating segments comprising the OBL Group's corporate operations and the Group's fund structures.

The OBL Group's wholly owned subsidiaries own historical litigation investments and provide investment management advisory and administration services to the Group's fund structures in the following locations:

- Australia
- United States
- Canada
- Asia
- Europe, Middle East and Africa (EMEA)

The Group's Fund structures include:

- **Fund 1** – Fund 1 was deconsolidated on 31 May 2023 following a sale of a participation in its underlying investments.

- **Funds 2 & 3** – This comprises Omni Bridgeway (Fund 2) Pty Ltd, Omni Bridgeway (Fund 3) Pty Ltd, IMF Bentham ROW SPV 1 Limited and IMF Bentham ROW SPV 2 Limited. These entities jointly invest in litigation investments outside the United States. Funds 2&3 are consolidated into the Group.

- **Fund 4** – This Fund invests in litigation investments in the United States. It consists of a series of parallel investing entities comprising Omni Bridgeway (Fund 4) Invt 1 LP; Omni Bridgeway (Fund 4) Invt 2 LP; Omni Bridgeway (Fund 4) Invt 3 LP; Omni Bridgeway (Fund 4) Invt 4 LP; Omni Bridgeway (Fund 4) Invt 5 LP; Omni Bridgeway (Fund 4) Invt 6 LP; Omni Bridgeway (Fund 4) Invt 7 LP; Omni Bridgeway (Fund 4) Invt 8 LP; Omni Bridgeway (Fund 4) Invt 9 LP; Security Finance (Fund 4) LLC; JPV I LP and Bentham HPCR LP. Fund 4 entities except for Bentham HPCR LP are consolidated into the Group.

- **Fund 5** – Consists of a collective investment group comprising Omni Bridgeway (Fund 5) LP, Omni Bridgeway (Fund 5) Cayman Invt. Limited, Omni Bridgeway (Fund 5) Australian Invt Pty Ltd, Omni Bridgeway (Fund 5) Canada Investments Ltd, Omni Bridgeway (Fund 5) NZ Invt Limited, Omni Bridgeway (Fund 5) Cayman DDI Limited, Gold Road Limited, Oak Henge Limited, as well as parallel joint investor, Omni Bridgeway (Fund 5) GPA Pty Ltd. 2238319 Alberta Ltd was deregistered on 20 April 2022. This Fund invests in litigation investments outside the United States. Only the parallel joint investor is consolidated within the Group and is included in the segment note.

- **Fund 6** – Is an investment structure focused in Europe, Middle East and Africa that was acquired in a business combination on 8 November 2019 and includes the entity responsible for providing the management of Fund 7. It was established to invest in litigation, arbitration and enforcement proceedings, and for the work-out and monetisation of claims. Revenue is derived from enforcement and recovery services and other income is derived from litigation investments. OBL retains control and ownership of Fund 6 via its equity interests. Legal ownership of the litigation investments are spread across the entire OBE Group. Fund 6 is consolidated into the Group.

- **Fund 8** – Is an investment structure focused on global enforcement investments and comprises Omni Bridgeway (Fund 8) Guernsey Investments Limited. Fund 8 is consolidated into the Group.

For Funds 2 & 3, the non-controlling interest is comprised of an equity interest, which carry an entitlement to receive a capped priority return on drawn capital and a further preferred return on committed but undrawn capital. OBL retains control and ownership of the Funds via its equity interests. Upon satisfaction of the non-controlling interests' priority returns, OBL is entitled to a manager return. After satisfaction of the priority return and the manager returns, the residual net cash flows are to be distributed 80% to OBL and 20% to non-controlling interests. The Funds have an infinite life and all distributions are discretionary.

For Fund 4 the non-controlling interest is comprised of an equity interest which, together with OBL's interest, carries an entitlement to receive return of capital plus a hurdle return on invested capital; and a pro-rata share of any residual after OBL's periodic management fee and transactional based performance fee. OBL retains control and ownership of the Funds via its equity interest. The Fund has an infinite life and all distributions are discretionary.

For Fund 5, there is no non-controlling interest as only OBL's 100% owned investment vehicle is consolidated. OBL is entitled to periodic management fees and transactional based performance fees.

For Fund 6, the non-controlling interest is comprised of an equity interest which, together with OBL's interest, carries a case by case entitlement to receive return of capital plus a return on invested capital after OBL's transactional based performance fee. OBL retains control and ownership of the Funds via its equity interest. The Fund has an infinite life and all distributions are discretionary during the investment period.

For Fund 8, there is no non-controlling interests as the fund is structured as an insured, leveraged special purpose vehicle (SPV). The capital for the fund is to be sourced from limited recourse debt and equity provided by OBL.

# Note 1: Segment information (continued)

Intersegment revenue comprises interest revenue on intercompany loans and advisory fees.

Intercompany interest revenue is recognised in accordance with AASB 9 using the effective interest rate method.

The intercompany advisory fee revenue earned during the year was derived from management and advisory agreements between the group entities. The consideration received is determined by reference to costs plus a percentage mark-up. The revenue is recognised over the period in which costs are incurred as it is deemed that the Group transfers control of the management services over this period and, therefore, satisfies its performance obligations and recognises revenue over time.

Adjustments and eliminations relate to certain finance and overheads costs that are not allocated to individual segments as the underlying expenses are incurred within wholly owned operations. These costs are capitalised into litigation funding contracts on consolidation of the Group. The associated tax effect accounting for these items are also managed on a Group basis and not allocated to the individual segments.

Inter-segment revenue and expenses are eliminated on consolidation and reflected in the "adjustments and eliminations" column.

Adjustments made in the balance sheet include adjustments to non-current assets to eliminate intercompany loans and investments in subsidiaries on consolidation.

| | Group | Funds | | | | | | Consolidation | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Corporate | 1 | 2&3 | 4 | 5 | 6 | 8 | Adjustments and eliminations | Consolidated |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| **Segment result for the year ended 30 June 2023** | | | | | | | | | |
| Revenue from contracts with customers | 6,599 | – | – | – | – | 5,443 | – | (573) | **11,469** |
| Interest revenue on cash and deposits | 1,475 | 5 | 304 | – | – | – | – | – | **1,784** |
| Interest revenue on receivables | – | – | 1,781 | 128 | – | 194 | – | – | **2,103** |
| Interest revenue on litigation investments - purchased claims | – | – | 2,104 | 2,385 | – | 633 | – | – | **5,122** |
| Inter-segment | 30,819 | – | – | – | – | (330) | – | (30,489) | **–** |
| **Segment revenue** | **38,893** | **5** | **4,189** | **2,513** | **–** | **5,940** | **–** | **(31,062)** | **20,478** |
| Net gain/(loss) on derecognition of litigation investments - intangible assets | 25,113 | (6,801) | 14,804 | 19,187 | 8,153 | 14,647 | | | **75,103** |
| Derecognition of capitalised overheads on litigation investments - intangible assets | (2,241) | (22,883) | (1,398) | (2,408) | (1,507) | – | | – | **(30,437)** |
| Net gain/(loss) on disposal of litigation investments - purchased claims | – | – | – | – | – | 1,019 | | – | **1,019** |
| Net gain on disposal of subsidiaries | 39,702 | 6,376 | – | – | – | – | | – | **46,078** |
| Other income | 3,338 | (1) | 1,440 | (10) | 1,397 | (433) | | (1,162) | **4,569** |
| **Total Income** | **104,805** | **(23,304)** | **19,035** | **19,282** | **8,043** | **21,173** | **–** | **(32,224)** | **116,810** |
| Amortisation of litigation investments - claims portfolio | – | – | – | – | – | 4,000 | 42 | – | **4,042** |
| Impairment expense and adverse costs - litigation investments | 6,548 | (6,794) | 331 | 5,340 | 668 | 7,009 | – | – | **13,102** |
| Other expenses | 146,571 | 86 | 2,249 | 286 | 183 | 14,739 | 496 | (59,077) | **105,533** |
| Share of (profit)/loss in associates | 2,161 | (1,606) | – | – | – | – | – | – | **555** |
| **Profit/(Loss) before tax and fair value adjustments** | **(50,475)** | **(14,990)** | **16,455** | **13,656** | **7,192** | **(4,575)** | **(538)** | **26,853** | **(6,422)** |
| Profit/(Loss) on fair value adjustment of financial assets and liabilities | 2,441 | – | (1,577) | – | – | – | – | 1,746 | **2,610** |
| **Profit/(Loss) before tax** | **(48,034)** | **(14,990)** | **14,878** | **13,656** | **7,192** | **(4,575)** | **(538)** | **28,599** | **(3,812)** |
| Income tax (benefit)/expense | (13,753) | 4 | 4,625 | 434 | 2,693 | 1,462 | – | (139) | **(4,674)** |
| **Segment result** | **(34,281)** | **(14,994)** | **10,253** | **13,222** | **4,499** | **(6,037)** | **(538)** | **28,738** | **862** |
| **Attributable to:** | | | | | | | | | |
| Equity holders of the Parent | (34,281) | (19,065) | (1,163) | 1,352 | 4,499 | (11,201) | (538) | 28,738 | **(31,659)** |
| Non-controlling interests | – | 4,071 | 11,416 | 11,870 | – | 5,164 | – | – | **32,521** |

## Note 1: Segment information (continued)

| | Group | Funds | | | | | | Consolidation | |
|---|---|---|---|---|---|---|---|---|---|
| | Corporate | 1 | 2&3 | 4 | 5 | 6 | 8 | Adjustments and eliminations | Consolidated |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| **Segment assets and liabilities at 30 June 2023** | | | | | | | | | |
| Cash and cash equivalents¹ | 92,602 | – | 14,655 | 8,175 | – | 1,566 | 18 | – | **117,016** |
| Receivables due from the completion of litigation investments | 36,571 | – | 47,131 | 17,094 | – | 44,902 | – | – | **145,698** |
| Other current assets | 13,934 | – | 7,149 | 1,609 | 15,381 | 22,482 | 1,051 | (12,781) | **48,825** |
| Litigation investments - claims portfolio | – | – | – | – | – | 122,118 | – | 3,657 | **125,775** |
| Litigation investments - purchased claims | – | – | 11,751 | 16,318 | – | 9,354 | – | – | **37,423** |
| Litigation investments - intangible assets | 9,460 | – | 81,096 | 172,763 | 29,073 | 64,341 | – | 29,577 | **386,310** |
| Litigation investments - financial assets | – | – | – | 3,777 | 7,199 | – | – | (3,898) | **7,078** |
| Litigation investments - investment in associates | 52,559 | – | – | – | – | – | – | 3,777 | **56,336** |
| Litigation investments - provision for impairment | – | – | (556) | (11,589) | – | (3,354) | – | (726) | **(16,225)** |
| Goodwill | 103,304 | – | – | – | – | – | – | – | **103,304** |
| Investments in funds | 257,160 | – | – | – | – | 30 | – | (250,178) | **7,012** |
| Other non-current assets | 415,427 | – | 2,551 | 949 | 1,670 | 4,211 | 12,836 | (321,361) | **116,283** |
| **Total segment assets** | **981,017** | **–** | **163,777** | **209,096** | **53,323** | **265,650** | **13,905** | **(551,933)** | **1,134,835** |
| | | | | | | | | | |
| Current liabilities | 58,026 | – | 15,645 | 14,695 | 46,485 | 15,964 | 11,468 | (58,556) | **103,727** |
| Non-current liabilities | 212,645 | – | 5,065 | – | 522 | 19,948 | 2,975 | 5,667 | **246,822** |
| **Total segment liabilities** | **270,671** | **–** | **20,710** | **14,695** | **47,007** | **35,912** | **14,443** | **(52,889)** | **350,549** |
| **Net assets** | **710,346** | **–** | **143,067** | **194,401** | **6,316** | **229,738** | **(538)** | **(499,044)** | **784,286** |
| **Equity attributable to:** | | | | | | | | | |
| Equity holders of the Parent | 710,346 | – | 24,750 | 38,880 | 6,316 | 66,946 | (538) | (497,849) | **348,851** |
| Contributed equity - NCI | – | – | 83,968 | 192,519 | – | 142,237 | – | – | **418,724** |
| Earnings - NCI | – | – | 34,349 | (36,998) | – | 20,555 | – | (1,195) | **16,711** |
| **Total equity** | **710,346** | **–** | **143,067** | **194,401** | **6,316** | **229,738** | **(538)** | **(499,044)** | **784,286** |

1. Cash in Funds can only be used for litigation investments and expenses within the respective Funds in accordance with their mandates and constituent documents

## Note 1: Segment information (continued)

| | Group | Funds | | | | | Consolidation | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Corporate | 1 | 2&3 | 4 | 5 | 6 | Adjustments and eliminations | Consolidated |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| **Segment result for year ended 30 June 2022** | | | | | | | | |
| Revenue from contracts with customers | 4,613 | – | – | – | – | 17,254 | – | **21,867** |
| Interest revenue on cash and deposits | 297 | 14 | 8 | – | – | – | – | **319** |
| Interest revenue on receivables | – | – | 1,419 | – | – | 355 | – | **1,774** |
| Interest revenue on litigation investments - purchased claims | – | – | 1,655 | 423 | – | 4,197 | – | **6,275** |
| Inter-segment | 18,410 | – | – | – | – | (549) | (17,861) | **–** |
| **Segment revenue** | **23,320** | **14** | **3,082** | **423** | **–** | **21,257** | **(17,861)** | **30,235** |
| | | | | | | | | |
| Net gain/(loss) on derecognition of litigation investments - intangible assets | (21,649) | 16,502 | 21,670 | 29,911 | 626 | 10,230 | – | **57,290** |
| Derecognition of capitalised overheads on litigation investments - intangible assets | (1,461) | (2,047) | (2,638) | (762) | (1,353) | – | – | **(8,261)** |
| Net gain/(loss) on disposal of litigation investments - purchased claims | – | – | – | – | – | 790 | – | **790** |
| Other income | 7,668 | (1) | 1,063 | (8) | 2,217 | 1,507 | (3,319) | **9,127** |
| **Total Income** | **7,878** | **14,468** | **23,177** | **29,564** | **1,490** | **33,784** | **(21,180)** | **89,181** |
| | | | | | | | | |
| Amortisation of litigation investments - claims portfolio | – | – | – | – | – | 5,650 | – | **5,650** |
| Impairment expense - litigation investments | – | 10,405 | (553) | 652 | – | 769 | – | **5,511** |
| Other expenses | 109,755 | 75 | 824 | 1,168 | 274 | 14,027 | (38,500) | **87,623** |
| Share of (profit) in associates and joint ventures | (387) | – | – | – | – | – | – | **(387)** |
| **Profit/(Loss) before tax and fair value adjustments** | **(95,728)** | **3,988** | **22,906** | **27,744** | **1,216** | **13,338** | **17,320** | **(9,216)** |
| Profit/(Loss) on fair value adjustment of financial liabilities | 7,424 | – | (1,275) | – | – | – | 1,275 | **7,424** |
| **Profit/(Loss) before tax** | **(88,304)** | **3,988** | **21,631** | **27,744** | **1,216** | **13,338** | **18,595** | **(1,792)** |
| Income tax (benefit)/expense | (24,182) | 163 | 8,808 | 517 | 718 | 4,185 | 1,517 | **(8,274)** |
| **Segment result** | **(64,122)** | **3,825** | **12,823** | **27,227** | **498** | **9,153** | **17,078** | **6,482** |
| **Attributable to:** | | | | | | | | |
| Equity holders of the Parent | (64,122) | (2,971) | (1,687) | 4,793 | 498 | 766 | 17,078 | **(45,645)** |
| Non-controlling interests | – | 6,796 | 14,510 | 22,434 | – | 8,387 | – | **52,127** |

## Note 1: Segment information (continued)

| | Group | Funds | | | | | Consolidation | |
|---|---|---|---|---|---|---|---|---|
| | Corporate | 1 | 2&3 | 4 | 5 | 6 | Adjustments and eliminations | Consolidated |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| **Segment assets and liabilities at 30 June 2022** | | | | | | | | |
| Cash and cash equivalents[1] | 107,645 | 8,820 | 24,283 | 17,926 | 1 | 291 | – | **158,966** |
| Receivables due from the completion of litigation investments | 61,057 | – | 47,316 | 4,780 | – | 24,921 | – | **138,074** |
| Other current assets | 32,158 | – | 7,854 | 582 | 4,064 | 22,286 | (34,263) | **32,681** |
| Litigation investments - claims portfolio | – | – | – | – | – | 102,901 | 3,222 | **106,123** |
| Litigation investments - purchased claims | – | – | 17,727 | 9,198 | – | 20,115 | – | **47,040** |
| Litigation investments - intangible assets | 79,066 | 147,793 | 70,225 | 143,334 | 17,936 | 54,784 | 34,573 | **547,711** |
| Litigation investments - financial assets | – | – | – | – | 3,117 | – | (46) | **3,071** |
| Litigation investments - provision for impairment | (60,491) | (20,206) | (4,786) | (59,812) | – | (2,067) | (5,665) | **(153,027)** |
| Goodwill | 95,567 | – | – | – | – | – | – | **95,567** |
| Investments in funds | 280,196 | – | – | – | – | – | (275,165) | **5,031** |
| Other non-current assets | 369,818 | – | 5,067 | – | 2,953 | 1,827 | (285,653) | **94,012** |
| **Total segment assets** | **965,016** | **136,407** | **167,686** | **116,008** | **28,071** | **225,058** | **(562,997)** | **1,075,249** |
| | | | | | | | | |
| Current liabilities | 239,828 | 1,471 | 27,623 | 5,311 | 27,266 | 24,392 | (49,562) | **276,329** |
| Non-current liabilities | 32,589 | – | 1,902 | – | 460 | 15,029 | 9,441 | **59,421** |
| **Total segment liabilities** | **272,417** | **1,471** | **29,525** | **5,311** | **27,726** | **39,421** | **(40,121)** | **335,750** |
| **Net assets** | **692,599** | **134,936** | **138,161** | **110,697** | **345** | **185,637** | **(522,876)** | **739,499** |
| **Equity attributable to:** | | | | | | | | |
| Equity holders of the parent | 692,599 | 61,717 | 25,377 | 22,139 | 345 | 52,044 | (525,331) | **328,890** |
| Contributed equity - NCI | – | 33,447 | 93,038 | 127,686 | – | 118,201 | – | **372,372** |
| Earnings - NCI | – | 39,772 | 19,746 | (39,128) | – | 15,392 | 2,455 | **38,237** |
| **Total equity** | **692,599** | **134,936** | **138,161** | **110,697** | **345** | **185,637** | **(522,876)** | **739,499** |

1.  Cash in Funds can only be used for litigation investments and expenses within the respective Funds in accordance with their mandates and constituent documents

## Note 1: Segment information (continued)

Non-current assets, excluding financial assets and deferred tax assets, can be represented geographically as follows:

| | Consolidated | |
|---|---|---|
| | 2023<br>$'000 | 2022<br>$'000 |
| Australia | **184,618** | 168,236 |
| United States | **183,587** | 243,600 |
| Canada | **23,652** | 20,089 |
| Europe, Middle East and Africa | **220,429** | 169,243 |
| Asia | **23,958** | 20,044 |
| | **636,244** | 621,212 |

## Note 2: Revenue from contracts with customers

Revenue from contracts with customers is recognised when control of the service is transferred to the customer at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those services.

### (i) Litigation investments – claims portfolio

*The nature of services*

Revenue is generated from providing enforcement, collection, monetisation and recovery services to customers with judgements, awards or contractual debts and receivables.

*Performance obligations*

At investment inception, the Group assesses the services promised in its contracts with customers and identifies the performance obligation involved in each promise to transfer funds received to the customer. Performance obligations are satisfied at a point in time, upon the recovery of each dollar.

*Transaction price*

Almost all revenues from litigation investments – claims portfolio are based on a no success, no fee basis. The transaction price contains various components, with each component being either fixed or variable. The Group includes variable consideration (a portion or all) in the transaction price only when it is highly probable that the recognised revenue will not incur a significant revenue reversal. The revenue is based on a percentage that is recovered so the uncertainty is typically removed when the money is received or settlement agreement has been signed and where applicable, court approval obtained as, at that point, the revenue formula can be applied to the amount collected.

### (ii) Management fees

The management fee revenue earned during the year was derived from Investment Management Agreements with the investors in Fund 4, Fund 5 and Fund 7. The services provided are for the administration of the investor accounts and fund structures. For Fund 4 and Fund 5 the consideration is considered to be variable consideration and is determined with reference to the net invested capital attributable to the Investor's accounts. The revenue is recognised over the period in which there is net invested capital in the Fund as the Group transfers control of the services over this period and, therefore, satisfies its performance obligations over time. Variable consideration is recognised to the extent that it is highly probable that a significant reversal in the amount of cumulative revenue recognised will not occur. As the net invested capital is known at the end of each quarter the management fees are able to be calculated and recognised as it is then highly probable that a significant reversal in the amount of cumulative revenue recognised will not occur.

## Note 2: Revenue from contracts with customers (continued)

| | Corporate $'000 | Fund 6 $'000 | Total $'000 |
|---|---|---|---|
| **2023** | | | |
| **Type of service** | | | |
| Litigation investments – claims portfolio | – | 4,002 | 4,002 |
| Management and service fees | 6,025 | 1,442 | 7,467 |
| | 6,025 | 5,444 | 11,469 |
| **2022** | | | |
| **Type of service** | | | |
| Litigation investments – claims portfolio | – | 16,173 | 16,173 |
| Management and service fees | 4,613 | 1,081 | 5,694 |
| | 4,613 | 17,254 | 21,867 |
| **2023** | | | |
| **Geographical markets** | | | |
| Europe | – | 5,444 | 5,444 |
| Australia | 1,564 | – | 1,564 |
| United States | 2,812 | – | 2,812 |
| Cayman Islands | 1,649 | – | 1,649 |
| | 6,025 | 5,444 | 11,469 |
| **2022** | | | |
| **Geographical markets** | | | |
| Europe | – | 17,254 | 17,254 |
| Australia | 1,675 | – | 1,675 |
| United States | 2,223 | – | 2,223 |
| Cayman Islands | 715 | – | 715 |
| | 4,613 | 17,254 | 21,867 |
| **2023** | | | |
| **Timing of revenue recognition** | | | |
| Services transferred at a point in time | – | 4,002 | 4,002 |
| Services transferred over time | 6,025 | 1,442 | 7,467 |
| | 6,025 | 5,444 | 11,469 |
| **2022** | | | |
| **Timing of revenue recognition** | | | |
| Services transferred at a point in time | – | 16,173 | 16,173 |
| Services transferred over time | 4,613 | 1,081 | 5,694 |
| | 4,613 | 17,254 | 21,867 |

During the year, the Group received performance fees of $4.236 million (2022: $3.643 million) relating to Fund 4 and Fund 5 that have not yet satisfied IFRS income recognition requirements and are thus not disclosed as revenue. The cumulative amount of unrecognised performance fee is held as unearned revenue in trade and other payables on the Consolidated Statement of Financial Position. Refer to Note 26.

## Note 3: Interest revenue

Interest revenue is recognised using the effective interest rate method. The effective interest rate is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset to the net carrying amount of the financial asset.

The Group earned 97% (2022: 96%) of its interest revenue on cash and deposits in Australia. Interest revenue on receivables relates to the Europe, Middle East and Africa region. The purchased claims revenue relates to the Europe, Canada and United States geographical market.

| | Consolidated | |
|---|---|---|
| | 2023<br>$'000 | 2022<br>$'000 |
| **Interest revenue** | | |
| Interest revenue on cash and deposits | **1,784** | 319 |
| Interest revenue on receivables | **2,103** | 1,774 |
| Interest revenue on litigation investments - purchased claims | **5,122** | 6,275 |
| | **9,009** | 8,368 |

## Note 4: Net gain on derecognition of litigation investments - intangibles assets

Net gain on derecognition of litigation investments – intangibles assets is derived from the disposal through sale or completion (partial or full) of the underlying litigation that the Group invested in. The accounting policy for litigation investments - intangibles assets is outlined in Note 13.

| | Consolidated | |
|---|---|---|
| | 2023<br>$'000 | 2022<br>$'000 |
| **Net gain on derecognition of litigation investments - intangible assets** | | |
| Proceeds | **141,640** | 175,170 |
| Derecognition of carrying cost | **(96,974)** | (126,141) |
| | **44,666** | 49,029 |

Net gain on derecognition of litigation investments – intangible assets can be represented geographically as follows:

| | Consolidated | |
|---|---|---|
| | 2023<br>$'000 | 2022<br>$'000 |
| Australia | **18,589** | 1,668 |
| United States | **(9,503)** | 45,964 |
| Canada | **4,971** | (5,687) |
| Europe, Middle East and Africa | **15,715** | 7,136 |
| Asia | **14,861** | (9) |
| Latin America | **33** | (43) |
| | **44,666** | 49,029 |

## Note 5: Other income

| | Consolidated | |
|---|---:|---:|
| | 2023 | 2022 |
| | $'000 | $'000 |
| **Other income** | | |
| Net foreign exchange gain | **3,748** | 7,594 |
| Other income | **821** | 1,533 |
| | **4,569** | 9,127 |

## Note 6: Expenses

### Finance costs

Borrowing costs directly attributable to the acquisition and development of a qualifying asset (i.e. an asset that necessarily takes a substantial period of time to get ready for its intended use or sale) are capitalised as part of the cost of that asset. All other borrowing costs are expensed in the period they occur. Borrowing costs consist of interest and other costs that the Group incurs in connection with the borrowing of funds. Detailed information is provided in Note 19.

### Amortisation of litigation investments – claims portfolio

Amortisation of litigation investments – claims portfolio represents the amortisation of the capitalised contract costs due to completion of the underlying enforcement or recovery action. Detailed information is provided in Note 11.

### Depreciation

The depreciation policy is disclosed in Note 25.

### Employee benefits

Provision is made for employee benefits accumulated as a result of employees rendering services up to the end of the reporting period. These benefits include salaries and wages, annual leave, long service leave and bonuses. Liabilities in respect of employees' services rendered that are not expected to be wholly settled within one year after the end of the periods in which the employees render the related services are recognised as long-term employee benefits. These liabilities are measured at the present value of the estimated future cash outflow to be made to the employees using the projected unit credit method. Liabilities expected to be wholly settled within one year after the end of the period in which the employees render the related services are classified as short-term benefits and are measured at the amount due to be paid. The corresponding movements are expensed together with those incurred during the year.

### Share based payments

The policy for share based payments is disclosed in Note 32.

### Impairment expense – litigation investments

The policy for impairment expense – litigation investments is disclosed in Notes 11-14 according to asset classes litigation investments – claims portfolio, litigation investments – purchased claims, litigation investments – intangible assets and litigation investments – financial assets.

### Adverse costs – litigation investments

The expense raised is the Group's best estimate of the amount of adverse costs it will have to remit where the underlying litigation has received an unfavourable judgement. Refer to Notes 27 and 30 for further details on adverse costs.

## Note 6: Expenses (continued)

| | Consolidated | |
|---|---:|---:|
| | 2023 $'000 | 2022 $'000 |
| **(a) Finance costs** | | |
| Interest on lease liabilities (Note 28) | 1,091 | 808 |
| Other finance charges | 1,597 | 589 |
| | 2,688 | 1,397 |
| **(b) Amortisation of litigation investments - claims portfolio** | | |
| Amortisation of litigation investments - claims portfolio (Note 11) | 4,042 | 5,650 |
| **(c) Depreciation expense** | | |
| Depreciation (Note 25) | 3,917 | 3,455 |
| **(d) Employee benefits expenses** | | |
| Wages and salaries | 59,212 | 43,064 |
| Superannuation expense | 2,383 | 1,865 |
| Directors' fees | 527 | 572 |
| Payroll tax | 2,986 | 2,211 |
| Share based payments (Note 32) | 8,871 | 11,724 |
| Long service leave (Note 27) | 13 | (287) |
| | 73,992 | 59,149 |
| **(e) Corporate and office expenses** | | |
| Insurance expense | 3,868 | 3,513 |
| Network expense | 2,539 | 1,697 |
| Marketing expense | 1,736 | 1,581 |
| Occupancy expense | 656 | 719 |
| Professional fees expense | 5,241 | 7,675 |
| Recruitment expense | 1,593 | 1,237 |
| Travel expense | 2,513 | 989 |
| | 18,146 | 17,411 |
| **(f) Other expenses** | | |
| ASX fees | 182 | 174 |
| General expenses | 1,387 | 644 |
| Amortisation of contract costs | 939 | 939 |
| Postage, printing and stationery | 1,503 | 1,435 |
| Repairs and maintenance | 6 | 28 |
| Share registry costs | 39 | 30 |
| Staff training, development and conferences | 1,007 | 352 |
| Expected credit loss allowance (Note 22) | 1,727 | – |
| | 6,790 | 3,602 |
| **(g) Impairment expense and adverse costs - litigation investments** | | |
| Adverse costs - litigation investments (Note 27) | 7,699 | 2,609 |
| Net impairment loss - litigation investments (Notes 11 - 14) | 5,403 | 5,511 |
| | 13,102 | 8,120 |

## Note 7: Income tax

### Income tax

Current income tax assets and liabilities are measured at the amount expected to be recovered from or paid to the taxation authorities based on the current period's taxable income. The tax rates and tax laws used to compute the amount are those that are enacted or substantively enacted by the reporting date.

Deferred income tax is provided for using the full liability balance sheet method.

Deferred income tax liabilities are recognised for all taxable temporary differences except:

- When the deferred income tax liability arises from the initial recognition of goodwill or of an asset or liability in a transaction that is not a business combination and that, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss; or

- When the taxable temporary difference is associated with investments in subsidiaries, associates or interests in joint ventures, and the timing of the reversal of the temporary difference can be controlled and it is probable that the temporary difference will not reverse in the foreseeable future.

Deferred income tax assets are recognised for all deductible temporary differences, carry-forward of unused tax assets and unused tax losses, to the extent that it is probable that taxable profit will be available against which the deductible temporary differences and the carry-forward of unused tax credits and unused tax losses can be utilised, except:

- When the deferred income tax asset relating to the deductible temporary difference arises from the initial recognition of an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss; or

- When the deductible temporary difference is associated with investments in subsidiaries, associates or interests in joint ventures, in which case a deferred tax asset is only recognised to the extent that it is probable that the temporary difference will reverse in the foreseeable future and taxable profit will be available against which the temporary difference can be utilised.

The carrying amount of deferred income tax assets is reviewed at each reporting date and reduced to the extent that it is no longer probable that sufficient taxable profit will be available to allow all or part of the deferred income tax asset to be utilised.

Unrecognised deferred income tax assets are reassessed at each reporting date and are recognised to the extent that it has become probable that future taxable profit will allow the deferred tax asset to be recovered.

Deferred income tax assets and liabilities are measured at the tax rates that are expected to apply to the year when the asset is realised or the liability is settled, based on tax rates (and tax laws) that have been enacted or substantively enacted at the reporting date.

Income taxes relating to items recognised directly in other comprehensive income are recognised in equity and not in profit or loss.

Deferred tax assets and deferred tax liabilities are offset only if a legally enforceable right exists to set off current tax assets against current tax liabilities and the deferred tax assets and liabilities relate to the same taxable entity and the same taxation authority.

### *Australian tax consolidated group*

The Parent and its Australian resident wholly owned subsidiaries have formed an income tax consolidated group. The Parent has entered into tax funding arrangements with its Australian resident wholly owned subsidiaries, pursuant to which each subsidiary has agreed to pay or receive a tax equivalent amount based on the net taxable amount or loss of the subsidiary at the current tax rate. The tax consolidated group has applied the separate taxpayer approach in determining the appropriate amount of current taxes to allocate to each entity.

## Note 7: Income tax (continued)

### Other taxes

Revenues, expenses and assets are recognised net of the amount of GST, except (i) when the GST incurred on a purchase of goods and services is not recoverable from the taxation authority, in which case the GST is recognised as part of the cost of acquisition of the asset or as part of the expense item, as applicable; and (ii) receivables and payables, which are stated with the amount of GST included.

The net amount of GST recoverable from, or payable to, the taxation authority is included as part of receivables or payables in the Consolidated Statement of Financial Position.

Cash flows are included in the Consolidated Statement of Cash Flows on a gross basis and the GST component of cash flows arising from investing and financing activities, which is recoverable from, or payable to, the taxation authority is classified as part of cash flows from operating activities.

Commitments and contingencies are disclosed net of the amount of GST recoverable from, or payable to, the taxation authority.

|  | Consolidated | |
|---|---|---|
|  | 2023 | 2022 |
|  | $'000 | $'000 |
| **Consolidated Statement of Comprehensive Income** | | |
| The major components of income tax benefit are: | | |
| *Current income tax* | | |
| Current income tax charge | **(13,973)** | (7,854) |
| Adjustment in respect of current income tax expense of previous year | **(249)** | 203 |
| Refund of foreign state-based taxes | **(58)** | 452 |
| Current year losses moved to deferred tax asset | **17,991** | 18,133 |
| Other | **1,309** | 587 |
| *Deferred income tax:* | | |
| Relating to origination and reversal of temporary differences | **4,906** | (5,167) |
| Current year losses moved to deferred tax asset | **(17,991)** | (18,133) |
| Adjustment in respect of deferred income tax of previous year | **1,516** | 3,528 |
| Other | **1,875** | (23) |
| **Income tax benefit reported in the Consolidated Statement of Comprehensive Income** | **(4,674)** | (8,274) |
| **Other comprehensive income** | | |
| *Deferred income tax related to items charged or credited directly to equity* | | |
| Deferred tax associated with share-based payments | **96** | 377 |
| **Income tax expense reported in equity** | **96** | 377 |

## Note 7: Income tax (continued)

A reconciliation between income tax benefit and the product of accounting loss before income multiplied by the Group's applicable income tax rate is as follows:

| | Consolidated | |
|---|---|---|
| | 2023<br>$'000 | 2022<br>$'000 |
| Accounting loss before income tax | (3,812) | (1,792) |
| At the Group's statutory income tax rate of 30% (2022: 30%) | (1,143) | (538) |
| Foreign tax rate adjustments | (611) | (1,463) |
| Adjustment in respect of income and deferred tax of previous years | 1,210 | 3,731 |
| Expenditure not allowable for income tax purposes | 749 | 2,645 |
| Non-assessable income | (683) | (12,467) |
| State income tax | 49 | 100 |
| Relating to deductible temporary differences not previously recognised | (2,710) | – |
| Other | (1,535) | (282) |
| **Income tax benefit reported in the Consolidated Statement of Comprehensive Income** | (4,674) | (8,274) |

| | Consolidated | | | |
|---|---|---|---|---|
| | Statement of<br>Financial Position | | Statement of<br>Comprehensive Income | |
| | 2023<br>$'000 | 2022<br>$'000 | 2023<br>$'000 | 2022<br>$'000 |
| Deferred income tax at 30 June relates to the following: | | | | |
| *Deferred income tax liabilities* | | | | |
| Litigation investments – intangible assets | 29,085 | 29,688 | 602 | 8,081 |
| Accrued interest & unrealised foreign exchange differences | – | – | – | 12 |
| Right of use assets and other plant and equipment | 876 | 1,171 | 295 | 78 |
| Other | 5,101 | (39) | (5,139) | 39 |
| Gross deferred tax liabilities | 35,062 | 30,820 | (4,242) | 8,210 |
| *Offsetting deferred tax assets* | | | | |
| Net operating losses | 2,473 | 355 | 2,118 | (12,474) |
| Accruals and provisions | – | – | – | (6,251) |
| Share based payments | 217 | 299 | 14 | (2,666) |
| Leases | 767 | 222 | 545 | 8 |
| Expenditure deductible for income tax over time | 726 | (338) | 1,057 | (1,596) |
| Gross deferred tax assets | 4,183 | 538 | 3,734 | (22,979) |
| **Net deferred tax liabilities** | 30,879 | 30,282 | | |

## Note 7: Income tax (continued)

| | Consolidated | | | |
|---|---|---|---|---|
| | Statement of Financial Income | | Statement of Comprehensive Income | |
| | 2023 | 2022 | 2023 | 2022 |
| | $'000 | $'000 | $'000 | $'000 |
| *Deferred tax assets* | | | | |
| Accruals and provisions | **9,189** | 8,686 | **503** | 7,316 |
| Intercompany | **3,492** | 780 | **2,712** | 725 |
| Expenditure deductible for income tax over time | **1,626** | 4,301 | **(2,668)** | 2,801 |
| Leases | **3,656** | 6,867 | **(3,210)** | 2,330 |
| Share based payments | **274** | 1,118 | **(844)** | (97) |
| Deferred tax assets - Foreign net operating losses | **59,352** | 42,057 | **17,294** | 24,729 |
| **Deferred tax assets** | **77,589** | 63,809 | **13,787** | 37,804 |
| | | | | |
| **Net deferred income tax** | | | **13,279** | 23,035 |
| Movements in foreign exchange | | | **(3,584)** | (3,240) |
| **Deferred tax expense** | | | **9,695** | 19,795 |

### Unrecognised temporary differences and tax losses

At 30 June 2023, the Group had $2.466 million (2022: $2.287 million) of unrecognised deferred tax assets relating to temporary differences and tax losses in its Canadian subsidiaries.

### Deferred tax assets relating to Australian operations

The deferred tax assets balance includes $34.336 million (2022: $17.765 million) of assets relating to carried forward tax losses of the Omni Bridgeway Limited (OBL) tax consolidated group at 30 June 2023.

It is probable that the OBL tax consolidated group will earn sufficient taxable incomes to utilise the losses as the Australian business has significant investments on balance sheet and through Fund 5 participation, which have a combined EPV of $12.788 billion. In addition, OBL is expected to receive distributions from Fund 2&3 and intra-group income from the wider group.

### Deferred tax assets relating to USA operations

The deferred tax assets balance includes $24.731 million (2022: $22.750 million) of assets relating to carried forward tax losses of Omni Bridgeway Holdings (USA) Inc. Under existing tax regulations, the losses incurred prior to financial year ended 30 June 2019 can be carried forward for 20 years and losses incurred thereafter can be carried forward indefinitely. The US business had a history of incurring tax losses before the year ended 30 June 2023. The losses have arisen primarily from the implementation of the expansion of the operating base in the United States to support strategic growth initiatives that are, according to plan, yet to realise their full value. OBL has considered the utilisation of these tax losses within the expanded US business and has determined that, based on approved budgets and existing investments, it is probable that the US tax group will earn sufficient taxable income to utilise the losses. Further, in assessing the utilisation of the tax losses, OBL considers there to be convincing other evidence to support the recoverability of these tax losses including:

(i)   The US business has been in an expansion and infrastructure growth phase. Additional costs have been incurred in the business related to the expansion of activity, changes in operations to a Fund management structure and establishment of a scalable platform. Investments in people, systems and infrastructure have been made ahead of the expected investment activity of the Funds. Fund 4 started in 2019 for an approved portfolio of commitment up to US$500 million (of which the US business has a 20% interest) is currently in its investment commitment activity phase. With an average investment life of circa 3-4 years, a significant portion of the expected income is in the future. This income generation will be by way of both investment returns and fee revenues.

(ii)   The US business has raised substantial external capital over the past 4 years via its Fund structures. Fund 4 investors committed US$500 million (80% external commitments). The external capital raised is the foundation of the investing activity that enables the US business to grow and generate returns to realise future taxable income. Fund 4 Series II which is currently being considered by the institutional investors and may be launched in the near future.

(iii)   US business achieved a record level of commitment of A$278 million last year. The commitment growth supports the increased business activity, growth phase, profit generation and recovery of deferred tax assets in the future.

(iv)   There are 55 US investments with total EPV of $9.1 billion as at 30 June 2023. Using the Group's normalised long term conversion rate of 15%, this indicates an implied embedded value of $1.3 billion. OBL's share of this potential embedded value could be received by way of investment returns and performance fees or accelerated from the sale of these investments in the secondary market. The realisation of this potential embedded value will assist in the recovery of deferred tax assets.

### Deferred tax assets relating to Funds 2 & 3

Omni Bridgeway (Fund 2) Pty Limited and Omni Bridgeway (Fund 3) Pty Limited carried combined total deferred tax assets balances of $0.070 million at 30 June 2023 (2022: $1.573 million), the deferred tax assets balances were predominantly related to the loss of Asian and Europe, Middle East & Africa investments during this reporting period. The Funds are 100% committed with litigation investment that are expected to generate significant taxable income in their respective tax jurisdictions in the future.

## Note 8: Loss per share

Basic loss per share is calculated as net loss attributable to members of the Parent, adjusted to exclude any costs of servicing equity (other than dividends), divided by the weighted average number of ordinary shares outstanding during the financial year, adjusted for any bonus element.

Diluted loss per share is calculated as net loss attributable to members of the Parent, adjusted for:

• Costs of servicing equity (other than dividends);

• The after-tax effect of interest dividends associated with dilutive potential ordinary shares that have been recognised; and

• Other non-discretionary changes in revenue or expenses during the period that would result from dilution of potential ordinary shares;

• Divided by the weighted average number of shares and dilutive shares, adjusted for any bonus element.

At 30 June 2023, 15,421,416 performance rights (2022: 15,929,183) were on issue as detailed in Note 32. Upon meeting certain performance and service conditions, the vesting of each right will result in the issue of 1 ordinary share. The performance shares are contingently issuable and are not considered dilutive.

The following reflects the income and share data used in the basic loss per share computation:

### a.  Loss used in calculating loss per share

|  | Consolidated | |
|---|---|---|
|  | 2023 | 2022 |
|  | $'000 | $'000 |
| **For basic and diluted loss per share** | | |
| Total net loss attributable to equity holders of the Parent | (31,659) | (45,645) |

### b.  Weighted average number of shares

|  | 2023 | 2022 |
|---|---|---|
|  | 000 | 000 |
| Weighted average number of ordinary shares outstanding | 275,182 | 265,850 |
| Effect of dilution: | | |
| Performance rights | – | – |
| Variable deferred consideration - business combination shares | – | – |
| Weighted average number of ordinary shares | 275,182 | 265,850 |

Variable deferred consideration – business combination may be settled by the issue of fully paid ordinary shares in Omni Bridgeway Limited. Refer to Note 29 for details.

These shares have not been included for the following reasons:

• Variable deferred consideration – business combination shares have not been included as their performance milestones for future tranches have yet to be met.

• In addition to the above, the inclusion of any of these shares would be considered anti-dilutive.

The weighted average number of ordinary shares outstanding includes performance rights granted under the Long-Term Incentive Plan which are only included in dilutive earnings per ordinary share where the performance hurdles are met as at period end and they do not have an anti-dilutive effect.

There have been no transactions involving ordinary shares or potential ordinary shares that would significantly change the number of ordinary shares outstanding between the reporting date and the date of completion of these financial statements.

## Note 9: Dividends paid and proposed by Omni Bridgeway Limited (the parent entity)

### (a) Cash dividends on ordinary shares declared and paid

There were no dividends declared or paid for the year ended 30 June 2023 (2022: nil cents per share). Omni Bridgeway Limited's retained earnings are disclosed in Note 21.

The Company considers all its capital management options in light the cash position and performance of the Group at the time of as well as the likely demand for cash over the ensuing 12-month period. In determining the appropriate mechanism to deliver returns to shareholders, the board will consider both semi-annual dividends and share buy-backs. Relevant considerations include the source and nature of income and the prevailing share price relative to the intrinsic value and the franking credit balance.

The Company put in place a buy-back facility on 29 August 2022 and has a dividend reinvestment plan (**DRP**) that shareholders may elect to participate in. On appropriate occasions, the Company may arrange DRP underwriting to reduce the impact a particular dividend might otherwise have on the Group's cash resources.

## Note 9: Dividends paid and proposed by Omni Bridgeway Limited (the parent entity) (continued)

### (b) Franking credit balance

|  | 2023 | 2022 |
|---|---|---|
|  | $'000 | $'000 |
| The amount of franking credits for the subsequent financial year are: |  |  |
| Franking account balance at the end of previous financial year at 30% | 5,905 | 5,905 |
| Franking debits | – | – |
| Balance at 30 June | 5,905 | 5,905 |

### (c) Tax rates

The tax rate at which paid dividends have been franked is 30% (2022: 30%).

## Note 10: Statement of cash flows reconciliation

### Reconciliation of net profit for the year to net cash flows used in operations:

|  | Consolidated | |
|---|---|---|
|  | 2023 | 2022 |
|  | $'000 | $'000 |
| **Net profit for the year** | **862** | 6,482 |
| *Adjustments for:* |  |  |
| Net impact of the reclassification of litigation investments - intangible assets related to cash flows from investing activities | (110,976) | (115,628) |
| Fair value adjustments to litigation investments - deferred consideration | (906) | (667) |
| Fair value adjustments to financial liabilities | (2,610) | (7,424) |
| Amortisation of litigation investments - claims portfolio | 4,042 | 5,650 |
| Amortisation of contract costs | 939 | 939 |
| Depreciation | 3,917 | 3,455 |
| Share based payments | 10,616 | 13,966 |
| Unrealised foreign exchange gain | (3,748) | (7,594) |
| *Changes in assets and liabilities* |  |  |
| (Increase)/Decrease in receivables | (22,039) | 66,913 |
| Increase in other current assets | (6,674) | (5,911) |
| Decrease/(Increase) in litigation investments - intangible assets | 24,599 | (3,650) |
| Increase in litigation investments - claims portfolio | (19,652) | (11,064) |
| Decrease/(Increase) in litigation investments - purchased claims | 9,617 | (8,286) |
| Increase in deferred tax assets and liabilities | (13,183) | (22,657) |
| Decrease in other liabilities | (24,107) | (20,579) |
| Increase in lease liabilities | 4,013 | 8,085 |
| Increase in trade and other payables | 8,157 | 20,944 |
| Increase in provisions | 6,162 | 1,098 |
| Increase in current income tax payable | 543 | 1,381 |
| Net cash used in operating activities | (130,428) | (74,547) |

### Disclosure of financing facilities

Refer to Notes 18, 19 and 28.

### Changes in liabilities arising from financing activities

Refer to Notes 19 and 28.

## B. LITIGATION INVESTMENTS AND GOODWILL

### Note 11: Litigation investments - claims portfolio

#### (a) Recognition and measurement

Litigation investments - claims portfolio assets consist of the capitalised costs incurred to purchase, obtain or fulfil a contract with a customer. These contracts with customers involve a vendor-customer relationship established in the contract. They comprise the litigation enforcement and recovery investment contracts and certain merits-based funding contracts.

Costs incurred to obtain a contract are only capitalised to the investment when it is expected that a contract will be executed, and where those costs will be recoverable. The Group recognises an asset for costs incurred to fulfil a contract if those costs relate directly to the contract, the costs generate or enhance resources of the Group to satisfy performance obligations in the future and the costs are expected to be recovered. All capitalised contract costs are amortised to the profit or loss on a systematic basis that follows delivery of performance obligations to the customer. The delivery of performance obligations to the customer on the contracts are aligned with each individual dollar of recovery to the customer.

The carrying value of the litigation investments - claims portfolio is measured at cost less amortisation and any impairment. At each reporting date an assessment is made on an individual investment by investment basis to determine if the carrying amount of a contract exceeds its recoverable amount. In order to determine the recoverable amount a cashflow model is used which includes forecast revenues and expenses, together with an estimate of directly attributable overheads to complete the contract. If the carrying value exceeds the recoverable amount the difference is recognised as an impairment expense in the profit or loss.

#### Reconciliation of carrying amounts

|  | Consolidated | |
|---|---|---|
|  | 2023 | 2022 |
|  | $'000 | $'000 |
| Balance at 1 July[1] | **106,123** | 95,059 |
| Additions | **20,969** | 20,749 |
| Amortisation of carrying costs[2] | **(4,042)** | (5,650) |
| Impairment expense | **(719)** | (197) |
| Foreign currency adjustment | **3,444** | (3,838) |
| Balance at 30 June[3] | **125,775** | 106,123 |

1. Includes $59.558 million (2022: $64.541 million) of fair value adjustments from business combination in FY20.
2. Includes $1.180 million (2022: $2.414 million) of fair value adjustments from business combination in FY20.
3. Includes $63.151 million (2022: $59.558 million) of fair value adjustments from business combination in FY20.

### Note 12: Litigation investments - purchased claims

#### (a) Recognition and measurement

Litigation investments – purchased claims are litigation actions which have been acquired by the Group (except by business combination). They are classified as purchased credit-impaired financial assets which are initially recognised at fair value.

The credit-adjusted effective interest rate on these financial assets is calculated taking into account the initial lifetime expected credit loss in the estimated cash flows. In determining the lifetime expected credit losses for these financial assets, the Group has taken into account the financial position of the counterparties, the legal environment in which the enforcement occurs, historical default experience and considering various external sources of actual and forecast information, as appropriate.

Purchased claims are subsequently measured at amortised cost by applying the credit-adjusted effective interest rate. The Group recognises:

i.    Interest income through the application of the credit-adjusted effective interest rate to the amortised cost of the purchased claims; and

ii.   Impairment losses and gains, when material, due to the changes in estimated lifetime expected credit losses. At each reporting period, the Group reviews the estimated cash flows from purchased claims on an investment by investment basis, estimating the expected recovery, its timing and any other cashflows that may be attributable to the counterparties. The net present value of the cashflows are then determined using the credit-adjusted effective interest rate and the value compared to the carrying value. Where there is a material gain, this gain is recognised by adjusting the gross carrying amount of the receivable. Where there is a material loss, it is recognised as an impairment provision.

## Note 12: Litigation investments - purchased claims (continued)

### Reconciliation of carrying amounts

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Balance at 1 July[1] | **47,040** | 38,754 |
| Interest revenue | **5,122** | 6,275 |
| (Decrease)/Increase in carrying value reflected in deferred consideration (Note 15) | **(16,387)** | 8,447 |
| Carrying value disposed[2] | **(651)** | (5,637) |
| Impairment (loss)/gain | **(1,546)** | 260 |
| Foreign currency adjustment | **3,845** | (1,059) |
| Balance at 30 June[3] | **37,423** | 47,040 |

At 30 June 2023, the fair value of the litigation investments - purchased claims amounted to $37.423 million (2022: $47.040 million) and the gross contractual amount was $169.008 million (2022: $177.500 million).

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| **Net gain on disposal of litigation investments - purchased claims** | | |
| Proceeds | **1,670** | 6,427 |
| Carrying value disposed[2] | **(651)** | (5,637) |
| | **1,019** | 790 |

1. Includes $0.586 million (2022: $2.936 million) of fair value adjustments from the business combination in FY20.
2. Includes ($0.228) million (2022: $2.331 million) of fair value adjustments from the business combination in FY20.
3. Includes $0.861 million (2022: $0.586 million) of fair value adjustments from the business combination in FY20.

## Note 13: Litigation investments - intangible assets

### (a) Recognition and measurement

Litigation investments involve funding provided to pursue an underlying litigation dispute that are not classified as purchased investments, claims portfolio or financial assets. They are recognised as intangible assets in the financial statements of the Group when they represent future economic benefits controlled by the Group. The Group is able to control the expected future economic benefit as the investment may be exchanged or sold. The litigation funding contract does not give rise to an unconditional right to receive cash. Rather, it provides the Group with a right to a share of litigation proceeds which may be in the form of cash or other non-financial assets.

These litigation contracts are not considered contracts with customers as they are collaborative arrangements and there is no vendor-customer relationship established in the contract.

Litigation investments – intangible assets are measured at cost on initial recognition. They are not amortised as the assets are not available for use until the determination of a judgement or settlement, withdrawal or sale, at which point the assets are realised through disposal.

Gains or losses arising from derecognition are measured as the difference between the net disposal proceeds and the carrying amount of the asset at the time and are recognised in the profit or loss when the asset is derecognised.

The following specific asset recognition and derecognition rules have been applied to litigation investments – intangible assets:

#### (i) Ongoing litigation

When the underlying litigation action is ongoing and pending a determination, the investments are carried at cost (subject to any provision for impairment). Initial and subsequent ongoing expenditure is capitalised when it meets all the following criteria:

(a) the Group is able to demonstrate its ability to complete the litigation so that the asset will be available for use and the benefits embodied in the asset will be realised;

(b) the Group retains control of the asset;

(c) the Group can demonstrate that it intends to complete the litigation;

(d) the Group is able demonstrate the availability of adequate technical, financial and other resources to complete the litigation; and

(e) the Group can measure reliably the expenditure attributable to the intangible asset during the life of the litigation investments – intangible assets.

Impairment is considered in line with the policy described in (b) below.

## Note 13: Litigation investments - intangible assets (continued)

### (ii) Completion

Where the underlying litigation has been finally determined or a settlement has been agreed, such that there is not considered to be a significant risk of reversal, this constitutes a disposal transaction, the carrying cost is derecognised and a gain or loss on disposal of the intangible asset is recognised in the Consolidated Statement of Comprehensive Income. Control of the intangible asset is considered to be transferred as follows:

• For judgements, typically after a judgement has been determined and the relevant appeal periods have expired;

• For settlements, typically when settlement agreement is reached and if relevant, court approval is obtained; and

• For sales, typically when a binding agreement is executed.

### (iii) Partial completion

Where litigation investments have been subject to a partial sale transaction, consideration has been agreed, such that there is not considered to be a significant risk of reversal and it is evident the litigation investment can be assessed at the respective percentage of interest level, this constitutes a disposal transaction and a gain or loss on disposal is recognised in the statement of comprehensive income.

Control of the partial intangible asset is considered to be transferred as follows:

• When the partial sale agreement is executed. Upon this date, the purchaser is considered to be able to direct the use of the interest and assume substantially all the remaining benefits of the interest.

### (iv) Appeal/enforcement

If a funded client obtains an unsuccessful decision from the court, arbitration or tribunal and appeals against the judgement, where the investment and funding was undertaken by the Group with that as a central thesis, the investment may be considered to be ongoing with deployment capitalised to the investment. Where there was not such thesis, the investment is dercognised and future costs incurred in relation to the appeal are expensed as incurred.

If a funded client obtains a successful decision from the court, arbitration or tribunal and has to subsequently undertake enforcement activities, where the investment and funding was undertaken with that as a central thesis, the investment may be considered to be ongoing with a delivery of a partial service obligation requiring partial derecognition of the investment and income recognition. Where there was not such a thesis, the investment is derecognised, with a receivable recognised and any future costs incurred in relation to the enforcement appeal are expensed as incurred.

### (v) Portfolio investments

Upon completion of an underlying litigation within a portfolio, a corresponding portion of the intangibles carrying value is derecognised. The difference between the disposal proceeds received and the derecognised carrying value is recognised as a net gain or loss in the profit or loss. The remainder of the portfolio continues to be carried at cost (subject to usual impairment considerations) until the earlier of either the full return to the Group is obtained or each case within the portfolio has completed.

### Reconciliation of carrying amounts

|  | Consolidated | |
|---|---:|---:|
|  | 2023 | 2022 |
|  | $'000 | $'000 |
| Balance at 1 July | **394,684** | 391,034 |
| Additions - external funding costs | **157,201** | 91,829 |
| Additions - capitalised overheads | **28,772** | 18,085 |
| Derecognitions - external expenditure | **(61,352)** | (101,622) |
| Derecognitions - capitalised overheads | **(35,284)** | (19,988) |
| Net derecognition of purchase price adjustment arising from business combination | **(339)** | (4,534) |
| Impairment expense | **(3,138)** | (5,574) |
| Deconsolidation of Fund 1 and HC 1 LLC | **(123,420)** | – |
| Effect of movement in foreign currency | **12,961** | 25,454 |
| Balance at 30 June | **370,085** | 394,684 |

The carrying value includes external costs such as solicitors' fees, counsels' fees and experts' fees funded by the Group, the capitalisation of certain directly attributable internal costs of managing the litigation funding investment, such as certain direct salaries and wages, occupancy costs, other out of pocket expenses and the capitalisation of borrowing costs as described below. The capitalised salaries and wages in 2023 equated to approximately 13.0% of the Group's total salary and wages expense (2022: 14.6%). The other internal capitalised expenses equated to approximately 49.9% of related overhead costs (2022: 52.2%).

The Group has determined that litigation investments – intangible assets meet the definition of qualifying assets and that all borrowing costs are eligible for capitalisation. The weighted average cost of borrowing was 6.9% (2022: 6.9%).

## Note 13: Litigation investments - intangible assets (continued)

The carrying value of litigation investments – intangible assets can be summarised as follows:

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| External funding costs | **337,167** | 472,310 |
| Capitalised overheads | **49,143** | 75,399 |
| Gross carrying amount at cost | **386,310** | 547,709 |
| Accumulated impairment - Investments in progress | **(16,225)** | (153,025) |
| Balance at 30 June | **370,085** | 394,684 |

### (b) Impairment testing of litigation investments – intangible assets

Except for specific litigation investments – intangible assets that are subject to an unfavourable judgement or award, the recoverable amount of each of the litigation investments – intangible assets is determined based on a value in use calculation using cash flow projections based on financial budgets approved by management for the expected length of each investment.

The following describes each key assumption on which management has based its cash flow projections when determining the value in use of litigation investments – intangible assets:

- The estimated cost to complete is budgeted based on estimates provided by the external legal advisors handling the litigation.

- The value of the litigation is estimated based on a successful completion and the fees due to the Group under the litigation funding contract.

- The discount rate applied to the cash flow projections is based on the Group's weighted average cost of capital and other factors relevant to the particular investment including country risk. The discount rate applied ranged between 12.8% and 13.7% for this reporting period (2022: between 10.9% and 12.0%).

At 30 June 2023, a provision for impairment has been recognised for $16.225 million (2022: $153.025 million). The impairment comprised:

- ($12.006) million relating to a Fund 4 investment. An initial court decision ruled in favour of the defendants. The plaintiffs are currently reviewing avenues/feasibility for appeal.

- The remainder of the impairment, ($4.219) million at 30 June 2023 (2022: $25.068 million) relates to 18 investments (2022: 27) across the remainder of the portfolio, the majority of which are not individually material.

For new or increased impairments, during the impairment review, management have determined that either a successful outcome for the investment was no longer likely to occur or that the likely outcome would not recover the current carrying value of the investment. The discount rate used in the impairment assessment of these assets was 13.2%. After taking into account the impairment, at 30 June 2023, the 18 investments have a combined carrying value of $7.153 million. This amount reflects the net recoverable amount expected to be received from the investments.

## Note 14: Litigation investments - financial assets

### (a) Recognition and measurement

Litigation investments - financial assets previously represented the Group's investments made into Managed Investment Schemes (**MISs**) relating to Australian class actions, where Omni Bridgeway Managed Investments Limited (**OBIML**), which is part of the consolidated Group, was the responsible entity of each MIS.

On 17 June 2022, the Full Federal Court determined that funded litigation schemes are generally not within the definition of a Managed Investment Scheme but more a financial product under the Australian Corporation Law. As a result, all nine MISs were deregistered on 25 December 2022 and there was no longer a requirement for OBIML to hold an Australian Financial Services Licence (**AFSL**). This does not affect the carrying value, viability, prospect or accounting treatment for the Group.

These investments continue to be held within Fund 5 where the Group participates in these investments via its 20% participation and are not consolidated with the Group.

The investments are classified as financial assets at fair value through the profit or loss. The investments are initially recognised at fair value plus any attributable transaction costs and are subsequently measured at fair value at each reporting date. The determination of the fair value is designated as level 3 in the fair value hierarchy. Management judgement is required when calculating the fair value of the investments. Level 3 inputs are used in the fair value calculation and estimation of fair value is inherently uncertain.

Typically the fair value of investments are equivalent to the Group's deployed capital on the investment, being the Group's share of funded costs of the litigation plus any associated costs until there is some material objective positive or negative event in the underlying litigation that would cause a change in value.

## Note 14: Litigation investments - financial assets (continued)

### (b) Reconciliation of carrying amounts

The following table reconciles the movements in recurring fair value measurements categorised within level 3 of the fair value hierarchy:

|  | Consolidated | |
|---|---:|---:|
|  | 2023<br>$'000 | 2022<br>$'000 |
| Balance at 1 July | 3,071 | 389 |
| Additions | 4,007 | 2,791 |
| Disposals | – | (109) |
| Balance at 30 June | 7,078 | 3,071 |

## Note 15: Litigation investments – deferred consideration

### (a) Recognition and measurement

Variable consideration relating to litigation investments - purchased claims is initially measured at fair value and subsequently measured at amortised cost using the effective interest rate method. The determination of the fair value is designated as level 3 in the fair value hierarchy.

### (b) Reconciliation of carrying amounts

The following table reconciles the movements in recurring fair value measurements categorised within level 3 of the fair value hierarchy:

|  | Consolidated | |
|---|---:|---:|
|  | 2023<br>$'000 | 2022<br>$'000 |
| Balance at 1 July | 21,872 | 14,376 |
| (Decrease)/Increase in carrying value (Note 12) | (16,387) | 8,447 |
| Interest expense | 490 | 800 |
| Valuation remeasurement recognised through profit or loss | (906) | (667) |
| Effect of movement in foreign currency | 2,598 | (1,084) |
| Balance at 30 June | 7,667 | 21,872 |
| Current | 3,342 | 21,872 |
| Non-current | 4,325 | – |
|  | 7,667 | 21,872 |

## Note 16: Goodwill

### (a) Recognition and measurement

Goodwill is initially measured at cost (being the excess of the aggregate of the consideration transferred and the amount recognised for non-controlling interests and any previous interest held over the fair value of the net identifiable assets acquired and liabilities assumed). Goodwill is subsequently measured at cost less any impairment.

Goodwill arose on the acquisition of Omni Bridgeway Holding B.V. and its subsidiaries (collectively known as the OBE Group) accounted for as a business combination. For impairment purposes, goodwill has been solely allocated to the OBE Group, its related enforcement business and income generated by the OBE Group. The Group performs its annual impairment test on the goodwill associated with the OBE Group at 30 June each year.

The impairment test performed on the OBE Group goodwill is done via a value-in-use calculation using the following inputs:

i.    Cashflows generated over a 5-year period from the OBE Group's annual budget. The annual budget includes an estimation for all cashflows from operations of the OBE Group, including returns from investments and payments of overheads. The budget cashflows are sensitive to the timing and amount of investment completions. The investment completions refer to income earned from claims portfolio, purchased claims and intangible assets – litigation contracts in progress. The timing of completion and amount of investment income are based on the relevant investment manager's best estimates during the Group's annual budget process and are reviewed internally by management. The cashflows from investment completions have a compound annual growth rate of 25.4% (2022: 38.3%) over the cash flow period. This is reflective of the management's estimate of the OBE Group's expected future growth in business activity.

ii.   Discount rate of 14.9% (2022: 18.4%). The discount rate represents the current assessment of the risks specific to OBE Group cash-generating unit (**CGU**), taking into consideration the time value of money and individual risks of the underlying OBE Group investment that have not been incorporated in the cash flow estimates. The discount rate was arrived using the OBL's weighted average cost of capital (**WACC**) as a starting base.

No reasonably possible change in key assumption would result in the carrying amount of the CGU exceeding its recoverable amount.

### Reconciliation of carrying amounts

|  | Consolidated | |
|---|---|---|
|  | 2023 | 2022 |
|  | $'000 | $'000 |
| Balance at 1 July | 95,567 | 99,645 |
| Effect of movement in foreign currency | 7,737 | (4,078) |
| Balance at 30 June | 103,304 | 95,567 |

## C. CAPITAL STRUCTURE

### Note 17: Financial risk management

The Group's principal financial instruments comprise cash and short-term deposits, purchased claims, receivables, payables, debt securities (bonds and fixed rate notes), borrowings, lease liabilities, deferred consideration and variable deferred consideration.

The Group manages its exposure to key financial risks, including interest rate risk and currency risk in accordance with the Group's financial risk management policy. The objective of the policy is to support the delivery of the Group's financial targets whilst protecting its future financial security. On 18 July 2022, Group fully repaid and redeemed all of its debt securities (bonds and fixed rate notes) from the proceeds of debt drawn down from a debt facility in the form of a Senior Facility Agreement, entered into on 5 May 2022. Refer to Note 19.

The main risks arising from the Group's financial instruments are interest rate risk, foreign currency risk, credit risk and liquidity risk. The Group uses different methods to measure and manage different types of risks to which it is exposed. These include monitoring levels of exposure to interest rates and currencies and assessments of market forecasts for interest rates and foreign currencies. Ageing analyses and monitoring of specific credit allowances are undertaken to manage credit risk. Liquidity risk is monitored through the development of future rolling cash flow forecasts.

**Risk exposures and responses**

*Interest rate risk*

The Group's exposure to the risk of changes in market interest rates relates primarily to:

- The Group's cash holdings with a floating interest rate; and
- The Group has a $190 million variable rate debt facility outstanding including fixed capitalised costs of issuing debt as at 30 June 2023. The debt facility requires that the Group make a quarterly interest payment based on the Bank Bill Swap Bid Rate plus a fixed margin of 7% per annum.

At reporting date the Group had the following financial instruments exposed mainly to Australian variable interest rate risk:

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| **Financial instruments** | | |
| Cash and cash equivalents | **117,016** | 158,966 |
| Borrowings | **(190,000)** | – |
| Omni Bridgeway Bonds | **–** | (76,000) |
| Net exposure | **(72,984)** | 82,966 |

The Group regularly analyses its interest rate exposure. Within this analysis, consideration is given to expected interest rate movements and the Group's future cash requirements, potential renewals of existing positions, alternative financing available, and the mix of fixed and variable interest rates.

The following sensitivity analysis is based on the interest rate risk exposures in existence at the reporting date.

At 30 June 2023, if interest rates had moved with all other variables held constant, post-tax profit and equity would have been affected as follows:

| | Post Tax Profit Higher/ (Lower) | | Equity Higher/(Lower) | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| | $'000 | $'000 | $'000 | $'000 |
| +1.00% (100 basis points) (2022: +1.00%) | **(511)** | 581 | **(511)** | 581 |
| -1.00% (100 basis points) (2022: -1.00%) | **511** | (581) | **511** | (581) |

*Credit risk*

Credit risk arises from the financial assets of the Group, which comprises cash and cash equivalents, purchased claims and receivables from litigation contracts and other. The Group's exposure to credit risk arises from potential default of the counterparty, with a maximum exposure equal to the carrying amount of these instruments. Exposure at reporting date is addressed in each applicable note. Apart from ratings on cash held and litigation contract receivables, as detailed below, the remainder of the Group's receivables typically do not carry a credit risk rating from a ratings agency.

To mitigate credit risk on litigation contract receivables the Group assesses the defendants in the investments funded by the Group prior to entering into any agreement to provide funding and continues this assessment during the course of funding. Wherever possible, the Group ensures that security for settlement sums is provided, usually with the settlement funds placed into solicitors' trust accounts. As at 30 June 2023, there are $13.7 million worth of funds within solicitor's trust accounts. The Group's continual monitoring of the defendants' financial capacity mitigates this risk. At 30 June 2023, there were no litigation contract receivables that were due to be paid by the AAA rated government (2022: $nil).

To mitigate credit risk on purchased claims, the Group assesses the defendants in the investments funded by the Group prior to purchasing the claim. The Group's continual monitoring of the defendants' financial capacity mitigates this risk.

## Note 17: Financial risk management (continued)

To mitigate credit risk on cash and cash equivalents, the Group holds over 99.6% (2022: 92.4%) of its cash with Australian, American, Canadian and Singaporean AA rated banks.

Refer to each financial asset's respective note for information on how impairment and credit loss is determined.

### *Liquidity risk*

The liquidity position of the Group is managed to ensure sufficient liquid funds are available to meet the Group's expected financial commitments in a timely and cost-effective manner.

Management continually reviews the Group's liquidity position, including the preparation of cash flow forecasts, to determine the forecast liquidity position and to maintain appropriate liquidity levels. All financial liabilities of the Group, except the debt facility, consideration liabilities and non-current lease liabilities, are current and payable within 30 days.

The maturity profile of the Group's financial liabilities based on contractual maturity on an undiscounted basis are set out below. On 18 July 2022, Group fully repaid and redeemed all of its debt securities (bonds and fixed rate notes) from the proceeds of debt drawn down from a debt facility in the form of a Senior Facility Agreement, entered into on 5 May 2022. This repayment included an early redemption fee.

| | < 6 months $'000 | 6-12 months $'000 | 1-5 years $'000 | >5 years $'000 | Total $'000 |
|---|---|---|---|---|---|
| **2023** | | | | | |
| **Financial Liabilities** | | | | | |
| Trade and other payables | **50,110** | **–** | **–** | **–** | **50,110** |
| Borrowings - principal | **–** | **–** | **190,000** | **–** | **190,000** |
| Borrowings - interest | **10,227** | **10,227** | **61,697** | **–** | **82,151** |
| Lease liabilities | **1,466** | **1,467** | **10,885** | **4,123** | **17,941** |
| Litigation investments - deferred consideration | **3,342** | | **4,325** | | **7,667** |
| Deferred consideration - Insurance | **1,099** | **–** | **2,975** | **–** | **4,074** |
| Variable deferred consideration - business combinations | **6,998** | **–** | **7,775** | **–** | **14,773** |
| | **73,242** | **11,694** | **277,657** | **4,123** | **366,716** |
| **2022** | | | | | |
| **Financial Liabilities** | | | | | |
| Trade and other payables | 41,953 | – | – | – | 41,953 |
| Bonds and Notes - principal | 148,000 | – | – | – | 148,000 |
| Bonds and Notes - interest | 1,519 | – | – | – | 1,519 |
| Lease liabilities | 1,377 | 1,378 | 6,932 | 4,241 | 13,928 |
| Litigation investments - deferred consideration | 12,406 | 9,466 | – | – | 21,872 |
| Deferred and variable deferred consideration - business combinations | 29,161 | – | 16,568 | – | 45,729 |
| | 234,416 | 10,844 | 23,500 | 4,241 | 273,001 |

### *Equity price risk*

The fair value of the deferred and variable deferred consideration – business combination for the acquisition of the OBE Group (refer to Note 20 and 29) is exposed to changes in the Company's share price. There is no hedging or policy in place to mitigate the changes in share price. Refer to Fair Value section below for sensitivity analysis of this risk.

## Note 17: Financial risk management (continued)

*Fair value*

The methods for estimating fair value are outlined in the relevant notes to the financial statements. The carrying amounts of financial assets and liabilities of the Group carried at amortised cost approximate their fair values.

For the purposes of disclosure, the fair value measurements used for all assets and liabilities below are level 3, except for the bonds which are level 1 on the fair value hierarchy.

|  | Carrying Value | | Fair Value | |
|---|---|---|---|---|
|  | 2023<br>$'000 | 2022<br>$'000 | 2023<br>$'000 | 2022<br>$'000 |
| **Financial assets** | | | | |
| Trade and other receivables | **186,431** | 164,392 | **186,431** | 164,392 |
| Litigation investments - purchased claims | **37,423** | 47,040 | **37,423** | 47,040 |
| Litigation investments - financial assets | **7,078** | 3,071 | **7,078** | 3,071 |
| Security deposits | **2,925** | 2,848 | **2,925** | 2,848 |
|  | **233,857** | 217,351 | **233,857** | 217,351 |
| **Financial liabilities** | | | | |
| Trade and other payables | **50,110** | 41,953 | **50,110** | 41,953 |
| Omni Bridgeway bonds | **–** | 76,000 | **–** | 76,494 |
| Fixed rate notes | **–** | 72,000 | **–** | 73,146 |
| Borrowings | **181,639** | – | **181,639** | – |
| Deferred consideration - business combination | **4,074** | 15,491 | **4,074** | 15,491 |
| Variable deferred consideration - business combination | **14,773** | 30,238 | **14,773** | 30,238 |
| Variable consideration - litigation investments - purchased claims | **7,667** | 21,872 | **7,667** | 21,872 |
|  | **258,263** | 257,554 | **258,263** | 259,194 |

## Note 17: Financial risk management (continued)

*Description of significant inputs to valuation of deferred and variable deferred consideration – business combination*

The significant inputs and assumptions used in the fair value measurements of deferred and variable deferred consideration – business combination, categorised within Level 3 of the fair value hierarchy, together with a quantitative sensitivity analysis at 30 June 2023 are shown below:

| Item | Valuation technique | Significant unobservable inputs | Range (weighted average) | Sensitivity of the input to fair value |
|---|---|---|---|---|
| Variable deferred consideration - business combination | Black Scholes Option Pricing Model | Exercise price | **Theoretical exercise price based on the floor price of $3.407** | |
| | | Volatility | **40% at 30 June 2023** and 40% at 30 June 2022 | **At 30 June 2023:** **An absolute 5% increase in the volatility would result in a $170,000 increase in the value of the liability. An absolute 5% decrease in the volatility would result in a $164,000 decrease in the value of the liability.** At 30 June 2022: An absolute 5% increase/(decrease) in the volatility would result in a $487,000 increase/(decrease) in the value of the liability respectively. |
| | | Underlying share price | **$2.62 at 30 June 2023** and $3.55 at 30 June 2022 | **At 30 June 2023:** **A relative 5% increase in the share price would result in a $176,000 increase in the value of the liability. A relative 5% decrease in the share price would result in a $153,000 decrease in the value of the liability.** At 30 June 2022: A relative 5% increase in the share price would result in a $875,000 increase in the value of the liability. A relative 5% decrease in the share price would result in a $803,000 decrease in the value of the liability. |
| | | Dividend yield | **At 30 June 2023:** **0% for 8-Nov-23 payment 0% for 8-Nov-24 payment** At 30 June 2022: 0% for 8-Nov-22 payment 2% for 8-Nov-23 payment 2% for 8-Nov-24 payment | **At 30 June 2023:** **An absolute 1% increase in dividend yield would result in a $33,000 decrease in the value of the liability. An absolute 1% decrease in dividend yield would not result in a change in the value of the liability.** At 30 June 2022: An absolute 1% increase in dividend yield would result in a $160,000 decrease in the value of the liability. An absolute 1% decrease in dividend yield would result in a $164,000 increase in the value of the liability. |
| | | Risk free rate | **At 30 June 2023:** **4.36% for 8-Nov-23 payment 4.36% for 8-Nov-24 payment** At 30 June 2022: 1.94% for 8-Nov-22 payment 2.95% for 8-Nov-23 payment 3.02% for 8-Nov-24 payment | **At 30 June 2023:** **An absolute 0.5% increase in risk free rate would result in a $43,000 decrease in the value of the liability. An absolute 0.5% decrease in risk free rate would result in a $41,000 increase in the value of the liability.** At 30 June 2022: An absolute 0.5% increase in risk free rate would result in a $77,000 decrease in the value of the liability. An absolute 0.5% decrease in risk free rate would result in a $79,000 increase in the value of the liability. |
| | | FX forward rate (AUD/EUR) | **At 30 June 2023:** **8-Nov-23: 1.64 8-Nov-24: 1.66** At 30 June 2022: 8-Nov-22: 1.53 8-Nov-23: 1.58 8-Nov-24: 1.62 | **At 30 June 2023:** **A relative 5% increase/(decrease) in the forward exchange rates would result in a $714,000 increase/(decrease) in the value of the liability respectively.** At 30 June 2022: A relative 5% increase in the forward exchange rates would result in a $1,489,000 increase the value of the liability. A relative 5% decrease in the forward exchange rate would result in a $1,489,000 decrease in the value of the liability. |

## Note 17: Financial risk management (continued)

*Foreign currency risk*

The Group operates internationally and is exposed to foreign exchange risk arising from various currency exposures, primarily with respect to the US dollar. Foreign exchange risk arises from commercial transactions and recognised assets and liabilities denominated in a currency that is not the functional currency in which they are measured. The risk is monitored using sensitivity analysis and cash flow forecasting. The Group is also exposed to foreign exchange translation risk arising from its foreign operations. The Group's investments in its subsidiaries are not hedged as those currency positions are considered to be long term in nature. In addition, the parent entity has intercompany receivables from its subsidiaries denominated in Australian Dollars which are eliminated on consolidation. The gains or losses on re-measurement of these intercompany receivables from foreign currencies to Australian Dollars are not eliminated on consolidation as the loans are not considered to be part of the net investment in the subsidiary.

The Group's exposure to foreign currency risk at 30 June were as follows:

| 2023 | AUD $'000 | USD $'000 | GBP $'000 | EUR $'000 | SGD $'000 | CAD $'000 | HKD $'000 | CHF $'000 | AED $'000 | JPY $'000 | NZD $'000 | NOK $'000 | ZAR $'000 | MAD $'000 | SEK $'000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Financial Assets** | | | | | | | | | | | | | | | |
| Cash and cash equivalents | – | 665 | 132 | 372 | 1 | 101 | 1,029 | 1 | 79 | 35 | – | – | – | – | – |
| Trade receivables[1] | – | 6,434 | 6,000 | 1,103 | – | 19,808 | – | – | – | – | – | – | – | – | – |
| Intercompany loan receivable | – | 59,427 | (831) | – | (2,095) | – | – | – | – | – | 351 | – | – | – | – |
| Total assets | – | 66,526 | 5,301 | 1,475 | (2,094) | 19,909 | 1,029 | 1 | 79 | 35 | 351 | – | – | – | – |
| **Financial Liabilities** | | | | | | | | | | | | | | | |
| Trade payables | 460 | 1,836 | 512 | 282 | 1 | 375 | – | – | 115 | – | – | 202 | – | 60 | 183 |
| Deferred and variable deferred consideration - business combination | 45,729 | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Total liabilities | 46,189 | 1,836 | 512 | 282 | 1 | 375 | – | – | 115 | – | – | 202 | – | 60 | 183 |

| 2022 | AUD $'000 | USD $'000 | GBP $'000 | EUR $'000 | SGD $'000 | CAD $'000 | HKD $'000 | CHF $'000 | AED $'000 | JPY $'000 | NZD $'000 | NOK $'000 | ZAR $'000 | MAD $'000 | SEK $'000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Financial Assets** | | | | | | | | | | | | | | | |
| Cash and cash equivalents | – | 9,963 | 306 | 996 | 303 | – | 9,820 | 27 | 102 | 41 | – | – | – | – | – |
| Trade receivables[1] | – | 6,516 | 6,000 | 5,052 | – | 14,725 | – | – | – | – | – | – | – | – | – |
| Intercompany loan receivable | – | 43,141 | (705) | – | (2,956) | – | – | – | – | – | 4 | – | – | – | – |
| Total assets | – | 59,620 | 5,601 | 6,048 | (2,653) | 14,725 | 9,820 | 27 | 102 | 41 | 4 | – | – | – | – |
| **Financial Liabilities** | | | | | | | | | | | | | | | |
| Trade payables | 2,897 | 279 | 15 | 301 | 2 | 207 | 88 | – | 34 | (34) | 35 | 31 | 557 | – | – |
| Deferred and variable deferred consideration - business combination | 45,729 | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Total liabilities | 48,626 | 279 | 15 | 301 | 2 | 207 | 88 | – | 34 | (34) | 35 | 31 | 557 | – | – |

1. Receivables includes intercompany loan trade receivable and payable.

The Group's exposure to foreign currency risk on cash and cash equivalents primarily relates to foreign cash holdings within the parent entity. The USD foreign currency risk for receivables is predominately due to the Group's AUD and Euro denominated subsidiaries which have USD receivables. The AUD foreign currency risk for variable deferred consideration is due to Omni Bridgeway (Storm) Holdings BV's acquisition of the OBE Group and its requirement to deliver AUD denominated shares in the Company.

## Note 17: Financial risk management (continued)

*Sensitivity*

The following table summarises the sensitivity of financial instruments held at balance date to movement in the exchange rate of the subsidiary's functional currency to the listed currencies, with all other variables held constant. The sensitivity is based on management's estimate of reasonably possible changes over the financial year.

| | | AUD | USD | GBP | EUR | SGD | CAD | HKD | CHF | AED | JPY | NZD | NOK | ZAR | MAD | SEK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Impact on profit or loss before tax ($'000) | | | | | | | | | |
| **30 June 2023** | +10% | **1,428** | **(9,773)** | **(913)** | **(196)** | **233** | **(2,228)** | **(20)** | **–** | **1** | **–** | **(32)** | **3** | **–** | **1** | **3** |
| | (10%) | **(1,428)** | **9,773** | **913** | **196** | **(233)** | **2,228** | **20** | **–** | **(1)** | **–** | **32** | **(3)** | **–** | **(1)** | **(3)** |
| 30 June 2022 | +10% | 4,528 | (8,632) | (985) | (873) | 277 | (1,638) | (180) | (4) | (3) | – | 3 | – | 5 | – | – |
| | (10%) | (4,528) | 8,632 | 985 | 873 | (277) | 1,638 | 180 | 4 | 3 | – | (3) | – | (5) | – | – |

## Note 18: Cash and cash equivalents

Cash and cash equivalents in the Consolidated Statement of Financial Position and Consolidated Statement of Cash Flows comprise cash at bank and on hand, and short-term deposits with an original maturity of three months or less that are readily convertible to known amounts of cash on hand and which are subject to an insignificant risk of changes in value.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Cash at bank | **115,430** | 124,755 |
| Short-term deposits | **1,586** | 34,211 |
| | **117,016** | 158,966 |

Cash at bank earns interest at floating rates based on daily bank deposit rates. The carrying amounts of cash and cash equivalents represent fair value. Of the cash at bank, $2,226,000 (2022: $1,686,000) is restricted as it is cash received for unearned revenue or is held within Stichting vehicles on behalf of customers. The Stichting vehicles were founded as a separate, independent foundation to ensure the cash flows related to the claims were secured.

Short-term deposits are made for varying periods depending on the immediate cash requirements of the Group. At 30 June 2023, all short-term deposits are due to mature in less than 90 days from inception and earn interest at the respective short-term deposit rates.

### Bank Guarantees

Bank guarantees have been issued by the Group's bankers as security for leases over premises. At 30 June 2023, guarantees of $1,735,000 were outstanding (2022: $2,355,000). The Group has a total guarantee facility limit of $1,735,000 (2022: $2,472,000) that is secured by an offset arrangement with deposits of $1,490,000 (2022: $1,672,000).

## Note 19: Borrowings and debt securities

All loans and borrowings are initially recognised at fair value less directly attributable transaction costs.

After initial recognition, interest-bearing loans and borrowings are subsequently measured at amortised cost using the effective interest rate method.

On 8 July 2022, the Group fully repaid and redeemed all of its Bonds and Fixed Rate Notes from the proceeds of debt drawn down from a debt facility with a limit of $250 million in the form of a Senior Facility Agreement, entered into on 5 May 2022. The total amount of drawn down from the debt facilities at 30 June 2023 was $190 million.

The interest rate of the borrowings is 7% + BBSY and matures on 5 July 2027.

There were no breaches of financial covenants during the year ended 30 June 2023.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| **Current** | | |
| Omni Bridgeway Bonds | **–** | 76,000 |
| Fixed Rate Notes | **–** | 72,000 |
| | **–** | 148,000 |
| **Non-Current** | | |
| Borrowings | **181,639** | – |
| | **181,639** | – |

## Note 19: Borrowings and debt securities (continued)

Cash and non-cash movements in borrowings are shown below:

| | Consolidated | |
| --- | --- | --- |
| | 2023 | 2022 |
| | $'000 | $'000 |
| Balance at 1 July | **148,000** | 145,522 |
| Repayment of Bonds and Fixed Rate Notes | **(148,000)** | – |
| Proceeds from issue of borrowings | **190,000** | – |
| Capitalised costs of borrowings | **(10,378)** | – |
| Amortisation of costs of borrowings | **2,017** | 2,478 |
| Balance at 30 June | **181,639** | 148,000 |

The application of AASB 123 Borrowing Costs (revised 2007) has resulted in the capitalisation of interest and borrowing cost amounting to $19.601 million (2022: $10.182 million) during the current financial year as part of the litigation investments which are deemed to be qualifying assets post the application date of AASB 123 (revised) on 1 July 2009 (refer to Note 13).

## Note 20: Contributed equity

### (a) Ordinary shares

Ordinary shares are classified as equity. Issued and paid up capital is recognised at the fair value of the consideration received by the Company. Incremental costs directly attributable to the issue of new shares or options are shown in equity as a deduction, net of tax, from the proceeds.

Fully paid ordinary shares carry one vote per share and the right to dividends.

| | Consolidated | |
| --- | --- | --- |
| | 2023 | 2022 |
| | $'000 | $'000 |
| *Contributed equity* | | |
| Issued and fully paid ordinary shares | **449,854** | 406,963 |

| | Number '000 | $'000 |
| --- | --- | --- |
| **Movement in ordinary shares** | | |
| At 1 July 2021 | 262,180 | 389,501 |
| Shares issued during the year (deferred and variable deferred consideration - business combination) (Note 29) | 3,659 | 10,940 |
| Shares issued upon exercise of performance rights (Note 32) | 2,800 | 6,522 |
| At 30 June 2022 | 268,639 | 406,963 |
| Shares issued during the year (deferred and variable deferred consideration - business combination) (Note 29) | 7,756 | 30,712 |
| Shares issued upon exercise of performance rights (Note 32) | 2,768 | 13,839 |
| Share Buy-Back Scheme | (544) | (1,660) |
| At 30 June 2023 | 278,619 | 449,854 |

### (b) Performance rights

At 30 June 2023, there were 15,421,416 unissued ordinary shares in respect of which share performance rights have been issued but not vested were outstanding (2022: 15,929,183). Refer to Note 32.

### (c) Variable deferred consideration shares

ASX has granted the Company a waiver from Listing Rule 7.3.4 on 31 December 2019, to permit the Company to seek Shareholder approval for the issue of the Variable Deferred Consideration Shares in respect of the Variable Deferred Consideration later than 3 months from the date of the Meeting but no later than 60 months after the date of Completion (ASX Waiver). The ASX Waiver was granted subject to the following conditions:

(i)    the Annual Targets not being varied;

(ii)   the maximum number of Variable Deferred Consideration Shares to be issued is calculated based upon the Minimum Deemed Issue Price and is stated in the Notice, along with adequate details regarding potential dilution;

(iii)  for any annual reporting during which any of the Variable Deferred Consideration Shares have been issued or any of them remain to be issued, the Company's annual report sets out in detail the number of Variable Deferred Consideration Shares issued in that annual reporting period, the number of Variable Deferred Consideration Shares that remain to be issued and the basis on which the Variable Deferred Consideration Shares may be issued;

## Note 20: Contributed equity (continued)

(iv) in any half year or quarterly report for a period during which any of the Variable Deferred Consideration Shares have been issued or remain to be issued, the Company must include a summary statement of the number of Variable Deferred Consideration Shares issued during the reporting period, the number of Variable Deferred Consideration Shares that remain to be issued and the basis on which the Variable Deferred Consideration Shares may be issued; and

(v) the notice of shareholder meeting contains the full terms and conditions of the Variable Deferred Consideration Shares and the conditions of the Waiver.

During the year, the following number of shares were issued in settlement of this obligation:

|  | 2023 $'000 | 2022 $'000 |
|---|---|---|
| Maximum approved as permissible to issue | **17,329** | 17,329 |
| Previously issued | **(7,468)** | (3,809) |
| Issued during the year | **(3,640)** | (3,659) |
| Total issued | **(11,108)** | (7,468) |
| Remaining shares to be issued | **6,221** | 9,861 |

### (d) Capital management

Capital includes debt, lease liabilities and equity attributable to the equity holders of the Parent. When managing capital, management's objective is to ensure the Group continues as a going concern while maintaining optimal returns to shareholders and benefits for other stakeholders. Management also aims to maintain a capital structure that ensures the lowest cost of capital available to the Group.

The Group's earnings often vary dramatically, and this is expected to continue in future. Management's policy is to pay dividends to shareholders from earnings where there is capital surplus to the needs of the business.

The Group is not subject to any externally imposed capital requirements. The Parent's accumulated losses/retained earnings are disclosed in Note 33.

## Note 21: Accumulated losses and reserves

### Movements in retained earnings/(accumulated losses) were as follows:

|  | Consolidated | |
|---|---|---|
|  | 2023 $'000 | 2022 $'000 |
| Balance at 1 July | **(87,832)** | (42,187) |
| Net loss for the year | **(31,659)** | (45,645) |
| Balance at 30 June | **(119,491)** | (87,832) |

### (a) Movements in reserves were as follows:

|  | Share based payment reserve $'000 | Foreign currency translation reserve $'000 | Option premium reserve $'000 | Convertible note reserve $'000 | Fund equity reserve $'000 | Total reserves $'000 |
|---|---|---|---|---|---|---|
| Balance at 1 July 2021 | 28,327 | (28,405) | 3,404 | 3,832 | (22,599) | (15,441) |
| Movements in reserves during the year | 3,946 | 8,599 | – | – | 12,655 | 25,200 |
| Balance at 30 June 2022 | 32,273 | (19,806) | 3,404 | 3,832 | (9,944) | 9,759 |
| Movements in reserves during the year | **(9,531)** | **13,893** | **–** | **–** | **4,367** | **8,729** |
| Balance at 30 June 2023 | **22,742** | **(5,913)** | **3,404** | **3,832** | **(5,577)** | **18,488** |

### (b) Nature and purpose of reserves

#### i. Share-based payment reserve

The share-based payment reserve is used to recognise the value of equity-settled share-based payments provided to employees, including key management personnel as part of their remuneration. Refer to Note 32 for further details of this plan.

#### ii. Foreign currency translation reserve

This reserve is used to record differences on the translation of the assets and liabilities of foreign operations.

#### iii. Option premium reserve

This reserve is used to record the value of equity benefits provided to employees and directors, including Key Management Personnel, as part of their remuneration. This reserve relates to the previous plan for options already vested.

#### iv. Convertible note reserve

This reserve was used to record the equity portion on the convertible notes (issued on 13 December 2010), which were fully redeemed by the Company during December 2013.

#### v. Fund equity reserve

This reserve is used to record changes in the proportion of equity held by non-controlling interests within the Group.

## D. WORKING CAPITAL, OTHER ASSETS AND OTHER LIABILITIES

### Note 22: Trade and other receivables

Receivables are recognised initially at fair value and subsequently remeasured at amortised cost using the effective interest rate method, less an allowance for any uncollectible amounts.

Receivables due from the completion of litigation investments are recognised upon various stages of completion of the underlying litigation in conjunction with the income recognition criteria of each investment. Collectability is reviewed on an ongoing basis and at each reporting period.

The Group recognises an allowance for expected credit losses (**ECLs**) for all receivables based on the difference between the contractual cash flows due and all the cash flows that the Group expects to receive, discounted at an approximation of the original effective interest rate. ECLs are recognised in two stages. For credit exposures for which there has not been a significant increase in credit risk since initial recognition, ECLs are provided for credit losses that result from default events that are possible within the next 12-months (a 12-month ECL). For those credit exposures for which there has been a significant increase in credit risk since initial recognition, a loss allowance is required for credit losses expected over the remaining life of the exposure, irrespective of the timing of the default (a lifetime ECL). At 30 June 2023, the value of the ECL allowance is $1.727 million (2022: $nil).

Other receivables comprise interest receivable upon the maturity of the Group's short-term deposits (between 30 and 90 days), receivables from co-funders of litigation contracts in progress, short term loans and deposits receivable.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| **Current** | | |
| Receivables due from the completion of litigation investments | **101,929** | 101,448 |
| Other receivables | **38,841** | 26,306 |
| | **140,770** | 127,754 |
| **Non-current** | | |
| Receivables due from the completion of litigation investments | **43,769** | 36,638 |
| Other receivables | **1,892** | – |
| | **45,661** | 36,638 |

#### (a) Fair value and credit risk

Due to the nature of these receivables, the carrying value of the current receivables approximates its fair value. The maximum exposure to credit risk is the carrying value of receivables. It is not the Group's policy to transfer (on-sell) receivables.

### Note 23: Contract costs

The Group holds management and advisory contracts in respect of Fund 4 and Fund 5. Incremental costs incurred in obtaining a contract are capitalised when the Group expects to recover the costs and are amortised on a systemic basis that is consistent with the Group's transfer of related services to the customer.

The amounts have been capitalised as shown below. The amounts are being amortised on a straight line basis over a period of seven years, being in reference to the initial four-year commitment period of the fund plus the estimated litigation funding contract life of three years.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Balance at 1 July | **3,522** | 4,461 |
| Amortisation of contract costs | **(939)** | (939) |
| Balance at 30 June | **2,583** | 3,522 |
| | | |
| Current | **939** | 939 |
| Non-current | **1,644** | 2,583 |
| | **2,583** | 3,522 |

## Note 24: Other assets

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| **Current** | | |
| Prepayments | **5,075** | 2,576 |
| Security deposits | **2,925** | 2,848 |
| | **8,000** | 5,424 |
| **Non-current** | | |
| Prepayments | **16,988** | 12,037 |
| Other | **800** | 714 |
| | **17,788** | 12,751 |

## Note 25: Right of use assets and other plant and equipment

### Plant and Equipment

Plant and equipment is stated at historical cost less accumulated depreciation and impairment. Such cost includes the cost of replacing parts that are eligible for capitalisation when the cost of replacing parts is incurred. All other repairs and maintenance are recognised in the profit or loss as incurred.

Depreciation is calculated on a straight-line basis over the estimated useful lives of the assets. The major categories of property, plant and equipment are depreciated as follows:

- Equipment         2 to 5 years;
- Furniture         2 to 6 years;
- Leasehold         2 to 11 years; and
- Right-of-use      3 to 10 years.

The assets' residual values, useful lives and amortisation methods are reviewed, and adjusted if appropriate, at each financial year end. An item of plant and equipment is derecognised upon disposal or when no further future economic benefits are expected from its use or disposal.

### Right-of-use assets

The Group recognises right-of-use assets at the commencement date of the lease (ie. the date the underlying asset is available for use). Right-of-use assets are measured at cost, less any accumulated depreciation and impairment losses, and adjusted for any remeasurement of lease liabilities. The cost of right-of-use assets includes the amount of lease liabilities recognised (Refer to Note 28), initial direct costs incurred, and lease payments made at or before the commencement date less any lease incentives received. Unless the Group is reasonably certain to obtain ownership of the leased asset at the end of the lease term, the recognised right-of-use assets are depreciated on a straight-line basis over the shorter of its estimated useful life and the lease term. Right-of-use assets are subject to impairment indicator assessments.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Gross carrying amount - at cost | **29,066** | 26,942 |
| Accumulated depreciation | **(10,620)** | (12,073) |
| Net carrying amount | **18,446** | 14,869 |

## Note 25: Right of use assets and other plant and equipment (continued)

**Reconciliation of carrying amounts at the beginning and end of the year**

|  | Equipment | Furniture, fixtures and fittings | Leasehold improvements | Right-of-use assets | Total |
|---|---|---|---|---|---|
|  | $'000 | $'000 | $'000 | $'000 | $'000 |
| **Gross carrying amount** |  |  |  |  |  |
| Balance at 1 July 2021 | 2,080 | 968 | 1,931 | 9,202 | 14,181 |
| Additions | 357 | 242 | 1,065 | 15,084 | 16,748 |
| Disposals | (2) | – | – | (4,446) | (4,448) |
| Effect of movement in foreign currency | (2) | 10 | 12 | 441 | 461 |
| Balance at 30 June 2022 | 2,433 | 1,220 | 3,008 | 20,281 | 26,942 |
| Additions | **334** | **156** | **57** | **6,399** | **6,946** |
| Disposals/terminations | **(948)** | **(302)** | **(1,772)** | **(2,562)** | **(5,584)** |
| Effect of movement in foreign currency | **(33)** | **59** | **14** | **722** | **762** |
| Balance at 30 June 2023 | **1,786** | **1,133** | **1,307** | **24,840** | **29,066** |
|  |  |  |  |  |  |
| **Accumulated depreciation** |  |  |  |  |  |
| Balance at 1 July 2021 | 1,594 | 776 | 1,814 | 4,092 | 8,276 |
| Depreciation charge for the year | 339 | 106 | 255 | 2,757 | 3,457 |
| Disposals | (2) | – | – | – | (2) |
| Adjustments | – | – | – | 197 | 197 |
| Effect of movement in foreign currency | (2) | 10 | 8 | 129 | 145 |
| Balance at 30 June 2022 | 1,929 | 892 | 2,077 | 7,175 | 12,073 |
| Depreciation charge for the year | **458** | **99** | **238** | **3,122** | **3,917** |
| Disposals | **(1,292)** | **(302)** | **(1,772)** | **(2,562)** | **(5,928)** |
| Adjustments | **–** | **–** | **–** | **183** | **183** |
| Effect of movement in foreign currency | **53** | **42** | **12** | **268** | **375** |
| Balance at 30 June 2023 | **1,148** | **731** | **555** | **8,186** | **10,620** |

Property, plant and equipment of the Company is subject to a fixed charge to secure the Company's debt. See Note 19 for further details. Refer to Note 28 for further information on right-of-use assets and their associated leases.

## Note 26: Trade and other payables

Trade payables, other payables and accruals are carried at amortised cost. Due to their short-term nature they are not discounted. They represent liabilities for goods and services provided to the Group or liabilities to provide funding in relation to a litigation investment to the end of the financial year that are unpaid and arise when the Group becomes obliged to make future payments in respect of the purchase of these goods and services or deployment against investment commitments. The amounts are unsecured, non-interest bearing and are usually paid within 30 days of recognition.

|  | Consolidated | |
|---|---|---|
|  | 2023 | 2022 |
|  | $'000 | $'000 |
| Trade payables | **36,226** | 30,842 |
| Unearned revenue (Refer to Note 2) | **11,862** | 8,594 |
| Wage accruals | **2,022** | 468 |
| Interest accruals | **–** | 2,049 |
|  | **50,110** | 41,953 |

**Fair Value**

Due to the nature of trade and other payables, their carrying value approximates their fair value.

## Note 27: Provisions

### General provisions

Provisions are recognised when the Group has a present obligation (legal or constructive) as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation.

Provisions are measured at the present value of management's best estimate of the expenditure required to settle the present obligation at the balance date. If the effect of the time value of money is material, provisions are discounted using a current pre-tax rate that reflects the time value of money and the risks specific to the liability.

The increase in the provision resulting from the passage of time is recognised in finance costs.

Refer to Notes 11 - 14 in respect to litigation investment impairment provisions.

### Employee benefits

Provision is made for employee benefits accumulated as a result of employees rendering services up to the end of the reporting period. These benefits include wages, salaries, annual leave, long service leave and bonuses.

Liabilities in respect of employees' services rendered that are not expected to be wholly settled within one year after the end of the periods in which the employees render the related services are recognised as long-term employee benefits. These liabilities are measured at the present value of the estimated future cash outflow to be made to the employees using the projected unit credit method.

Liabilities expected to be wholly settled within one year after the end of the period in which the employees render the related services are classified as short-term benefits and are measured at the amount due to be paid.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| **Current** | | |
| Annual leave and vested long service leave | **4,483** | 3,941 |
| Litigation investments - adverse costs | **26,753** | 20,877 |
| Bonus | **2** | 306 |
| | **31,238** | 25,124 |
| **Non-Current** | | |
| Premises lease make good | **626** | 601 |
| Long service leave | **665** | 642 |
| | **1,291** | 1,243 |

### (a) Movement in provisions

| | Litigation investments - adverse costs | Annual leave | Long service leave | Premises lease make good | Bonus | Total |
|---|---|---|---|---|---|---|
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| Balance at 1 July 2021 | 19,100 | 3,733 | 1,481 | 278 | 677 | 25,269 |
| Arising during the year | 1,777 | 3,060 | 160 | 323 | 725 | 6,045 |
| Utilised | – | (3,469) | (447) | – | (1,085) | (5,001) |
| Effect of movement in foreign currency | – | 65 | – | – | (11) | 54 |
| Balance at 30 June 2022 | 20,877 | 3,389 | 1,194 | 601 | 306 | 26,367 |
| | | | | | | |
| Arising during the year | **7,583** | **4,160** | **146** | **120** | **–** | **12,009** |
| Utilised | **(1,707)** | **(3,684)** | **(133)** | **(95)** | **(304)** | **(5,923)** |
| Effect of movement in foreign currency | **–** | **76** | **–** | **–** | **–** | **76** |
| Balance at 30 June 2023 | **26,753** | **3,941** | **1,207** | **626** | **2** | **32,529** |
| | | | | | | |
| Current 2023 | **26,753** | **3,941** | **542** | **–** | **2** | **31,238** |
| Non-current 2023 | **–** | **–** | **665** | **626** | **–** | **1,291** |
| | **26,753** | **3,941** | **1,207** | **626** | **2** | **32,529** |
| | | | | | | |
| Current 2022 | 20,877 | 3,389 | 552 | – | 306 | 25,124 |
| Non-current 2022 | – | – | 642 | 601 | – | 1,243 |
| | 20,877 | 3,389 | 1,194 | 601 | 306 | 26,367 |

## Note 27: Provisions (continued)

### (b) Nature and timing of provisions

#### Litigation investments – adverse costs

The Group raises a provision for adverse costs upon receipt of a losing judgement in jurisdictions that require adverse costs to be paid to the litigations's counter party. Refer to Notes 1, 6 and 30 for further details on adverse costs.

At 30 June 2023, an adverse costs provision of $26.8 million (2022: $20.9 million) exists in relation to two non-fund investments. Of that amount, $9.5 million will be recovered from (i) ATE insurance proceeds ($8.7 million); and (ii) as part of a co-funding agreement ($0.8 million) recognised as a receivable. As a result, $7.7 million has been expensed and is included in other expenses. $1.8 million had been recognised for fund investments with $1.2 million recoverable from insurance proceeds.

#### Premises lease make good

The make good provision relates to amounts recognised for make good requirements on leases of office space.

#### Bonus

The bonus provision relates to amounts accrued based on management's best estimate to be paid to employees.

## Note 28: Lease liabilities

The Group has lease contracts for rental property and motor vehicles. These leases generally have lease terms between 3 and 10 years. The Group's obligations under its leases are secured by the lessor's title to the leased assets. Generally, the Group is restricted from assigning and subleasing the leased assets. There are several lease contracts that include extension and termination options and variable lease payments, which are further discussed below.

The Group assesses at contract inception whether a contract is, or contains, a lease. That is, if the contract conveys the right to control the use of an identified asset for a period of time in exchange for consideration.

### Group as lessee

#### Lease liabilities

At the commencement date of the lease, the Group recognises lease liabilities measured at the present value of lease payments to be made over the lease term. The lease payments include fixed payments (including in-substance fixed payments) less any lease incentives receivable, variable lease payments that depend on an index or a rate, and amounts expected to be paid under residual value guarantees. The lease payments also include the exercise price of a purchase option reasonably certain to be exercised by the Group and payments of penalties for terminating a lease, if the lease term reflects the Group exercising the option to terminate.

In calculating the present value of lease payments, the Group uses the incremental borrowing rate at the lease commencement date if the interest rate implicit in the lease is not readily determinable. After the commencement date, the amount of lease liabilities is increased to reflect the accretion of interest and reduced for the lease payments made. In addition, the carrying amount of lease liabilities is remeasured if there is a modification, a change in the lease term, a change in the in-substance fixed lease payments or a change in the assessment to purchase the underlying asset.

#### Short-term leases and leases of low-value assets

The Group applies the short-term lease recognition exemption to its short-term leases of machinery and equipment (ie those leases that have a lease term of 12 months or less from the commencement date and do not contain a purchase option). It also applies the lease of low-value assets recognition exemption to leases of office equipment that are considered of low value. Lease payments on short-term leases and leases of low-value assets are recognised as expense on a straight-line basis over the lease term.

Set out below are the carrying amounts of lease liabilities and the movements during the year:

|  | Consolidated | |
| --- | --- | --- |
|  | **2023** | 2022 |
|  | **$'000** | $'000 |
| Balance at 1 July | **13,929** | 5,843 |
| Additions | **6,333** | 13,602 |
| Terminations | **–** | (2,738) |
| Accretion of interest | **1,091** | 808 |
| Payments | **(3,877)** | (3,955) |
| Effects of movement in foreign currency | **465** | 368 |
| Balance at 30 June | **17,941** | 13,928 |
|  |  |  |
| Current | **2,933** | 2,755 |
| Non-current | **15,008** | 11,173 |
|  | **17,941** | 13,928 |

## Note 28: Lease liabilities (continued)

The following are the amounts recognised in profit or loss:

| | Consolidated | |
|---|---|---|
| | 2023<br>$'000 | 2022<br>$'000 |
| Depreciation expense on right-of-use assets | 3,122 | 2,757 |
| Interest expense on lease liabilities (included in finance costs) | 1,091 | 808 |
| Expense relating to short-term leases | 227 | 99 |
| Expenses relating to leases of low-value assets (included in corporate and office expense) | 413 | 522 |
| Total amount recognised in profit or loss | 4,853 | 4,186 |

The Group had total cash outflows for leases of $4,517,636 in 2023 (2022: $4,576,000). The future cash outflows relating to leases that have not yet commenced are disclosed in Note 30.

The Group has several lease contracts that include extension and termination options. These options are negotiated by management to provide flexibility in managing the leased-asset portfolio and align with the Group's business needs. Management exercises significant judgement in determining whether these extension and termination options are reasonably certain to be exercised.

## Note 29: Other financial liabilities

Deferred and variable deferred consideration is valued at fair value at the acquisition date as part of a fair value through profit or loss business combination. It is subsequently remeasured at fair value at each reporting date.

| | Consolidated | |
|---|---|---|
| | 2023<br>$'000 | 2022<br>$'000 |
| **Current** | | |
| Deferred consideration - Insurance | 1,099 | – |
| Deferred consideration - business combination | – | 15,491 |
| Variable deferred consideration - business combination | 6,998 | 13,670 |
| | 8,097 | 29,161 |
| **Non-Current** | | |
| Deferred consideration - Insurance | 2,975 | – |
| Variable deferred consideration - business combination | 7,775 | 16,568 |
| | 10,750 | 16,568 |

## Note 29: Other financial liabilities (continued)

### Deferred and variable deferred consideration – business combination

Relates to the acquisition of OBE Group. Deferred consideration in relation to the business combination was fully paid via shares issue in December 2022. The determination of the fair value is designated as level 3 in the fair value hierarchy. Refer to Note 17 for further information.

The following table reconciles the movements in recurring fair value measurements categorised within level 3 of the fair value hierarchy:

| | Deferred consideration - business combination $'000 | Variable deferred consideration - business combination $'000 | Total $'000 |
|---|---|---|---|
| **Current** | | | |
| Balance at 1 July 2021 | – | 14,647 | 14,647 |
| Fair value remeasurement recognised through profit or loss | (1,564) | (4,971) | (6,535) |
| Issue of shares to satisfy the liability | – | (10,940) | (10,940) |
| Reclassification from Non-Current | 17,055 | 15,050 | 32,105 |
| Effect of movement in foreign currency | – | (116) | (116) |
| Balance at 30 June 2022 | 15,491 | 13,670 | 29,161 |
| Fair value remeasurement recognised through profit or loss | 337 | (1,161) | (824) |
| Issue of shares to satisfy the liability | (16,297) | (14,415) | (30,712) |
| Reclassification from Non-Current | – | 8,503 | 8,503 |
| Effect of movement in foreign currency | 469 | 401 | 870 |
| Balance at 30 June 2023 | – | 6,998 | 6,998 |
| | | | |
| **Non-Current** | | | |
| Balance at 1 July 2021 | 17,783 | 33,886 | 51,669 |
| Fair value remeasurement recognised through profit or loss | – | (880) | (880) |
| Reclassification to Current | (17,055) | (15,050) | (32,105) |
| Effect of movement in foreign currency | (728) | (1,388) | (2,116) |
| Balance at 30 June 2022 | – | 16,568 | 16,568 |
| Fair value remeasurement recognised through profit or loss | – | (1,617) | (1,617) |
| Reclassification to Current | – | (8,503) | (8,503) |
| Effect of movement in foreign currency | – | 1,327 | 1,327 |
| Balance at 30 June 2023 | – | 7,775 | 7,775 |

## Note 30: Commitments and contingencies

### Capital commitments

Omni Bridgeway Limited has $420.220 million (2022: $402.532 million) in aggregate Investor Capital commitments to its Funds 1, 2&3, 4, 5, 6, 7 and 8 collectively, of which $195.290 million is undrawn at 30 June 2023 (2022: $227.703 million).

The Funds have made aggregate funding commitments to Investments totalling $2,115.500 million (2022: $1,574.017 million), of which $931.550 million is yet to be deployed at 30 June 2023 (2022: $799.979 million).

### Remuneration commitments

|  | Consolidated | |
| --- | ---: | ---: |
|  | 2023 | 2022 |
|  | $'000 | $'000 |
| Commitments for the payment of salaries and other remuneration under long-term employment contracts in existence at the reporting date but not recognised as liabilities payable: | | |
| Within one year | **5,008** | 4,295 |
| After one year but no more than five years | **–** | – |
|  | **5,008** | 4,295 |

Amounts disclosed as remuneration commitments also include commitments arising from the service contracts of, and bonuses payable to, directors and executives referred to in the Remuneration Report of the Directors' Report that are not recognised as liabilities and are not included in the compensation of Key Management Personnel.

### Contingencies

In certain jurisdictions litigation funding agreements contain an undertaking from the Group to the client that the Group will pay adverse costs awarded to the successful party in respect of costs incurred during the period of funding, should the client's litigation be unsuccessful. It is not possible to predict in which cases such an award might be made.

The Group has insurance arrangements which, in some circumstances, will lessen the impact of such awards. The entire Funds 2 & 3 portfolio has an after the event (**ATE**) insurance policy that will respond to claims for adverse costs in aggregate in excess of $7.5 million. The entire Fund 5 portfolio has an ATE insurance policy that will respond to claims for adverse costs in aggregate in excess of US$20 million. Additionally, the Group may obtain insurance cover over a specific investment. Based on past experience, an award of adverse costs to a defendant will approximate nil to 80% (depending on jurisdiction) of the amount paid by the plaintiff to pursue the litigation (although in some cases there may be more than one defendant).

An indicative pre-insurance cover estimate of the total gross potential adverse costs exposure of the Group may be made by assuming all cases are lost, that adverse costs equal 40% to 80% of the amount spent by the plaintiff and that there is only one defendant per case.

At 30 June 2023, the total amount of capital deployed on currently funded investments by the Group where undertakings to pay adverse costs have been provided was $177.351 million (2022: $141.127 million). This excludes specifically identified investments where adverse costs provisions have already been recognised in liabilities (refer to Note 27) .The potential adverse costs exposure using the above methodology would amount to $50.302 million (2022: $53.363 million), including the portion attributable to the Group of $19.880 million. Notwithstanding the historic performance, subject to specific investment impairment considerations, the Group does not currently expect that any of the investments will be unsuccessful. The Group maintains a large cash holding in the event that one or more investments are unsuccessful and an adverse costs order is made which is not covered by its insurance arrangements.

Further to the contingent comment above, in respect to a number of investments where the Group has a potential exposure to adverse cost OBL has provided a security deed poll. The Group has invested $34.084 million to these investments collectively. Where such investment is within a Fund, OBL is indemnified by the respective Fund.

A portion of the consideration relating to the acquisition of OBE Group is contingent upon the OBE Group meeting performance targets. This is outlined in Notes 20 and 29.

## E. THE GROUP, MANAGEMENT AND RELATED PARTIES

### Note 31: Key management personnel

**Details of Key Management Personnel**

During the year, Stuart Mitchell was replaced by Guillaume Leger as Global Chief Financial Officer, effective 1 September 2022.

As announced to the ASX on 23 February 2023, Raymond van Hulst will be appointed CEO upon Andrew Saker's retirement, effective 26 October 2023.

There were no further changes to Key Management Personnel after the reporting date and before the date the financial report was authorised for issue.

**Compensation of Key Management Personnel**

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Short-term employee benefits | **4,854** | 4,690 |
| Post-employment benefits | **154** | 163 |
| Long term employee benefits | **(14)** | (659) |
| Termination payments | **88** | 882 |
| Share based payments | **2,024** | 2,357 |
| | **7,106** | 7,433 |

### Note 32: Share-based payment plan

**Share-based payment transactions**

*(i) Equity-settled transactions*

The Company's LTIP awards share performance rights to key senior employees. The cost of equity-settled transactions with employees is measured by reference to the fair value of the equity instruments at the date at which they are granted. The fair value is determined using a Monte Carlo or Black Scholes Model depending on the type of LTIP.

In valuing equity-settled transactions, no account is taken of any vesting conditions, other than conditions linked to the price of the shares of OBL (i.e. market conditions) if applicable.

The cost of equity-settled transactions is recognised, together with a corresponding increase in the share-based payment reserve, over the period in which the performance and/or service conditions are fulfilled (the vesting period), ending on the date on which the relevant employees become fully entitled to the award (the vesting date).

The charge to the profit or loss for the period is the cumulative amount as calculated above less the amounts already charged in previous periods. There is a corresponding credit to equity.

Equity-settled awards granted by OBL to employees of subsidiaries are recognised in the Parent's separate financial statements as an additional investment in the subsidiary with a corresponding credit to equity. These amounts are eliminated through consolidation. As a result, the expenses recognised by the Company in relation to equity-settled awards only represents the expense associated with grants to employees of the Parent. The expense recognised by the Group is the total expense associated with all such awards.

Until an award has vested, any amounts recorded are contingent and will be adjusted if more or fewer awards vest than were originally anticipated to do so. Any award subject to a market condition is considered to vest irrespective of whether or not that market condition is fulfilled, provided that all other conditions are satisfied.

If the terms of an equity-settled award are modified, as a minimum an expense is recognised as if the terms had not been modified. An additional expense is recognised for any modification that increases the total fair value of the share-based payment arrangement, or is otherwise beneficial to the employee, as measured at the date of modification.

If an equity-settled award is cancelled, it is treated as if it had vested on the date of cancellation, and an expense not yet recognised for the award is recognised immediately. However, if a new award is substituted for the cancelled award and designated as a replacement award on the date that it is granted, the cancelled and new award are treated as if they were a modification of the original award, as described in the previous paragraph.

Where outstanding rights do not have an anti-dilutive effect and are currently meeting the performance criteria, the dilutive effect, if any, is added to share dilution in the computation of diluted earnings per share.

*(ii) Cash-settled transactions*

The Group does not provide cash-settled share-based benefits to employees or senior executives.

**Long Term Incentive Plan**

LTIP awards are delivered in the form of performance rights over shares which vest after a period of three years subject to meeting performance measures. The Group uses relative TSR and CAGR of Funds Deployed as the performance measures.

For the portion of the LTIP subject to the relative TSR performance measure, the fair value of share performance rights granted is estimated at the date of grant using a Monte-Carlo simulation model, taking into account the terms and conditions upon which the share performance rights were granted. For the portion of the LTIP based on the achievement of CAGR of Funds Deployed, the Black-Scholes model is used.

## Note 32: Share-based payment plan (continued)

### Performance Rights

On 14 July 2022, 201,059 performance rights were issued to Guillaume Leger in relation to his appointment as the new Global Chief Financial Officer. The performance rights are subject to Mr. Leger meeting both service and performance conditions. On 28 June 2023, the Board has approved vesting of 140,752 performance rights, the remaining 60,307 will be tested and approved at the remuneration committee meeting to be held on 28 June 2024.

6,228,684 share performance rights were issued during 2023 (2022: 5,032,932). Specific assessment for performance rights issued in the period is below:

| Grant Date | 1 July 2022 |
|---|---|
| Share price at grant date | $3.450 |
| Exercise price | Nil |
| Expected Volatility (%) | 40% |
| Dividend yield (%) | 0% for FY23 and 2% for FY24 and FY25 |
| Risk-free rate (%) | 2.92% |
| Performance period | 3 years ending 30 June 2025 |
| Models used | Monte Carlo & Black Scholes |
| Tranche 1 - relative TSR (value per right $) | $1.850 |
| Tranche 2 - CAGR (value per right $) | $3.320 |
| T1 performance rights | n/a |
| T2 performance rights | n/a |

The expense recognised for share based payments during the year is shown below:

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Share based payments expense | **8,871** | 11,724 |

The following table illustrates the number and weighted average exercise prices (WAEP) of, and movements in, share performance rights during the year:

| | 2023 Number | 2023 WAEP | 2022 Number | 2022 WAEP |
|---|---|---|---|---|
| **Movements during the year** | | | | |
| Outstanding at 1 July | **15,929,183** | – | 18,528,532 | – |
|   Granted | **6,228,684** | – | 5,032,932 | – |
|   Exercised | **(4,212,468)** | – | (4,599,380) | – |
|   Forfeited | **(2,523,983)** | – | (3,032,901) | – |
| Outstanding at 30 June | **15,421,416** | – | 15,929,183 | – |
| Exercisable at 30 June | **1,964,822** | – | 4,274,861 | – |

## Note 33: Parent entity information

| | 2023<br>$'000 | 2022<br>$'000 |
|---|---|---|
| **Information relating to Omni Bridgeway Limited:** | | |
| Current assets | **79,347** | 154,401 |
| Total assets | **589,682** | 547,672 |
| | | |
| Current liabilities | **(33,892)** | (201,847) |
| Total liabilities | **(230,422)** | (172,845) |
| **Net assets** | **359,260** | 374,827 |
| | | |
| Issued capital | **445,702** | 402,686 |
| Accumulated losses | **(116,261)** | (67,037) |
| Reserves | **29,819** | 39,178 |
| **Total shareholders' equity** | **359,260** | 374,827 |
| | | |
| Loss of the Parent | **(49,224)** | (61,435) |
| **Total comprehensive loss of the Parent** | **(49,224)** | (61,435) |

Details of the contractual commitments and contingent liabilities of the Parent are contained in Note 30.

The consolidated financial statements include the financial statements of OBL and the subsidiaries listed in the following table:

| | | Percentage owned | |
|---|---|---|---|
| Name | Country of<br>Incorporation | 2023<br>% | 2022<br>% |
| **Fund 1** | | | |
| Omni Bridgeway (Fund 1) LLC[1] | USA | **100** | 100 |
| HC 1 LLC[2] | USA | **–** | 25 |
| Security Finance (Fund 1) LLC[1] | USA | **100** | 100 |
| | | | |
| **Funds 2 & 3** | | | |
| Omni Bridgeway (Fund 2) Pty Ltd | Australia | **27** | 23 |
| Omni Bridgeway (Fund 3) Pty Ltd | Australia | **27** | 23 |
| IMF Bentham ROW SPV 1 Limited | United Kingdom | **27** | 23 |
| IMF Bentham ROW SPV 2 Limited | Australia | **27** | 23 |
| | | | |
| **Fund 4** | | | |
| Omni Bridgeway (Fund 4) Invt 1 LP | USA | **20** | 20 |
| Omni Bridgeway (Fund 4) Invt 2 LP | USA | **20** | 20 |
| Omni Bridgeway (Fund 4) Invt 3 LP | USA | **20** | 20 |
| Omni Bridgeway (Fund 4) Invt 4 LP | USA | **20** | 20 |
| Omni Bridgeway (Fund 4) Invt 5 LP | USA | **20** | 20 |
| Omni Bridgeway (Fund 4) Invt 6 LP | USA | **20** | 20 |
| Omni Bridgeway (Fund 4) Invt 7 LP | USA | **20** | 20 |
| Omni Bridgeway (Fund 4) Invt 8 LP | USA | **20** | 20 |
| Omni Bridgeway (Fund 4) Invt 9 LP | USA | **20** | 20 |
| JPV I LP | USA | **20** | 20 |
| | | | |
| **Fund 5** | | | |
| Omni Bridgeway (Fund 5) GPA Pty Ltd | Australia | **100** | 100 |

## Note 33: Parent entity information (continued)

| Name | Country of Incorporation | Percentage owned 2023 % | 2022 % |
|---|---|---|---|
| **Fund 6** | | | |
| Omni Bridgeway BV | Netherlands | **81** | 81 |
| Omni Bridgeway Legal Tech BV | Netherlands | **41** | 41 |
| Omni Bridgeway Emerging Markets BV | Netherlands | **81** | 81 |
| Omni Bridgeway Collective Redress BV | Netherlands | **81** | 81 |
| Omni Bridgeway Asia Pte Ltd | Singapore | **81** | 81 |
| Omni Bridgeway Holding (Switzerland) SA | Switzerland | **81** | 81 |
| Omni Bridgeway SA | Switzerland | **81** | 81 |
| Omni Bridgeway GmbH (formerly Omni Bridgeway AG) | Germany | **81** | 81 |
| Omni Bridgeway Finance BV | Netherlands | **81** | 81 |
| Stichting Client Accounts Omni Bridgeway[3] | Netherlands | **n/a** | n/a |
| Stichting Cartel Compensation[3] | Netherlands | **n/a** | n/a |
| Stichting Trucks Cartel Compensation[3] | Netherlands | **n/a** | n/a |
| Omni Bridgeway France SAS[4] | France | **81** | – |
| Omni Bridgeway Italy S.r.L[5] | Italy | **81** | – |
| **Fund 7** | | | |
| Omni Bridgeway Advisory Ltd | United Arab Emirates | **65** | 65 |
| **Fund 8** | | | |
| Omni Bridgeway (Fund 8) Guernsey Investments Limited[6] | Guernsey | **81** | – |
| **Group Subsidiaries** | | | |
| Omni Bridgeway Holdings (Fund 1) LLC | USA | **100** | 100 |
| Omni Bridgeway Capital GP (Fund 4) LLC | USA | **100** | 100 |
| Omni Bridgeway (USA) LLC | USA | **100** | 100 |
| Omni Bridgeway Management (USA) LLC | USA | **100** | 100 |
| Omni Bridgeway Holdings (USA) Inc | USA | **100** | 100 |
| Security Finance LLC | USA | **100** | 100 |
| Omni Bridgeway Capital (Canada) Limited | Canada | **100** | 100 |
| Lien Finance Canada Limited | Canada | **100** | 100 |
| Omni Bridgeway (Singapore) Pte Limited | Singapore | **100** | 100 |
| Omni Bridgeway (UK) Limited | United Kingdom | **100** | 100 |
| Omni Bridgeway (Cayman) Limited | Cayman Islands | **100** | 100 |
| Omni Bridgeway (Storm) Holdings Pty Ltd | Australia | **100** | 100 |
| Omni Bridgeway (Storm) Holdings BV | Netherlands | **100** | 100 |
| Omni Bridgeway Investment Management Ltd | Australia | **100** | 100 |
| Omni Bridgeway Holding BV | Netherlands | **100** | 100 |
| Omni Bridgeway Investment BV[7] | Netherlands | **100** | 100 |
| Omni Bridgeway (NZ) Limited | New Zealand | **100** | 100 |
| Crestwood I LLC | USA | **100** | 100 |

1. This holding represents 100% of share capital and the voting rights. On 31 May 2023, Fund 1 was ceased to be consolidated into the Group due to loss of control as a result of the disposal of participation interests in Fund. Upon the disposal transaction, Fund 1 was determined as an agent because of the provision of without cause kick out right to the new owner of the participation interests (Class A interests).
2. The entity was deregistered 30 December 2022.
3. The Stichting vehicles were founded as separate, independent foundations to ensure the cash flows related to the claims were secured.
4. The entity was incorporated 8 March 2023.
5. The entity was incorporated 31 May 2023.
6. The entity was incorporated 19 July 2022.
7. This holding this represents 100% of type A shares and voting rights. Type B shares, with no voting rights, represent 90% of share capital and receive 10% of yearly profits. Type A shares receive the remaining yearly profits.

## Note 34: Material partly-owned subsidiaries

For all subsidiaries where there is less than 51% ownership interest, the Group has power to direct the relevant activities of the investee under contractual arrangements and exposure to variable returns the Group is considered to be acting as principal and thus has control.

Financial information of subsidiaries that have material non-controlling interests is provided below:

| | | Percentage owned | |
| --- | --- | --- | --- |
| | | 2023 | 2022 |
| | Country of Incorporation | % | % |
| **Proportion of equity interest held by non-controlling interests:** | | | |
| | | | |
| **Fund 1** | | | |
| Omni Bridgeway (Fund 1) LLC[1] | USA | – | – |
| HC 1 LLC[1] | USA | – | 75 |
| Security Finance (Fund 1) LLC[1] | USA | – | – |
| | | | |
| **Funds 2 & 3** | | | |
| Omni Bridgeway (Fund 2) Pty Ltd[2] | Australia | 73 | 77 |
| Omni Bridgeway (Fund 3) Pty Ltd[2] | Australia | 73 | 77 |
| IMF Bentham ROW SPV 1 Limited[2] | United Kingdom | 73 | 77 |
| IMF Bentham ROW SPV 2 Limited[2] | Australia | 73 | 77 |
| | | | |
| **Fund 4** | | | |
| Omni Bridgeway (Fund 4) Invt 1 LP[3] | USA | 80 | 80 |
| Omni Bridgeway (Fund 4) Invt 2 LP[3] | USA | 80 | 80 |
| Omni Bridgeway (Fund 4) Invt 3 LP[3] | USA | 80 | 80 |
| Omni Bridgeway (Fund 4) Invt 4 LP[3] | USA | 80 | 80 |
| Omni Bridgeway (Fund 4) Invt 5 LP[3] | USA | 80 | 80 |
| Omni Bridgeway (Fund 4) Invt 6 LP[3] | USA | 80 | 80 |
| Omni Bridgeway (Fund 4) Invt 7 LP[3] | USA | 80 | 80 |
| Omni Bridgeway (Fund 4) Invt 8 LP[3] | USA | 80 | 80 |
| Omni Bridgeway (Fund 4) Invt 9 LP[3] | USA | 80 | 80 |
| JPV I LP[3] | USA | 80 | 80 |
| Security Finance (Fund 4) LLC[3] | USA | 100 | 100 |
| | | | |
| **Fund 6** | | | |
| Omni Bridgeway BV[4] | Netherlands | 19 | 19 |
| Omni Bridgeway Legal Tech BV[4] | Netherlands | 59 | 59 |
| Omni Bridgeway Emerging Markets BV[4] | Netherlands | 19 | 19 |
| Omni Bridgeway Collective Redress BV[4] | Netherlands | 19 | 19 |
| Omni Bridgeway Asia Pte Ltd[4] | Singapore | 19 | 19 |
| Omni Bridgeway Holding (Switzerland) SA[4] | Switzerland | 19 | 19 |
| Omni Bridgeway SA[4] | Switzerland | 19 | 19 |
| Omni Bridgeway GmbH (formerly Omni Bridgeway AG)[4] | Germany | 19 | 19 |
| Omni Bridgeway Finance BV[4] | Netherlands | 19 | 19 |
| Omni Bridgeway France SAS[4] | France | 19 | – |
| Omni Bridgeway Italy S.r.L[4] | Italy | 19 | – |

## Note 34: Material partly-owned subsidiaries (continued)

### Accumulated balances of material non-controlling interest:

| | 2023 $'000 | 2022 $'000 |
|---|---:|---:|
| **Accumulated balances of material non-controlling interest:** | | |
| Omni Bridgeway (Fund 1) LLC[1] | – | 32,005 |
| HC 1 LLC[1] | – | 47,148 |
| Omni Bridgeway (Fund 2) Pty Ltd[2] | 90,888 | 86,738 |
| Omni Bridgeway (Fund 3) Pty Ltd[2] | 30,296 | 28,912 |
| Fund 4[3] | 154,326 | 91,013 |
| Fund 6[4] | 162,791 | 133,593 |
| Transaction costs, net of tax - disposal of non-controlling interest (Fund 1) | – | (5,934) |
| Transaction costs, net of tax - disposal of non-controlling interest (Funds 2 & 3) | (2,866) | (2,866) |
| | 435,435 | 410,609 |
| **Profit allocated to material non-controlling interest:** | | |
| Omni Bridgeway (Fund 1) LLC[1] | 4,071 | 6,796 |
| Omni Bridgeway (Fund 2) Pty Ltd[2] | 8,562 | 10,883 |
| Omni Bridgeway (Fund 3) Pty Ltd[2] | 2,854 | 3,628 |
| Fund 4[3] | 11,870 | 22,434 |
| Fund 6[4] | 5,164 | 8,386 |
| | 32,521 | 52,127 |

1. On 31 May 2023, Fund 1 was deconsolidated due to a loss of control by the Group upon sale of a participation interest into the Fund. Comparatives of the results and non-controlling interests of these entities were included in Note 1 Segment Information.
2. The results and non-controlling interests of these entities comprise the results of Funds 2 & 3, included in Note 1 Segment Information.
3. The results and non-controlling interests of these entities comprise the results of Fund 4, included in Note 1 Segment Information.
4. The results and non-controlling interests of these entities comprise the results of Fund 6, included in Note 1 Segment Information.

Movements in NCI's of material partly owned subsidiaries during the year were as follows:

| | Consolidated | | | | |
|---|---:|---:|---:|---:|---:|
| | Fund 1 $'000 | Funds 2 & 3 $'000 | Fund 4 $'000 | Fund 6 $'000 | Total $'000 |
| Balance at 1 July 2021 | 147,470 | 80,399 | 85,120 | 117,485 | 430,474 |
| Contributions | 20 | 19,600 | 16,211 | 7,786 | 43,617 |
| Distributions | (80,593) | – | (32,742) | – | (113,335) |
| Change in share of net assets attributable to NCI | (4,778) | (1,635) | (7,265) | 939 | (12,739) |
| Profit | 6,796 | 14,511 | 22,434 | 8,386 | 52,127 |
| Other comprehensive income/(loss) | 4,304 | (91) | 7,255 | (1,003) | 10,465 |
| Balance at 30 June 2022 | 73,219 | 112,784 | 91,013 | 133,593 | 410,609 |
| | | | | | |
| Contributions | 10,548 | 15,880 | 85,390 | 24,036 | 135,854 |
| Distributions | (34,244) | (24,950) | (33,972) | – | (93,166) |
| Deconsolidation of Subsidiary | (49,518) | – | – | – | (49,518) |
| Change in share of net assets attributable to NCI | (4,076) | 2,938 | (3,662) | (2,356) | (7,156) |
| Profit | 4,071 | 11,416 | 11,870 | 5,164 | 32,521 |
| Other comprehensive income | – | 250 | 3,687 | 2,354 | 6,291 |
| Balance at 30 June 2023 | – | 118,318 | 154,326 | 162,791 | 435,435 |

## Note 34: Material partly-owned subsidiaries (continued)

### Fund 1

On 31 December 2022, the Group disposed all the equity shareholding in HC1 LLC to Gerchen Capital Partners (**GCP**) for an initial payment of $27.993 million and a deferred contingent consideration depends on the quantum and timing of the completion of the litigation underpinning the investment. The deferred contingent consideration is not recognised in the consolidated financial statements as the cash outflow is not probable.

The Group sold a participation in Fund 1 assets for a consideration of $47.662 million which completed on 31 May 2023, the residual interest in Fund 1 of $55.950 million is recognised as an investment in associate within the Group Consolidated Financial Statements. Refer to Note 35.

The disposals resulted in the deconsolidation of the Fund 1 entities by the Group because of the loss of control on the transaction date. An aggregate net gain to the Group of $28.465 million was recognised into the profit or loss, including the effect of the derecognition of related capitalised overhead costs amounted $17.613 million.

The details of net gain on disposals for the year are set out below.

| | HC 1 LLC $'000 | Omni Bridgeway (Fund 1) LLC $'000 | Total $'000 |
|---|---|---|---|
| **Carrying value of assets and liabilities** | | | |
| Cash and cash equivalent | – | 142 | 142 |
| Receivables | – | 2,611 | 2,611 |
| Intangible assets | 68,483 | 54,937 | 123,420 |
| Prepayment | 14,167 | – | 14,167 |
| Payables and accruals | (10) | (48) | (58) |
| Non-controlling interests | (61,863) | (6,393) | (68,256) |
| **Total carrying value of net assets** | **20,777** | **51,249** | **72,026** |
| | | | |
| Consideration received by the Group | 28,095 | 47,662 | 75,757 |
| Fair value of residual interest | – | 55,950 | 55,950 |
| Foreign exchange | (102) | – | (102) |
| Direct costs and expenses | (840) | (12,661) | (13,501) |
| | | | |
| **Net gain on disposal of subsidiaries** | **6,376** | **39,702** | **46,078** |
| | | | |
| Derecognition - capitalised overheads[1] | (5,091) | (12,522) | (17,613) |
| | | | |
| **Net gain on disposal of subsidiaries after derecognition of capitalised overheads** | **1,285** | **27,180** | **28,465** |

1. The capitalised overhead costs in relation to the disposed entities were fully written off upon the deconsolidation, as part of the calculation of net gain on derecognition of litigation investments - intangible assets in the profit or loss.

### Funds 2 & 3

On 13 September 2017, the Group established Omni Bridgeway (Fund 2) Pty Ltd and Omni Bridgeway (Fund 3) Pty Ltd. On 26 July 2019, the Group established IMF Bentham ROW SPV 1 Limited. On 15 March 2021, the Group established IMF Bentham ROW SPV 2 Pty Ltd. These entities are collectively "Funds 2 & 3".

### Fund 4

On 26 October 2018, the Group established Omni Bridgeway Capital GP (Fund 4) LLC. On 29 November 2018, the Group established Security Finance (Fund 4) LLC. On 4 December 2018, the Group established Omni Bridgeway (Fund 4) Invt 1 – 9 LP. On 7 July 2020, the Group established JPV I LP. These entities are collectively "Fund 4".

### Fund 6

Fund 6 was created in 2016 and was acquired by the Group as part of the November 2019 acquisition of OBE. During the year, the Group established Omni Bridgeway France SAS and Omni Bridgeway Italy S.r.L. Refer to Note 33. This is an Europe, Middle East and Africa focused investment structure.

## Note 34: Material partly-owned subsidiaries (continued)

The summarised financial information of controlled entities with material non-controlling interests is provided below is based on amounts prior to intercompany eliminations:

| | Consolidated | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Fund 1 | | Fund 2 & 3 | | Fund 4 | | Fund 5 | | Fund 6 | |
| | 2023 | 2022 | 2023 | 2022 | 2023 | 2022 | 2023 | 2022 | 2023 | 2022 |
| | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 | $'000 |
| **Summarised statement of cash flows** | | | | | | | | | | |
| Operating | **(225)** | (265) | **(5,926)** | 2,941 | **(733)** | (2,231) | **–** | – | **(30,900)** | (18,458) |
| Investing | **15,259** | 77,816 | **1,400** | (6,176) | **(75,565)** | 17,960 | **–** | – | **(17,620)** | 9,970 |
| Financing | **(24,194)** | (80,573) | **(5,100)** | 24,500 | **65,855** | (20,155) | **–** | – | **49,789** | (17) |
| **Net increase/(decrease) in cash and cash equivalents** | **(9,160)** | (3,022) | **(9,626)** | 21,265 | **(10,443)** | (4,426) | **–** | – | **1,269** | (8,505) |
| | | | | | | | | | | |
| Cash and cash equivalents at the beginning of the period | **8,820** | 10,836 | **24,283** | 3,018 | **17,926** | 20,402 | **–** | – | **291** | 9,478 |
| Deconsolidation of Subsidiary | **(140)** | – | **–** | – | **–** | – | **–** | – | **–** | – |
| Foreign exchange | **480** | 1,006 | **(2)** | – | **692** | 1,950 | **–** | – | **6** | (682) |
| **Cash and cash equivalents at the end of the period** | **–** | 8,820 | **14,655** | 24,283 | **8,175** | 17,926 | **–** | – | **1,566** | 291 |

## Note 35: Interest in associates

Set out below are the associates and joint ventures of the Group as at 30 June 2023 which, in the opinion of the directors, are material to the Group. The entities listed below have share capital consisting solely of ordinary shares, which are held directly by the Group. The country of incorporation or registration is also their principal place of business.

| | | % of ownership interest | | % of voting rights | | | Carrying amount | |
|---|---|---|---|---|---|---|---|---|
| | Place of business/ country of | 2023 | 2022 | 2023 | 2022 | | 2023 | 2022 |
| Name of entity | incorporation | % | % | % | % | Classification | $'000 | $'000 |
| OB Capital Coop U.A[1] | Netherlands | 5 | 5 | n/a | n/a | Investment in associates | 6,981 | 5,031 |
| Omni Bridgeway (Fund 1) LLC[2] | USA | 100 | 100 | 100 | 100 | Litigation investment - investment in associates | 56,336 | – |
| Total equity-accounted investments | | | | | | | 63,317 | 5,031 |

1. OB Capital Coop U.A is an associate of the Group and it is acquired through the acquisition of Omni Bridgeway Holding B.V. in November 2019. The entity invests in litigation investments in the Netherlands. The Coop agreement outlines the various powers and rights of responsibilities of the members, includes provisions that provide the Group with significant influence over the entity

2. Omni Bridgeway (Fund 1) LLC is an litigation investment associate of the Group and it is an entity within Fund 1 which invests in litigation investments in the United States. The Group has 100% voting rights subject to a without-cause kick-out right exercisable by GCP effective 31 May 2023, which changed the Group's status from agent.

### (a) Recognition and measurement

An associate is an entity over which the Group has significant influence. Significant influence is the power to participate in the financial and operating policy decisions of the investee, but is not control or joint control over those policies.

Litigation investment associates are investment in associates where the underlying investments in the entity assets either wholly or significantly litigation investments.

The considerations made in determining significant influence are similar to those necessary to determine control over subsidiaries. The Group's investment in its associate are accounted for using the equity method.

Under the equity method, the investment in an associate is initially recognised at cost. The carrying amount of the investment is adjusted to recognise changes in the Group's share of net assets of the associate since the acquisition date. Goodwill relating to the associate is included in the carrying amount of the investment and is not tested for impairment separately.

If existence of an associate is resulted from the loss of control over a former subsidiary of the Group's consolidated financial statements, the associate is initially recognised at the fair value of the retained residual interest held by the Group. The fair value is determined using the methodology of the initial recognition of a financial asset, which represents the present value of the risk-adjusted future potential cashflows to be received by the Group. Since the probability-weighted cashflows are a significant unobservable input, the fair value of the retained residual interest is classified as a level 3 fair value.

## Note 35: Interest in associates (continued)

The following table summarises the quantitative information about the significant unobservable inputs used in the fair value measurements of initial recognition of residual interests in Omni Bridgeway (Fund 1) LLC, which is a former subsidiary of the Group's consolidated financial statements.

| Description | Fair value at 31 May 2023 $'000 | Significant unobservable inputs | Range of inputs | Sensitivity of the input to fair value |
|---|---|---|---|---|
| Residual interest in Fund 1 | 55,950 | Risk-adjusted discount rate | 14% - 24% | Increasing the discount rate by 5% would result in a change in fair value of ($6.813) million. Decreasing the discount rate by 5% would result in a change in fair value of $8.350 million. |
| | | Expected cash flows | 10% | If expected cash flows were 10% higher, the fair value would increase by $11.907 million. If expected cash flows were 10% lower, the fair value would decrease by $12.051 million. |
| | | Expected timing of cash flows | 0 - 6 months | A shift the timing by defer the expected cash flows by 6 months would reduce the fair value by $14.202 million. |

The statement of profit or loss reflects the Group's share of the results of operations of the associate. Any change in Other Comprehensive Income (**OCI**) of those investees is presented as part of the Group's OCI. In addition, when there has been a change recognised directly in the equity of the associate, the Group recognises its share of any changes, when applicable, in the statement of changes in equity. Unrealised gains and losses resulting from transactions between the Group and the associate are eliminated to the extent of the interest in the associate.

The aggregate of the Group's share of profit or loss of an associate is shown on the face of the statement of profit or loss outside operating profit and represents profit or loss after tax and non-controlling interests in the subsidiaries of the associate.

The financial statements of the associate are prepared for the same reporting period as the Group. When necessary, adjustments are made to bring the accounting policies in line with those of the Group.

After application of the equity method, the Group determines whether it is necessary to recognise an impairment loss on its investment in its associate. At each reporting date, the Group determines whether there is objective evidence that the investment in the associate is impaired. If there is such evidence, the Group calculates the amount of impairment as the difference between the recoverable amount of the associate and its carrying value, and then recognises the loss within 'Share of profit/(loss) of an associate' in the statement of profit or loss.

Upon loss of significant influence over the associate, the Group measures and recognises any retained investment at its fair value. Any difference between the carrying amount of the associate upon loss of significant influence and the fair value of the retained investment and proceeds from disposal is recognised in profit or loss.

### (b) Commitments and contingent liabilities in respect of associates

As part of the gain on disposal calculation for Fund 1, an allowance has been made for future costs of managing the fund and requirement for capital commitments.

Apart from those described in Note 30, no other material commitments or contingent liabilities from share of associates.

## Note 35: Interest in associates (continued)

### (c) Summarised financial information for associates

Interest in those associates and joint ventures that are material to the Group for the relevant financial year is provided below:

| | Omni Bridgeway (Fund 1) LLC[1] | | OB Capital Coop U.A | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| | $'000 | $'000 | $'000 | $'000 |
| Income | (2,480) | n/a | (1) | (5) |
| Total expenses | 6 | n/a | 1,629 | 2,075 |
| Operating loss | (2,486) | n/a | (1,630) | (2,080) |
| Equity accounted investment result | – | n/a | 6,894 | 9,904 |
| **Net profit/(loss)** | **(2,486)** | n/a | **5,264** | **7,824** |
| | | | | |
| Share of profit/(loss) in associates and joint ventures | (2,486) | n/a | 263 | (392) |
| Effect of movement in foreign currency | 34 | n/a | 28 | 5 |
| **Net Share of (profit)/loss in associates and joint ventures** | **(2,452)** | n/a | **291** | **(387)** |
| | | | | |
| Current assets | 3,341 | n/a | 296 | 455 |
| Non-current assets | 50,228 | n/a | 136,474 | 99,413 |
| Current liabilities | 51 | n/a | 664 | 750 |
| Non-current liabilities | 57,408 | n/a | – | – |
| **Equity** | **(3,890)** | n/a | **136,106** | **99,118** |
| | | | | |
| Group's share in equity | 56,336 | n/a | 6,981 | 5,031 |
| **Group's carrying amount of the investment** | **56,336** | n/a | **6,981** | **5,031** |

1. The entity was equity accounted for as an investment in associate when the Group lost the control on 31 May 2023, the table includes the financial information of the entity for the periods after this date. The profit or loss and balance sheet of this entity represents the IFRS standalone financial statements of Fund 1, whereas the Group's share in equity is its residual interest that was recognised at fair value at deconsolidation. Refer to Note 34.

2. Included in the net share of profit/(loss) in associates, there is a share of profit of $1.606 million from an associate of the Omni Bridgeway (Fund 1) LLC, which was deconsolidated on 31 May 2023. Refer to (d) below.

### (d) Individually immaterial associates

In addition to the interests in associates disclosed above, the Group also had an interest in an immaterial associate that are accounted for using the equity method. The interest in this immaterial associate is held via the shareholding and control of Omni Bridgeway (Fund 1) LLC, and ceased on 31 May 2023 when the Omni Bridgeway (Fund 1) LLC is deconsolidated.

The carrying amount the immaterial associate was nil at the year end (2022: $6.325 million), and the amount of the Group's share of profit from continuing operations was $1.606 million at year end (2022: $4.744 million). There were no amounts of the Group's share of post-tax profit or loss from discontinued operations or other comprehensive income at the year end (2022: nil).

## Note 36: Related party disclosure

### Transactions with related entities

The following table provides the total amount of transactions that were entered into with related parties for the relevant financial year.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Transactions with Thomson Geer[1] | **55** | 38 |
| Transactions with Omni Bridgeway DARP Cooperatief UA[2] | **1,330** | 1,838 |
| | **1,385** | 1,876 |

1. During the year, the Group obtained legal advice from a legal firm associated with Michael Bowen, Thomson Geer Lawyers of $55,000. The legal advice was obtained at arm's length. The Group engages a number of different law firms for its external legal advice and the relationship with Thomson Geer is not exclusive. Michael Bowen did not participate in any board decisions to appoint external counsel when Thomson Geer is being considered for engagement. Mr Bowen ceased to be a non-executive director on 30 November 2022.
2. During the year, the Group received management fees from OB DARP Cooperatief UA, a related entity of the Group.

### Loans with a related entity

The following table provides the total amount of loans with related parties for the relevant financial year.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Loans with Omni Bridgeway DARP Cooperatief UA[2] | **6,697** | 5,167 |
| | **6,697** | 5,167 |

## Note 37: Auditor's remuneration

The auditor of Omni Bridgeway Limited is BDO Audit (WA) Pty Ltd.

| | Consolidated | |
|---|---|---|
| | 2023 | 2022 |
| | $'000 | $'000 |
| Fees for auditing the statutory financial report of the parent covering the group and auditing the statutory financial reports of any controlled entities | **1,073** | 984 |
| Taxation fees | **813** | 632 |
| | **1,886** | 1,616 |

## Note 38: Events after the reporting date

Apart from that disclosed in this report, no other circumstances have arisen since 30 June 2023 that have significantly affected, or may significantly affect the consolidated entities' operations, the results of those operations, or the consolidated entities state of affairs in the future financial years.

# Directors' Declaration

We state that, in the Directors' opinion:

a. the financial statements and notes of Omni Bridgeway Limited for the financial year ended 30 June 2023 are in accordance with the *Corporations Act 2001*, including:

    i. giving a true and fair view of its financial position as at 30 June 2023 and performance for the year ended on that date; and

    ii. complying with Accounting Standards (including the Australian Accounting Interpretations) and the *Corporations Regulations 2001*;

b. the financial statements and notes also comply with International Financial Reporting Standards as disclosed in the notes to the financial statements; and

c. there are reasonable grounds to believe that the Company will be able to pay its debts as and when they become due and payable.

Signed in accordance with a resolution of directors of Omni Bridgeway Limited pursuant to section 295A of the Corporations Act 2001 for the financial year ended 30 June 2023, on behalf of the directors.

**Michael Kay**
Non-Executive Chairman

**Andrew Saker**
Managing Director & CEO and Chief Strategy Officer – US

Sydney, 22 August 2023

# Independent Auditor's Report



| Tel: +61 8 6382 4600 | Level 9, Mia Yellagonga Tower 2 |
| Fax: +61 8 6382 4601 | 5 Spring Street |
| www.bdo.com.au | Perth, WA 6000 |
| | PO Box 700 West Perth WA 6872 |
| | Australia |

**INDEPENDENT AUDITOR'S REPORT**

To the members of Omni Bridgeway Limited

## Report on the Audit of the Financial Report

### Opinion

We have audited the financial report of Omni Bridgeway Limited (the Company) and its subsidiaries (the Group), which comprises the consolidated statement of financial position as at 30 June 2023, the consolidated statement of comprehensive income, the consolidated statement of changes in equity and the consolidated statement of cash flows for the year then ended, and notes to the financial report, including a summary of significant accounting policies and the directors' declaration.

In our opinion the accompanying financial report of the Group, is in accordance with the *Corporations Act 2001*, including:

(i)     Giving a true and fair view of the Group's financial position as at 30 June 2023 and of its financial performance for the year ended on that date; and

(ii)    Complying with Australian Accounting Standards and the *Corporations Regulations 2001*.

### Basis for opinion

We conducted our audit in accordance with Australian Auditing Standards. Our responsibilities under those standards are further described in the *Auditor's responsibilities for the audit of the Financial Report* section of our report. We are independent of the Group in accordance with the *Corporations Act 2001* and the ethical requirements of the Accounting Professional and Ethical Standards Board's APES 110 *Code of Ethics for Professional Accountants (including Independence Standards)* (the Code) that are relevant to our audit of the financial report in Australia.  We have also fulfilled our other ethical responsibilities in accordance with the Code.

We confirm that the independence declaration required by the *Corporations Act 2001*, which has been given to the directors of the Company, would be in the same terms if given to the directors as at the time of this auditor's report.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

### Key audit matters

Key audit matters are those matters that, in our professional judgement, were of most significance in our audit of the financial report of the current period. These matters were addressed in the context of our audit of the financial report as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters.

BDO Audit (WA) Pty Ltd ABN 79 112 284 787 is a member of a national association of independent entities which are all members of BDO Australia Ltd ABN 77 050 110 275, an Australian company limited by guarantee. BDO Audit (WA) Pty Ltd and BDO Australia Ltd are members of BDO International Ltd, a UK company limited by guarantee, and form part of the international BDO network of independent member firms. Liability limited by a scheme approved under Professional Standards Legislation.



**Impairment of litigation related assets**

| Key audit matter | How the matter was addressed in our audit |
|---|---|
| As disclosed in Notes 11, 12 and 13 to the Financial Report, the Group recognises three distinct litigation investments, which comprises: | Our procedures included, but were not limited to: |

As disclosed in Notes 11, 12 and 13 to the Financial Report, the Group recognises three distinct litigation investments, which comprises:

- Claims portfolio;
- Purchased claims; and
- Intangibles.

Although the assets vary in terms of accounting treatment, the Group evaluates them for potential impairment in a comparable manner, using discounted cash flow models.

As a result, the carrying values are contingent on future cash flows and there is a risk that if these cash flows do not meet the Group's expectations, or if significant estimates and judgements such as the estimated completion dates and/or discount rates change, the assets may be impaired.

This was a key audit matter because it requires significant levels of estimates and judgements and changes in these assumptions could result in a significant change in the carrying values of the litigation related assets.

Our procedures included, but were not limited to:

- on a sample basis, assessing the effectiveness of the Group's controls in relation to the review of carrying values for litigation related assets, including controls over the discounted cash flow models and assumptions applied;

- discussing significant investments with respective Case Investment Managers, in order to understand investment status and assess estimates and judgements made by the Group that impact the discounted cash flow models including litigation completion dates, litigation proceeds, budgeted costs to complete and intention to continue the litigation matter;

- assessing the reasonableness of key assumptions including cash flow forecasts and considering the reliability of previous forecasts;

- using our internal valuation specialists to assess the appropriateness of the discounts rates applied;

- testing the mathematical accuracy of the discounted cash flow models;

- performing sensitivity analysis on key assumptions including cash flow forecasts and discount rates;

- reviewing Board minutes, ASX announcements and other publicly available information to ensure the Group has not decided to discontinue or has been unsuccessful in investments; and

- assessing the adequacy of the related disclosures in Notes 11, 12 and 13 to the Financial Report.



**Carrying value of goodwill**

| Key audit matter | How the matter was addressed in our audit |
|---|---|
| As disclosed in Note 16 to the Financial Report, the Group recognises goodwill in respect to the Fund 6 (OBE Group, EMEA) cash generating unit (CGU).<br><br>The Group is required under Australian Accounting Standard AASB 136 *Impairment of Assets* ("AASB 136"), to perform an annual impairment test of the carrying value of goodwill.<br><br>As a result, the Group's impairment assessment is undertaken using a value-in-use model.<br><br>This was a key audit matter because it requires a high level of estimates and judgements, in particular in estimating future growth rates, discount rates and the expected cash flows of the CGU to which the goodwill and other assets have been allocated. | Our procedures included, but were not limited to:<br><br>• evaluating the Group's CGU identification and the allocation of goodwill and other assets to the carrying value of the CGU based on our understanding of the CGU's business;<br><br>• assessing the reasonableness of key assumptions including cash flow forecasts, considering the reliability of previous forecasts and consistency with discounted cash flow models for the CGU's litigation related assets;<br><br>• comparing the CGU's forecast cash flows to the board approved budget;<br><br>• using our internal valuation specialists to assess the appropriateness of the discount rate applied;<br><br>• performing sensitivity analysis on key assumptions including cash flow forecasts, growth and discount rates;<br><br>• testing the mathematical accuracy of the value-in-use model; and<br><br>• assessing the adequacy of the related disclosures in Note 16 to the Financial Report. |

**Other information**

The directors are responsible for the other information. The other information comprises the information in the Group's annual report for the year ended 30 June 2023, but does not include the financial report and the auditor's report thereon.

Our opinion on the financial report does not cover the other information and we do not express any form of assurance conclusion thereon.

In connection with our audit of the financial report, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the financial report or our knowledge obtained in the audit or otherwise appears to be materially misstated.

If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

**Responsibilities of the directors for the Financial Report**

The directors of the Company are responsible for the preparation of the financial report that gives a true and fair view in accordance with Australian Accounting Standards and the Corporations Act 2001 and for such internal control as the directors determine is necessary to enable the preparation of the financial report that gives a true and fair view and is free from material misstatement, whether due to fraud or error.

In preparing the financial report, the directors are responsible for assessing the ability of the group to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the directors either intend to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

**Auditor's responsibilities for the audit of the Financial Report**

Our objectives are to obtain reasonable assurance about whether the financial report as a whole is free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with the Australian Auditing Standards will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of this financial report.

A further description of our responsibilities for the audit of the financial report is located at the Auditing and Assurance Standards Board website (http://www.auasb.gov.au/Home.aspx) at: https://www.auasb.gov.au/admin/file/content102/c3/ar1_2020.pdf. This description forms part of our auditor's report.



**Report on the Remuneration Report**

**Opinion on the Remuneration Report**

We have audited the Remuneration Report included in pages 36 to 44 of the directors' report for the year ended 30 June 2023.

In our opinion, the Remuneration Report of Omni Bridgeway Limited, for the year ended 30 June 2023, complies with section 300A of the *Corporations Act 2001*.

**Responsibilities**

The directors of the Company are responsible for the preparation and presentation of the Remuneration Report in accordance with section 300A of the *Corporations Act 2001*. Our responsibility is to express an opinion on the Remuneration Report, based on our audit conducted in accordance with Australian Auditing Standards.

**BDO Audit (WA) Pty Ltd**

**Glyn O'Brien**

**Director**

Perth

22 August 2023

# Shareholder information

The information set out below is current as at 31 July 2023.

## (a) Distribution of shareholders

### Ordinary share capital
278,689,725 fully paid ordinary shares are held by 4,170 individual shareholders. All issued ordinary shares carry one vote per share and carry the right to dividends.

### Options
There are no options issued over ordinary shares.

### Share performance rights
17,003,651 share performance rights were issued to 124 rights holders under the Company's Long Term Incentive Plan.

### Distribution of securities
The number of shareholders by size of holding, in each class are as at 31 July 2023:

|  | Number | Fully paid ordinary shares | % of issued capital |
|---|---|---|---|
| 1 – 1,000 | 1,267 | 519,628 | 0.19 |
| 1,001 – 5,000 | 1,516 | 4,069,774 | 1.46 |
| 5,001 – 10,000 | 605 | 4,486,194 | 1.61 |
| 10,001 – 100,000 | 718 | 19,271,817 | 6.91 |
| 100,001 and over | 64 | 250,342,312 | 89.83 |
| | **4,170** | **278,689,725** | **100.00** |

### Non-marketable parcels
There were 385 holders of less than a marketable parcel of ordinary shares.

## (b) Substantial shareholders

The names of the substantial shareholders listed in the Company's register as at 31 July 2023 are:

| Shareholder | Number of ordinary Shares | % of issued capital |
|---|---|---|
| Greencape Capital Ltd. | 22,748,652 | 8.20% |
| Perpetual Investment Management Ltd. | 17,828,487 | 6.40% |
| Amitell Holdings  Pte. Ltd. | 15,048,196 | 5.40% |

## (c) 20 largest holders of quoted equity securities as at 31 July 2023

| Ordinary Shares | Number of ordinary shares '000 | Issued capital % |
|---|---|---|
| 1. HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED | 75,312 | 27.02 |
| 2. CITICORP NOMINEES PTY LIMITED | 49,718 | 17.84 |
| 3. J P MORGAN NOMINEES AUSTRALIA PTY LIMITED | 36,216 | 13.00 |
| 4. BNP PARIBAS NOMS PTY LTD <DRP> | 16,079 | 5.77 |
| 5. NATIONAL NOMINEES LIMITED | 15,320 | 5.50 |
| 6. HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED <GSCO CUSTOMERS A/C> | 12,681 | 4.55 |
| 7. UBS NOMINEES PTY LTD | 5,228 | 1.88 |
| 8. BNP PARIBAS NOMS PTY LTD <GLOBAL MARKETS DRP> | 4,814 | 1.73 |
| 9. HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED - A/C 2 | 3,743 | 1.34 |
| 10. CPU SHARE PLANS PTY LTD <OBL LTI UNALLOCATED A/C> | 3,401 | 1.22 |
| 11. BNP PARIBAS NOMINEES PTY LTD <AGENCY LENDING DRP A/C> | 2,953 | 1.06 |
| 12. HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED-GSCO ECA | 2,481 | 0.89 |
| 13. CITICORP NOMINEES PTY LIMITED <COLONIAL FIRST STATE INV A/C> | 2,295 | 0.82 |
| 14. BNP PARIBAS NOMINEES PTY LTD <IB AU NOMS RETAILCLIENT DRP> | 1,704 | 0.61 |
| 15. MR PETER FREDERICK PHILLIPS + MRS ALICE SAU HAN PHILLIPS <PHILLIPS INVESTMENT ACCOUNT> | 1,474 | 0.53 |
| 16. MR MATTHEW BRENDAN RYLAND | 1,184 | 0.42 |
| 17. FIRST SAMUEL LTD ACN 086243567 <ANF ITS MDA CLIENTS A/C> | 1,078 | 0.39 |
| 18. BNP PARIBAS NOMINEES PTY LTD ACF CLEARSTREAM | 1,053 | 0.38 |
| 19. MR ALEXANDER PAUL CHANG | 850 | 0.30 |
| 20. HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED <NT-COMNWLTH SUPER CORP A/C> | 825 | 0.30 |
| | 238,409 | 85.55 |

## (d) Options as at 31 July 2023 – unquoted

There are no options issued.

## (e) Securities subject to escrow

On 20 July 2022, Mr. Guillaume Leger was issued 201,059 performance rights in relation to his appointment as Omni Bridgeway's Global Chief Financial Officer. On 14 July 2023, 70,306 ordinary fully paid shares were issued to Mr Leger following satisfaction of the performance conditions for the performance period from commencement of employment to 30 June 2023 (Tranche 1) and are subject to a 12-month voluntary escrow agreement from the date of issue.

## US ownership restriction

The ordinary shares of Omni Bridgeway are subject to ownership restrictions applying to residents of the United States.

The Shares have not been registered under the US Securities Act of 1933 or the securities laws of any state or other jurisdiction of the United States. In addition, OBL has not been registered under the US Investment Company Act of 1940 in reliance on an exemption from registration.

Accordingly, the Shares may not be offered or sold in the United States or to, or for the account or benefit of US Persons except in accordance with an available exemption from, or a transaction not subject to, the registration requirements of the US Securities Act, the US Investment Company Act and applicable US state securities laws.

In order to qualify for an exemption under the US Investment Company Act, the constitution of OBL provides that where a holder is an Excluded US Person:

- OBL may refuse to register a transfer of Shares to that Excluded US Person; and

- The Excluded US Person may be requested to sell such person's Shares and, if the Excluded US Person fails to do so within 30 business days, to be divested of such Shares and to receive the proceeds of sale (net of transaction costs, including any applicable brokerage) as soon as practicable after the sale.

In addition, OBL's constitution provides that a holder may be required to complete a statutory declaration in relation to whether they (or any person on whose account or benefit it holds Shares) are an Excluded US Person. Any holder who does not comply with such a request will be deemed to be an Excluded US Person.

The Shares are issued on terms under which each holder who is or becomes an Excluded US Person agrees to the above terms and irrevocably appoints OBL as that holder's agent and attorney to do all acts and things and execute all documents which OBL considers necessary, desirable or reasonably incidental to effect the above actions.

## Shares issued during the year

On 14 July 2023, the Company issued 70,306 shares to Mr Guillaume Leger following satisfaction of the performance conditions for the performance period from commencement of his employment to 30 June 2023 (Tranche 1).

On 7 December 2022, the Company issued 7,755,446 shares to the vendors of OBE relating to the 2019 acquisition in satisfaction of the third tranche of variable deferred consideration and second and final tranche of deferred consideration.

On 30 August 2022, the Company issued 2,768,359 shares relating to the FY20 LTIP vesting.

## Share options – unissued shares

As at 31 July 2023 there were 17,003,651 share performance rights on issue (2022: 15,929,183)

# Corporate information

This annual report covers both Omni Bridgeway Limited as an individual entity and the consolidated entity comprising Omni Bridgeway Limited and its subsidiaries. The Group's functional and presentation currency is AUD ($).

A description of the Group's operations and of its principal activities is included in the review of operations and activities in the Directors' Report. The Directors' Report is not part of the Financial report.

## Directors

| | |
|---|---|
| Michael Kay | Non-Executive Director and Chairman |
| Andrew Saker | Managing Director & CEO and Chief Strategy Officer – US |
| Raymond van Hulst | Executive Director, Managing Director and Co-Chief Investment Officer EMEA |
| Michael Bowen | Non-Executive Director (retired 30 November 2022) |
| Karen Phin | Non-Executive Director |
| Christine Feldmanis | Non-Executive Director |
| Michael Green | Non-Executive Director (formally appointed 28 April 2023) |

## Company Secretary

Jeremy Sambrook

## Registered office and principal place of business in Australia

Level 7, 35 Clarence Street
Sydney NSW 2000

Phone: +61 (0)2 8223 3567
Fax: +61 (0)2 8223 3555

## Solicitors

**DLA PIPER**
Level 9, 480 Queen Street
Brisbane QLD 4000

**THOMSON GEER**
Level 27, Exchange Tower
2 The Esplanade
Perth WA 6000

## Share registry

**COMPUTERSHARE**
Level 11, 172 St Georges Terrace
Perth WA 6000

## Auditors

**BDO AUDIT (WA) PTY LTD**
Level 9
Mia Yellagonga Tower 2
5 Spring Street
Perth WA 6000

## Bankers

**NATIONAL AUSTRALIA BANK LIMITED**
3/2 Carrington Street
Sydney NSW 2000

## Internet address

**www.omnibridgeway.com**

The Company is listed on the Australian Securities Exchange with Sydney, Australia as its home exchange. Its ASX ticker symbol is "OBL" and its shares were trading as at the date of this report.

# Glossary

Throughout Omni Bridgeway Limited's (**OBL, Company, Parent**) publicly available information, the following terms have the meanings detailed in this glossary which shall be updated from time to time:

| | |
|---|---|
| **AASB** | Australian Accounting Standards Board. |
| **Addressable Market** | OBL's estimate of the annual amount spent by claimants on external costs of dispute resolution (excluding enforcement) that could be addressed by OBL's litigation funding service offering. |
| **Adverse cost** | The cost that a losing party to litigation (in certain jurisdictions only) is required to pay to the winning party as compensation for the legal costs they have incurred in the process. |
| **After the event (ATE) Insurance** | Insurance cover to protect against adverse cost exposure. |
| **AFSL** | Australian Financial Services Licence. |
| **ALFA** | Association of Litigation Funders of Australia. |
| **American Waterfall** | The waterfall refers to the order in which investment proceeds in a fund are distributed between Fund participants. Under an American-style distribution performance fees are calculated by reference to completed investments only. |
| **Americas** | The geographic region of North and South America. |
| **APAC** | The geographic region incorporating Asia and the Pacific Region including Australia and New Zealand. |
| **ASX** | Australian Securities Exchange. |
| **CAGR** | Compound annual growth rate. |
| **Committed capital / Commitments** | The amount of funding that has been contracted to be provided by the Group to a litigation investment under a signed funding arrangement. |
| | It is equal to the total amount of capital to be provided to external parties that is either (i) committed to investments where there is a capped amount; or (ii) the estimated budgeted amount to run the investment to completion where the investment is open–ended It does not include co-funder contributions, possible overheads to be capitalised; |
| | Unless part of the investment thesis it does not include possible adverse costs that may become payable if the underlying litigation loses. For ongoing Fund 6 investments it includes possible adverse costs that may become payable (where applicable). |
| | Levels are reviewed and updated where necessary. |
| **Capital deployed** | Is equal to the total external expenditure on investments. |
| | For completed investments it includes any net adverse costs. It does not include co-funder contributions. |
| **Capitalised overheads** | Internal costs (including borrowing costs and direct staff costs) that are incurred in relation to Investments that are not expensed in the period they were incurred but added to the investment carrying value and recognised through the profit and loss in line with the completion of each respective investment. |
| | Capitalisation occurs at the OBL and consolidation level, not within each Fund and does not affect portfolio or Fund performance, waterfall or fees. |
| **Completed investments / Completion** | Refers to merits investments where the underlying litigation has progressed to a state where there no further risk to the legal result as the litigation has finalisation by either settlement, judgement, or arbitrator determination, for or against the funded claimant, notwithstanding that such finalisation may be conditional upon certain matters such as court approval. For enforcement investments completion is that the point where there is no further recovery action planned. |
| **Direct balance sheet** | Relates to investment of the Group that are not held via a Fund. |
| **CGU** | Cash-generating unit which is defined as the smallest group of assets that generates largely independent cash inflows. |
| **Distressed Asset Recovery Program (DARP)** | A strategic program of the World Bank's International Finance Corporation to reduce the effects of poverty in emerging markets by preventing the loss of assets and allowing access to formal credit, while helping to preserve jobs. Refer to Fund 7. |
| **DRP** | Dividend Reinvestment Plan. |
| **ELFA** | European Litigation Funders Association. |
| **EMEA** | The geographic region incorporating Europe, Middle East and Africa where the Group invests and offers its products and services. |
| **Enforcement investment** | Refers to investments where the underlying dispute has a debt &/or judicial finding that is not being honoured and requires action to be collected. |
| **ESG** | Environmental, social and governance. |
| **EPS** | Earnings per share. |

| | |
|---|---|
| **Estimated Portfolio Value (EPV)** | OBL's estimate of the value that may be achieved from an investment's underlying litigation from time-to-time. |
| | For an investment where the funding entity earns: |
| | i. a percentage of the resolution proceeds arising from the underlying litigation or enforcement as a funding commission, EPV is the estimate of the investment's recoverable amount after considering the perceived capacity of the defendant to meet the claim and any other pertinent factors. Such amount is not necessarily the amount being claimed, nor is it an estimate of the return to the Group if the investment is successful. It includes the amount to the funded client and to the Group. It does not include co-funder portion |
| | ii. a funding commission calculated as a multiple of the capital deployed; EPV is arrived at by taking the estimated potential income from the investment to the funding entity and grossing this up to an EPV using the Long–Term Conversion Rate at the time estimation. It does not include co-funder portion, or |
| | iii. a funding commission calculated on a combination of the above bases or on an alternative basis, arriving at the EPV may utilise one of the above methodologies, or a hybrid construct, or an alternative methodology depending upon the components of the funding commission. |
| | OBE Group's EPV has been estimated on a conceptually consistent basis noting that, enforcement case investments may have a multi–layered approach from a timing and value perspective. |
| | Regardless of how calculated, an EPV is an estimate and is subject to change over time for a number of reasons, including, but not limited to, changes in circumstances and knowledge relating to an investment or the defendant(s) perceived capacity to meet the claim, partial recovery and, where applicable, ability to enforce or recover. |
| | Possible EPVs are reviewed and updated where necessary. |
| **EPV conversion rate** | Refer to income conversion rate. |
| **European Waterfall** | The waterfall refers to the order in which investment proceeds in a fund are distributed between participants. Under an European-style distribution, performance fees are calculated by reference to all fund investments and not just completed investments. The manager will not participate in a portion of profits/performance fee/carry until the full amount of investor's capital and preferred return have been fully satisfied. |
| **Excluded US Person** | Means a holder of Shares (or a person who seeks to be registered as a holder of Shares) whom the directors of OBL have determined (i) is a US Person who is not a Qualified Purchaser or a Knowledgeable Employee or (ii) holds or will hold Shares for the account or benefit of any US Person who is not a Qualified Purchaser or a Knowledgeable Employee |
| **First Generation Fund (s)** | OBL's Fund 1, & Fund 2&3; which were established by the Group in 2017 with generally consistent terms. |
| **Fourth Generation Fund** | OBL's Fund 8 as raised in 2022. |
| **Fund Commitments** | The amount of capital agreed to be provide to an OBL Fund from OBL and external investors. |
| **Funds** | Means funds, or fund like structures, that OBL manages, advises and invests into. It includes Fund 1, Fund 2&3, Fund 4, Fund 5, Fund 6, Fund 7 and Fund 8. |
| **Funded investments** | Refers to investments where the Group has entered an unconditional binding contract. |
| **FUM /Funds under Management Commitments** | The aggregate amount of Fund commitments (whether called or uncalled) for all the OBL funds that are in operation at any point in time. |
| **Funds deployed** | Refer to Capital deployed. |
| **Fund 1** | Funding structure for Litigation investments in the US established in 2017. A participation in the fund was sold in May 2023 and is now deconsolidated from the group. OBL continues to manage the Fund. |
| **Funds 2&3** | Funding structure for Litigation investments in the RoW established in 2017 with Fund commitments of AUD 189 million. |
| **Fund 4** | Funding structure for Litigation investments in the US established in 2019 with Fund commitments of USD 500 million. |
| **Fund 4 (series II)** | Potential Funding structure to follow-on from Fund 4 with same mandate. |
| **Fund 5** | Funding structure for Litigation investments in the RoW established in 2019 with Fund commitments of USD 500 million. |
| | The Fund commitments from external investors are in structures that are not consolidated within the Group. OBL's 20% interest is via a parallel investing vehicle that is consolidated. |
| | In certain disclosures we specifically include 100% of Fund 5; this approach aggregates the external investors' interests with those of OBL to facilitate direct comparison between all Funds (as the other Funds are consolidated & hence disclosed at 100%). |
| **Fund 5 (series II)** | Potential funding structure for Litigation investments in the RoW. |
| **Fund 6** | Funding structure for investments focused on EMEA purchased as part of OBE Group in 2019. Established in 2017 with Fund commitments of EUR 188 million |
| **Fund 7** | A joint venture with the IFC/World Bank to facilitate DARP. Fund 7 is designed to invest in non-performing loans in the MENA region. Established in 2019 with Fund commitments of USD 100 million (including USD 50 million from Fund 6). |

| | |
|---|---|
| **Fund 8** | Funding structure established in 2022 focused on investing up to EUR 150 million in global enforcement investments. |
| **IC** | Investment Committee(s) – OBL's ultimate investment decision making bodies involving internal & external members. |
| **IC approved / conditionally funded** | Refers to investments that are approved by the Group's internal investment process but have not reached an unconditional status. This may relate to the state of the funding contract, or book build, loss quantification, discovery or other evidence requirements. |
| **ICC** | International Chamber of Commerce. |
| **IFRS** | International Financial Reporting Standards. |
| **ILFA** | International Legal Finance Association. |
| **IMF** | IMF Bentham Limited and its Group, now known as OBL following a name change in 2020. |
| **Implied Embedded Value (IEV)** | IEV is the product of multiplying the EPV by the LTCR. IEV is formulaic calculation of the gross proceed value that may possibly be generated from the portfolio of Funded investments at any point of time based upon its EPV and the group's historic performance. |
| | The LTCR is used for all IEV calculations notwithstanding that an EPV conversion rate of a particular fund may vary, sometimes materially from the LTCR. The smaller data set of a fund level EPV conversion rate makes that measure inherently more volatile than the global LTCR. |
| | It is important to note that IEV is not a forecast or estimate of future income by Omni Bridgeway itself as this does not account for the structure and return arrangements of Omni Bridgeway for each fund. |
| | IEV is instead a statement of the amount of gross proceeds which would be generated if each investment in the portfolio were to complete for an amount equal to the LTCR of the present EPV. Future performance, including the actual conversion rate realised, may exceed, or fall below historic performance of the LTCR. |
| **Income conversion rate** | Is the rate that EPV of completed investments converts to income for any period. |
| | It Includes investments that fully completed in the period and the total income recognised over the investments' life and excludes partial completions in the period. |
| | This rate includes consideration of lost investments. |
| **Investment Committee (IC) (s)** | Its members comprise both OBL executives and external appointees. |
| **Investment commitment** | Refer to committed capital/commitments. |
| **Income v revenue terminology** | Income, revenue and proceeds are generally used interchangeably for realised sums on litigation investments regardless of how IFRS may classify the assets and its consequential P&L disclosure. |
| **Income yet to be recognised** | Is the estimated value of income that may be generated from investments that are substantially complete from a litigation perspective at that point in time but have not fully satisfied revenue recognition accounting standards and our policies. It is subject to change and relates to substantially completed investments with conditional settlements or judgements on appeal which may be recognised in future periods. |
| **Internal rate of return (IRR)** | Is a discount rate that makes the net present value (NPV) of investment flows equal to zero in a discounted cash flow analysis. It is calculated on aggregated underlying journal entries for each completed case. Calculation includes losses and adverse costs but excludes consideration of capitalised overheads, operating overheads, and withdrawals. |
| | The IRR from completed investments may vary materially over time. |
| | By providing this historical information, OBL has not been and is not now in any way providing earnings guidance for future periods. |
| **Investment committed capital** | Is the amount of funding that has been contracted to an investment under a signed funding arrangement. |
| | It is equal to the total capital either (i) committed to investments where there is a capped amount; or (ii) the estimated budgeted amount to run the case to completion of hearing where the investment is open-ended, translated to Australian dollars at the foreign exchange spot rate prevailing on the reporting date. It does not include possible overheads to be capitalised. |
| | It does not include possible adverse costs that may become payable if a case loss. For ongoing Fund 6 investments it includes possible adverse costs that may become payable (where applicable). |
| | Commitment levels are reviewed and updated where necessary. |
| **Invested capital** | refer to Capital deployed |
| **Knowledgeable Employee** | As per the SEC's Rule 3c-5 under the US Investment Company act of 1940, Knowledgeable Employee with respect to any Covered Company means any natural person who is: (i) An Executive Officer, director, trustee, general partner, advisory board member, or person serving in a similar capacity, of the Covered Company or an Affiliated Management Person of the Covered Company. |
| **LatAm (Latin America)** | The geographic region spanning Central and South America. |

| | |
|---|---|
| **Long Term Conversion Rate (LTCR)** | Is the rate of Income conversion that the group has experienced on all completed investments over its life. |
| | Whilst noting that past performance is not necessarily an indication of future performance, past performance indicates that the Group's litigation funding investments (excluding OBE Group investments) have generated average gross income of approximately 15% of EPV at the at the time of completion. |
| **LTIP** | Long-Term Incentive Plan. |
| **Malus and clawback event provisions** | These are provisions whereby participants in the LTIP may in the event of certain specified conduct such as fraud, forfeit all or a portion of their performance rights or the resulting shares or be required to repay all or a portion of their sale proceeds from such securities. |
| **Managed Investment Scheme (MIS)** | An investment structure regulated under Australian Corporation Law regulations. |
| **Management fees** | Management fees are received for the provision of investment management services provided and are paid quarterly in arrears calculated on the net invested capital. |
| **MENA** | Middle East & North America. |
| **Merits investment** | Refers to investments where the underlying dispute involves ongoing questions about facts, damages or legal outcome and there is a risk around a judicial decision. |
| **MOIC** | Multiple on invested capital. |
| **NCI** | Non-controlling interest. |
| | This represents the interests of external Fund investors in funds that are consolidated within the Group, in accordance with each of the respective Funds' return waterfall. |
| **OBE Group** | Omni Bridgeway Holdings BV and subsidiaries; it includes Fund 6 and Fund 7. |
| **OBL** | Omni Bridgeway Limited (ABN 45 067 298 088). |
| **OCA** | OBL On-line Client Administration Proprietary Database. |
| **Other costs** | Includes unrecoverable due diligence costs and for Funds 2&3 and Fund 5 it additionally includes the cost of the After–the–Event insurance policy premium. |
| **Performance fees** | OBL is entitled to be paid a performance fee in connection with the management of each investment subject to the IRR generated. These are paid out of proceeds arising from the realisation of an investment. |
| **Possible completion periods (PCP)** | The possible completion period is the current estimate of the period in which an investment may finalised. It is not a projection or forecast. An investment may finalise earlier or later than the identified period for various reasons. |
| | For enforcement investments, it may be split across multiple possible completion periods. There are a variety of reasons for this which are all reflective of the nature of enforcement investments, for example there may be multiple underlying actions with a commensurate number of completions, or a single completion with a tranched settlement payment structure. |
| | PCP is a dynamic concept and is subject to regular review and updating to take account of the circumstances of the underlying investment. It is to be expected that the PCP for some investments within the portfolio will be adjusted at each reporting date |
| | PCP is not necessarily the same as anticipated IFRS income recognition period governing income recognition rules.or all investments, it may not follow that the financial result will be accounted for, nor that cash will be collected, in the year of finalisation. |
| **PPA** | Purchase price adjustment is the adjustment in value ascribed to the investments purchased with OBE compared to their carrying cost at the time of the business combination in 2019. |
| | Adjustment occurs at the OBL and consolidation level, not within OBE Group and does not affect portfolio or Fund performance, waterfall or fees. |
| **Principle protection cover** | Insurance cover to protect against risk of losing the Capital deployed to an investment. |
| **Qualified Purchaser** | Has the meaning given in Section 2(a)(51) of the US Investment Company Act of 1940 and the rules and regulations of the US Securities and Exchange Commission. |
| **Resolution Sum** | Means the total amount of any money, services, benefits and/or any in-kind assets that becomes due or is collected in accord with the underlying litigation or enforcement. It is before allowing for any amounts due to the funder, lawyers or other advisers or participants. The funder earns a share of this Resolution sum in accord with the funding arrangements. |
| **Rest of world (RoW)/ non–USA** | includes all regions, excluding the United States of America, in which OBL has or may have investments, LatAm. |
| **Return on invested capital (ROIC)** | Is the ratio of profit made above the investment cost is calculated on completed investments across their entire life (not on an annualised basis) |
| | Unless expressly stated to the contrary, it excludes consideration of capitalised overheads, operating overheads, and withdrawals from investments. |
| | It is calculated as gross investment income less all total expenditure (including any adverse costs), divided by total investment expenditure (excluding any adverse costs). |
| **SIAC** | Singapore International Arbitration Centre |
| **Second Generation Fund** | OBL's Fund 4 and Fund 5 - established by the Group in 2019 with generally consistent terms. |
| **Secondary market sale** | A sale (in whole or part) of an existing litigation investment to another litigation investor at a point during the life of the investment before completion. |

| | |
|---|---|
| **SPV** | Special purpose vehicle |
| **STIP** | Short-Term Incentive Plan |
| **Success rate** | Refers to % of investments where the underlying litigation has completed in a manner that causes the funder to have received more that it deployed. |
| **Success – legal** | Refers to investments where the underlying litigation has completed to the benefit of the funded party. |
| **Success – financial** | Refers to investments where the underlying litigation has completed in a manner that causes the funder to have received more that it deployed. |
| **TFR** | Total Fixed Remuneration |
| **Third Generation Fund / Purchased fund** | OBL's Fund 6 and Fund 7; which were established by OBE group and acquired as part of the 2019 acquisition of that group by IMF |
| **TSR** | Total shareholder return. |
| **US Person** | Any natural person resident in the United States is a US person according to Rule 902(k)(1)(i) of Regulation S. In C&DI 276.01, the SEC staff clarified that a person that has permanent resident status in the US (a so-called Green Card holder) is presumed to be a US resident for purposes of Regulation S. |
| **Withdrawal** | Refers to investments where the funder has ceased funding before the underlying litigation has completed. |
| **$ weighted average** | Is the average of results allowing for the respective relative AUD values of the sample inputs. |

## Total addressable market information sources – pages 16-17

1. US: Thomas, Brigette, Industry Research Reports United States 54111, "Law Firms in the US", IBISWorld, January 2023, pp 8, 10 / Thomson Reuters Institute and Georgetown Law Center on Ethics and the Legal Profession, "2023 Report on the State of the Legal Market", Thomson Reuters Institute and Georgetown Law Center on Ethics and the Legal Profession January 2023 p 25.

2. Canada: Thomas, Brigette, Industry Research Reports Canada 54111CA, "Law Firms in Canada", IBISWorld, May 2023, p 9.

3. UK: IRN Legal Reports, "UK Legal Services Market Trends Report 2023", March 2023 p 5 / Lythe, Oliver, Industry Research Reports United Kingdom M69.100, "Legal Activities in the UK", IBISWorld, July 2023 p 7.

4. Europe: MarketLine Industry Guide, Reference MLIG230001-01, "Legal Services Global Industry Guide 2018-2027", Marketline, July 2023, p 54.

5. Asia: MarketLine Industry Guide, Reference MLIG230001-01, "Legal Services Global Industry Guide 2018-2027", Marketline, July 2023, p 39 and Marketline Legal Services data.

6. Australia: Gannon, Darcy, Industry Research Reports Australia M6931, "Legal Services in Australia", IBISWorld, February 2023, p 9 / Thomson Reuters Institute and The University of Melbourne, "2022 Australia: State of the Legal Market Report", Thomson Reuters & University of Melbourne, August 2022, p 8.

7. NZ: Kyriakopoulos, Arthur, Industry Research Reports New Zealand M6931NZ, "Legal Services in New Zealand", IBISWorld, September 2022, pp 8, 9.

# Non-IFRS financial information and disclosure

**Non-IFRS financial information** *included in OBL's Annual (and Half-year) Report, associated result presentations, quarterly investment portfolio announcement and other materials has been prepared in accordance with ASIC Regulatory Guidance 230 – Disclosing Non-IFRS financial information, issued December 2011.*

Such information has not been audited or reviewed.

Non-IFRS financial information is financial information that is presented other than in accordance with all relevant accounting standards. The Group believes that given the unique nature of its business the inclusion of non-IFRS information is useful for investors and other users. In our disclosures it includes, EPV, IEV, LTCR, commitment, deployed, completion, PCP, preferred return, income yet to be recognised, investment income and other terms be-spoke to OBL. In certain instances, it is simply redisplaying IFRS information differently (e.g. "cash table" or "completion table" is readily reconcilable to the IFRS disclosures.)

Whilst our statutory financial reports provide historical financial information that are prepared in accordance with accounting standards and other financial reporting requirements of the Corporations Act and have the objective of ensuring consistent and comparable reporting of historical financial performance, position and cash flows over and between entities; our Non-IFRS material contains information aimed to assist in informed assessment of the Group's operations, financial position, business strategies and prospects. It is provided to more fully explain the performance and financial position of the Group so as to provide an understanding of the underlying business and the drivers of profit.

The Group's non-IFRS financial information is calculated consistently from period to period; is unbiased and does not remove 'bad news'. Definitions and assumptions around calculations, are provided as appropriate. Where such information is a re-presentation, re-classification or a subset of IFRS material, the identifiable IFRS components are provided in order to prove a link to the statutory financial reports.

The primary rationale for the majority of our non-IFRS information is to provide an indicative view of the size, value and diversification of the Group's litigation investments (however accounted for); our past economic performance regarding litigation investments and the interplay between OBL and NCI attribution. We feel that this is necessary due to the complex (& not readily understood or comparable) nature of our accounting and structural treatment. This is amplified by the overriding requirement of most of our litigation investments being required to be carried at cost (less any impairment).

Additionally, in certain disclosures we include 100% of Fund 5; this approach aggregates the external investors' interests with those of OBL to facilitate direct comparison between all Funds (as the other Funds are consolidated & hence disclosed at 100%).

# Assumptions relating to the provisional attribution of implied embedded value, estimated management fees and potential performance fees

## The attribution of implied embedded value (IEV) between OBL equity and non controlling interests (NCI) has been prepared based upon the following underlying assumptions:

- All unconditionally funded investments in the Group's investment portfolio at the date stated (**Portfolio Investment(s)**) complete in the selected Possible Completion Period (**PCP**).

- All Portfolio Investments are completed at their full estimated portfolio value (**EPV**).

- The income received by the Omni Bridgeway funding entity upon the completion of a Portfolio Investment reflects the long term conversion rate (**LTCR**) (which includes losses) and hence equals the full IEV of an investment.

- The residual capital to be deployed in Funds 2&3 is deployed in equal portions during FY24 and FY25.

- For Funds 4 and 5 the attribution is split solely in proportion to capital commitments.

- For Fund 6 the attribution to OBL equity reflects the historic blended average proportion of proceeds received by OBL equity (excluding performance fees).

- FX rates are assumed to remain constant across the periods.

- Performance fees in Funds 4, 5 and 6 have been excluded from the attribution to OBL and hence any performance fees earned will see an IEV attribution shift from NCI to OBL equity.

## The sensitivity analysis provided uses the following assumptions:

- IEV is adjusted to reflect variations in the income conversion rate from the LTCR of 15%. The selected sensitivity rates are 10% and 20%.

- EPV of material impaired investments are excluded from EPV with commensurate flow-on to IEV and attribution.

- PCP on all Portfolio Investments is delayed by 12 months. Duration risk has traditionally been addressed through a time based pricing escalator. Historically these capped out at a certain level, leaving the Group exposed to further delays. We have sought to address the risk by incorporating some additional IRR protection provisions. The 12 month delay sensitivity does not incorporate the effects of these duration protections and assumes the income is the IEV at whatever time it is received.

## Estimated portfolio value (EPV) assumptions:

- EPV includes all Portfolio Investments, irrespective of impairment provided, the Group believes there are positive prospects of ultimate success.

- Conditionally funded and IC approved investments are not included in the EPV.

## Possible completion period (PCP):

- PCP is a dynamic concept, subject to regular review to take account of each investment's circumstance

- It is to be expected that the PCP for some investments will be adjusted at each reporting date.

- PCP is not necessarily the same as anticipated IFRS income recognition period.

## Estimated management fee assumptions:

- Funds 4 and 5 earn management fees of up to 2.15% of external capital deployed as well as additional service fees.

- Includes Fund 6 management and servicing contribution which is recognised as an equity contribution and anticipated service fees from Fund 8.

- This approximation of management fees assumes that the net deployed capital grows in FY24 by approximately 17%. In practice, net deployed capital may vary over a given period, including delays or accelerations of investment completions or expenditure of investment budgets.

## Potential performance fee assumptions:

- To determine the potential performance fees in Fund 4 and Fund 5, it is assumed that:

  - the income received by the applicable Omni Bridgeway funding entity equals the full IEV of an investment.

  - investments complete in line with the Group's historical ROIC which is used to divide the IEV between the return of investor capital and the portfolio investment profit upon which performance fees are payable.

- The respective Fund 4 and Fund 5 performance fee waterfalls are then used to calculate the potential range of performance fees depending upon the applicable IRR achieved across the relevant investment portfolios.

- Past performance is not necessarily an indicator of future performance. This analysis is based on the hypothetical scenario of Fund 4 and Fund 5 investments completing at a normalised EPV conversion rate of 15% to their respective EPV at 30 June 2023, at an assumed ROIC. In practice, the portfolios will complete over multiple time periods with metrics different to those assumed.

**Disclaimer**

None of the content in the Omni Bridgeway Limited (OBL) Annual Report is an offer to sell, or a solicitation of an offer to buy, any securities of OBL or any other company affiliated with OBL. In addition, nothing herein should be construed as an offer to buy or sell, nor a solicitation of an offer to buy or sell, any security or other financial instrument, or to invest assets in any account managed or advised by OBL or its affiliates. This Annual Report is for the use of OBL's public shareholders and is not an offering of any OBL private fund.


**OMNI BRIDGEWAY**

## Americas

**Chicago**
+1 872 260 2057

500 West Madison Street
Suite 1000
Chicago IL 60661
United States

**Dallas**
+1 212 488 5331

United States

**Houston**
+1 713 965 7919

LyondellBasell Tower
1221 McKinney Street
Suite 2860
Houston TX 77010
United States

**Los Angeles**
+1 213 550 2687

555 W. Fifth Street
Suite 3310
Los Angeles CA 90013
United States

**Miami**
+1 786 891 2228

United States

**Minneapolis**
+1 612 488 9211

60 South 6th Street
Suite 2800
Minneapolis MN 55402
United States

**New York**
+1 212 488 5331

437 Madison Avenue
36th Floor
New York NY 10022
United States

**San Francisco**
+1 415 231 0363

50 California Street
Suite 2930
San Francisco CA 94111
United States

**Washington, D.C.**
+1 771 213 5181

2101 L Street, N.W.
Suite 925
Washington, D.C. 20037
United States

**Montreal**
+1 514 257 6971

60 rue St-Jacques
Bureau 401
Montréal QC H2Y 1L5
Canada

**Toronto**
+1 416 583 5720

250 The Esplanade
Suite 127
Toronto ON M5A 1J2
Canada

**Montevideo**
+1 514 257 6971

Uruguay

## Asia Pacific

**Melbourne**
+61 3 9913 3301

Level 3
Bourke Place
600 Bourke Street
Melbourne VIC 3000
Australia

**Perth**
+61 8 9225 2300

Level 10
66 St Georges Terrace
Perth WA 6000
Australia

**Sydney**
+61 2 8223 3567

Level 7
35 Clarence Street
Sydney NSW 2000
Australia

**Hong Kong**
+852 3978 2629

Level 27
World-Wide House
19 Des Voeux Road Central
Central, Hong Kong

**Singapore**
+65 6813 2647

Level 13-03
6 Battery Road
Singapore 049909

**Auckland**
+64 277 470 369

Commercial Bay Tower
Level 17
11-19 Customs Street
West Auckland 1010
New Zealand

## Europe,
## Middle East & Africa

**Amsterdam**
+31 70 338 4343

Schiphol Boulevard 121
1118 BG Schiphol
Amsterdam
The Netherlands

**Cologne**
+49 221 801155-0

Gereonstr. 43-65
50670 Cologne
Germany

**Geneva**
+41 22 818 6300

Rue de la Rôtisserie 4
1204 Geneva
Switzerland

**London**
+44 203 968 6061

Holborn Gate
330 High Holborn
London WC1V 7QH
United Kingdom

**Madrid**
+31 70 338 4343

Spain

**Milan**
+39 339 448 3907

Via Fatebenefratelli, 5
20121 Milano MI
Italy

**Paris**
+33 6 5159 4359

31 rue du Colisée
75008 Paris
France

**Dubai**
+971 4 514 4608

Unit 1905, Level 19
Index Tower
Dubai International
Financial Centre
507152 Dubai
United Arab Emirates